Suzanne S. Storm (State Bar No. 229003)
sstorm@attleseystorm.com
Diane V. Weifenbach (State Bar No. 162053)
dweifenbach@attleseystorm.com
ATTLESEY | STORM, LLP
2552 Walnut Avenue, Suite 100
Tustin, CA 92780
Tel: (714) 508-4949
Fax: (714) 508-0015

FILED
CLERK, U.S. DISTRICT COURT
JUL 28 2011
3:41
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

Attorneys for Defendants MARIX SERVICING, LLC, erroneously named as MATRIX SERVICES and ASSURED LENDER SERVICES, INC.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

KATHRYN O. SMITH and MICHAEL W. BALL,

Plaintiffs,

vs.

WELLS FARGO BANK, N.A.; MATRIX SERVICES; FIDELITY NATIONAL TITLE INS., CO.; ASSURED LENDER SERVICES INC., and DOES 1 through 100, inclusive,

Defendants.

CASE NO.: CV 11-6256-CAS (MANx)

**NOTICE OF REMOVAL OF ACTION TO FEDERAL COURT UNDER 28 U.S.C §1441(b) [FEDERAL QUESTION]**

**TO THE CLERK OF THE ABOVE-ENTITLED COURT:**

**PLEASE TAKE NOTICE** that Defendant MARIX SERVICING LLC erroneously named as Matrix Services ("MARIX" or "Defendant") hereby removes to

this Court the state court action described below pursuant to 28 U.S.C. Section 1441(b) et seq.

1. On or about June 20, 2011, Plaintiffs KATHRYN O. SMITH and MICHAEL W. BALL ("Plaintiffs") filed a Complaint in the Superior Court of the State of California in and for the County of Los Angeles styled *Smith, et al. v. Wells Fargo Bank, N.A., et al.* as case number SC113094. A true and correct copy of the summons and Complaint has been attached as **Exhibit "A."**

2. MARIX was served with the summons and Complaint on June 29, 2011. This notice of removal is timely under 28 U.S.C. Section 1446(b) because it was filed within 30 days of service of a copy of the Summons and Complaint on MARIX. *See Destfino v. Kennedy* (9th Cir. (Cal.) 2011) 630 F.3d 952

3. This action is a civil action of which this Court has original jurisdiction under 28 U.S.C. Section 1331, and is one which may be removed to this Court by Defendant pursuant to the provisions of 28 U.S.C. Section 1441(b) in that it arises under the Fair Credit Reporting Act, 15 U.S.C. §1681, et seq., Home Ownership and Equity Protection Act, 15 U.S.C. §1639 *et seq.*, Truth In Lending Act, 15 U.S.C. §1601 *et seq.*, Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.*, RICO, 18 U.S.C. §1961 *et seq.* (Compl. ¶¶141, 158, 220, 251-252). Supplemental jurisdiction exists with respect to any remaining claims pursuant to 28 U.S.C. Section 1367.

4. The United States District Court for the Central District of California has jurisdiction in this civil action as the real property that is the subject of the Complaint is located in the County of Los Angeles. Moreover, the Superior Court of California for the County of Los Angeles is located within the Central District of California. (See 28 U.S.C. section 84(a)). Thus venue is proper in this Court because it is the "district and division embracing the place where such action is pending." (28 U.S.C. section 1441(a))

5. Pursuant to General Order No. 98-03, the Division to which this civil action should be assigned is the Western Division because of the location of the real

property that is the subject of this action is in the City of Los Angeles and County of Los Angeles.

6. The other removed defendants in this action are Wells Fargo Bank, N.A. ("Wells"), Fidelity National Title Insurance Company ("Fidelity") and Assured Lender Services, Inc. ("ALSI"). Based upon information and belief, neither Wells nor Fidelity have been served and/or responded to the Complaint and as a result, MARIX has not been able to contact them to determine whether they object to removal. With regard to ALSI, it filed a Declaration of Non-Monetary Status in the Superior Court Action on July 22, 2011 and as its attorney of record, joins in removal of the action to federal court. A true and correct copy of the Declaration is attached as **Exhibit "B."**

7. Pursuant to 28 U.S.C. section 1446(a), MARIX filed this Notice of Removal in the District Court of the United States for the District and Division within which the state court action is pending.

8. Pursuant to 28 U.S.C. section 1446(d), MARIX will promptly give written notice of the removal to all adverse parties and will file a copy of the notice with the clerk of the Los Angeles County Superior Court.

9. Wherefore, Defendant hereby removes Los Angeles Superior Court Case No. SC113094 to the United States District Court for the Central District of California. By this Notice of Removal, MARIX does not waive any objections it may have as to service, jurisdiction or venue, or any other defendants or objections it may have to this action. MARIX intends no admission of fact, law or liability by this Notice, and expressly reserves all defenses, motions and/or pleas.

Dated: July 26, 2011

ATTLESEY | STORM, LLP

Suzanne S. Storm, Attorneys for Defendant, Marix Servicing, LLC and Assured Lender Services, Inc.

SUM-100

# SUMMONS
*(CITACION JUDICIAL)*

FOR COURT USE ONLY (SOLO PARA USO DE LA CORTE)

CONFORMED COPY OF ORIGINAL FILED Los Angeles Superior Court

JUN 20 2011

John A. Clarke, Executive Officer/Clerk
By: Jennifer Amezcua, Deputy

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***

Wells Fargo Bank, N.A., (Full Defendant name attached)

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***

Kathryn O. Smith and Michael W. Ball

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

***¡AVISO!*** *Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Santa Monica Courthouse
1725 Main Street, Santa Monica, CA 90401

CASE NUMBER: *(Número del Caso):* SC113094

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Moses A. Cohen 1490 Stone Point Drive, Suite 100, Roseville, CA 95661 877-791-2247

DATE: *(Fecha)* JUN 20 2011 JOHN A. CLARKE Clerk, by *(Secretario)* J. Amezcua, Deputy *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☒ on behalf of *(specify)*: Malik Servicing, LLC

under:
- ☐ CCP 416.10 (corporation)
- ☐ CCP 416.20 (defunct corporation)
- ☒ CCP 416.40 (association or partnership)
- ☐ CCP 416.60 (minor)
- ☐ CCP 416.70 (conservatee)
- ☐ CCP 416.90 (authorized person)
- ☐ other *(specify)*:

4. ☒ by personal delivery on *(date)*: 6/29/11 9:30 AM

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

SUMMONS

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

SUMMONS ATTACHMENT

LIST OF DEFENDANTS

., MATRIX SERVICES, FIDELITY NATIONAL TITILE INS., CO., ASSURED LENDER SERVICES INC., and DOES 1 through 100 inclusive

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
UFAN Legal Group, P.C.
1490 Stone Point Dr., Suite 100
Roseville, CA 95661
TELEPHONE NO.: 877-791-2247 FAX NO.:
ATTORNEY FOR (Name): Smith and Ball

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS:
MAILING ADDRESS: Santa Monica Courthouse
CITY AND ZIP CODE: 1725 Main St.
BRANCH NAME: Santa Monica, CA 90401

FOR COURT USE ONLY

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court
JUN 20 2011
John A. Clarke, Executive Officer/Clerk
By: Jennifer Amezcua, Deputy

CASE NAME:
Smith v. Wells Fargo Bank, N.A.

**CIVIL CASE COVER SHEET**
[✓] Unlimited (Amount demanded exceeds $25,000)
[ ] Limited (Amount demanded is $25,000 or less)

Complex Case Designation
[ ] Counter [ ] Joinder
Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402)

CASE NUMBER: SC113094
JUDGE:
DEPT: ALLAN J. GOODMAN

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[✓] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [ ] is [✓] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
a. [ ] Large number of separately represented parties
b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
c. [ ] Substantial amount of documentary evidence
d. [ ] Large number of witnesses
e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. [✓] monetary b. [✓] nonmonetary; declaratory or injunctive relief c. [✓] punitive
4. Number of causes of action *(specify)*:
5. This case [ ] is [✓] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: June 17, 2011
Moses A. Cohen
(TYPE OR PRINT NAME) (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]
CIVIL CASE COVER SHEET
Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

SC112634

| SHORT TITLE: Smith & Ball v. Wells Fargo Bank, N.A. | CASE NUMBER |
|---|---|

# CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION
## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to LASC Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.**

Item I. Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ☑ YES CLASS ACTION? ☐ YES LIMITED CASE? ☐ YES TIME ESTIMATED FOR TRIAL 2 ☐ HOURS/☑ DAYS

Item II. Select the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet Form, find the main civil case cover sheet heading for your case in the left margin below, and, to the right in Column A, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check one Superior Court type of action in Column B below which best describes the nature of this case.

**Step 3:** In Column C, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Los Angeles Superior Court Local Rule 2.0.

BY FAX

**Applicable Reasons for Choosing Courthouse Location (see Column C below)**

1. Class Actions must be filed in the County Courthouse, Central District.
2. May be filed in Central (Other county, or no Bodily Injury/Property Damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

| | A<br>Civil Case Cover Sheet Category No. | B<br>Type of Action (Check only one) | C<br>Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| Auto Tort | Auto (22) | ☐ A7100 Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| Auto Tort | Uninsured Motorist (46) | ☐ A7110 Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| Other Personal Injury/Property Damage/Wrongful Death Tort | Asbestos (04) | ☐ A6070 Asbestos Property Damage<br>☐ A7221 Asbestos - Personal Injury/Wrongful Death | 2.<br>2. |
| Other Personal Injury/Property Damage/Wrongful Death Tort | Product Liability (24) | ☐ A7260 Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| Other Personal Injury/Property Damage/Wrongful Death Tort | Medical Malpractice (45) | ☐ A7210 Medical Malpractice - Physicians & Surgeons<br>☐ A7240 Other Professional Health Care Malpractice | 1., 2., 4.<br>1., 2., 4. |
| Other Personal Injury/Property Damage/Wrongful Death Tort | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250 Premises Liability (e.g., slip and fall)<br>☐ A7230 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.)<br>☐ A7270 Intentional Infliction of Emotional Distress<br>☐ A7220 Other Personal Injury/Property Damage/Wrongful Death | 1., 2., 4.<br>1., 2., 4.<br>1., 2., 3.<br>1., 2., 4. |
| Non-Personal Injury/Property Damage/Wrongful Death Tort | Business Tort (07) | ☐ A6029 Other Commercial/Business Tort (not fraud/breach of contract) | 1., 2., 3. |
| Non-Personal Injury/Property Damage/Wrongful Death Tort | Civil Rights (08) | ☐ A6005 Civil Rights/Discrimination | 1., 2., 3. |
| Non-Personal Injury/Property Damage/Wrongful Death Tort | Defamation (13) | ☐ A6010 Defamation (slander/libel) | 1., 2., 3. |
| Non-Personal Injury/Property Damage/Wrongful Death Tort | Fraud (16) | ☐ A6013 Fraud (no contract) | 1., 2., 3. |

| SHORT TITLE: Smith & Ball v. Wells Fargo Bank, N.A. | CASE NUMBER |
|---|---|

| | A Civil Case Cover Sheet Category No. | B Type of Action (Check only one) | C Applicable Reasons -See Step 3 Above |
|---|---|---|---|
| Non-Personal Injury/Property Damage/ Wrongful Death Tort (Cont'd.) | Professional Negligence (25) | ☐ A6017 Legal Malpractice<br>☐ A6050 Other Professional Malpractice (not medical or legal) | 1., 2., 3.<br>1., 2., 3. |
| | Other (35) | ☐ A6025 Other Non-Personal Injury/Property Damage tort | 2.,3. |
| Employment | Wrongful Termination (36) | ☐ A6037 Wrongful Termination | 1., 2., 3. |
| | Other Employment (15) | ☐ A6024 Other Employment Complaint Case<br>☐ A6109 Labor Commissioner Appeals | 1., 2., 3.<br>10. |
| Contract | Breach of Contract/ Warranty (06) (not insurance) | ☐ A6004 Breach of Rental/Lease Contract (not Unlawful Detainer or wrongful eviction)<br>☐ A6008 Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence)<br>☐ A6019 Negligent Breach of Contract/Warranty (no fraud)<br>☐ A6028 Other Breach of Contract/Warranty (not fraud or negligence) | 2., 5.<br>2., 5.<br>1., 2., 5.<br>1., 2., 5. |
| | Collections (09) | ☐ A6002 Collections Case-Seller Plaintiff<br>☐ A6012 Other Promissory Note/Collections Case | 2., 5., 6.<br>2., 5. |
| | Insurance Coverage (18) | ☐ A6015 Insurance Coverage (not complex) | 1., 2., 5., 8. |
| | Other Contract (37) | ☐ A6009 Contractual Fraud<br>☐ A6031 Tortious Interference<br>☐ A6027 Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 5.<br>1., 2., 3., 5.<br>1., 2., 3., 8. |
| Real Property | Eminent Domain/Inverse Condemnation (14) | ☐ A7300 Eminent Domain/Condemnation Number of parcels______ | 2. |
| | Wrongful Eviction (33) | ☐ A6023 Wrongful Eviction Case | 2., 6. |
| | Other Real Property (26) | ☑ A6018 Mortgage Foreclosure<br>☑ A6032 Quiet Title<br>☑ A6060 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6.<br>2., 6.<br>2., 6. |
| Unlawful Detainer | Unlawful Detainer-Commercial (31) | ☐ A6021 Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Residential (32) | ☐ A6020 Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Drugs (38) | ☐ A6022 Unlawful Detainer-Drugs | 2., 6. |
| Judicial Review | Asset Forfeiture (05) | ☐ A6108 Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration (11) | ☐ A6115 Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |

| SHORT TITLE: Smith & Ball v. Wells F.rgo Bank, N.A. | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| Judicial Review (Cont'd.) | Writ of Mandate (02) | ☐ A6151 Writ - Administrative Mandamus | 2., 8. |
| | | ☐ A6152 Writ - Mandamus on Limited Court Case Matter | 2. |
| | | ☐ A6153 Writ - Other Limited Court Case Review | 2. |
| | Other Judicial Review (39) | ☐ A6150 Other Writ /Judicial Review | 2., 8. |
| Provisionally Complex Litigation | Antitrust/Trade Regulation (03) | ☐ A6003 Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007 Construction defect | 1., 2., 3. |
| | Claims Involving Mass Tort (40) | ☐ A6006 Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035 Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort Environmental (30) | ☐ A6036 Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014 Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| Enforcement of Judgment | Enforcement of Judgment (20) | ☐ A6141 Sister State Judgment | 2., 9. |
| | | ☐ A6160 Abstract of Judgment | 2., 6. |
| | | ☐ A6107 Confession of Judgment (non-domestic relations) | 2., 9. |
| | | ☐ A6140 Administrative Agency Award (not unpaid taxes) | 2., 8. |
| | | ☐ A6114 Petition/Certificate for Entry of Judgment on Unpaid Tax | 2., 8. |
| | | ☐ A6112 Other Enforcement of Judgment Case | 2., 8., 9. |
| Miscellaneous Civil Complaints | RICO (27) | ☐ A6033 Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030 Declaratory Relief Only | 1., 2., 8. |
| | | ☐ A6040 Injunctive Relief Only (not domestic/harassment) | 2., 8. |
| | | ☐ A6011 Other Commercial Complaint Case (non-tort/non-complex) | 1., 2., 8. |
| | | ☐ A6000 Other Civil Complaint (non-tort/non-complex) | 1., 2., 8. |
| Miscellaneous Civil Petitions | Partnership Corporation Governance(21) | ☐ A6113 Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121 Civil Harassment | 2., 3., 9. |
| | | ☐ A6123 Workplace Harassment | 2., 3., 9. |
| | | ☐ A6124 Elder/Dependent Adult Abuse Case | 2., 3., 9. |
| | | ☐ A6190 Election Contest | 2. |
| | | ☐ A6110 Petition for Change of Name | 2., 7. |
| | | ☐ A6170 Petition for Relief from Late Claim Law | 2., 3., 4., 8. |
| | | ☐ A6100 Other Civil Petition | 2., 9. |

| SHORT TITLE: Smith & Ball v. Wells Fargo Bank, N.A. | CASE NUMBER |
|---|---|

Item III. Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., Step 3 on Page 1, as the proper reason for filing in the court location you selected.

| REASON: CHECK THE NUMBER UNDER COLUMN C WHICH APPLIES IN THIS CASE<br>☐1. ☐2. ☐3. ☐4. ☐5. ☒6. ☐7. ☐8. ☐9. ☐10. | | | ADDRESS: 6400 Crescent Park East Drive, |
|---|---|---|---|
| CITY: Playa Vista | STATE: CA | ZIP CODE: 90094 | |

Item IV. *Declaration of Assignment*: I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the Santa Monica courthouse in the West District of the Los Angeles Superior Court (Code Civ. Proc., § 392 et seq., and LASC Local Rule 2.0, subds. (b), (c) and (d)).

Dated: June 20, 2011

(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.
2. If filing a Complaint, a completed Summons form for issuance by the Clerk.
3. Civil Case Cover Sheet form CM-010.
4. Complete Addendum to Civil Case Cover Sheet form LASC Approved CIV 109 03-04 (Rev. 03/06).
5. Payment in full of the filing fee, unless fees have been waived.
6. Signed order appointing the Guardian ad Litem, JC form 982(a)(27), if the plaintiff or petitioner is a minor under 18 years of age, or if required by Court.
7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

Moses A. Cohen (SBN No. 242365)
Kristin Crone (SBN No. 269679)
UFAN Legal Group P.C.
1490 Stone Point Dr.. Suite 100, Roseville, CA 95661
Telephone: (877) 791-2247
Facsimile: (916) 669-9698

Attorney for Plaintiffs,
KATHRYN O. SMITH and MICHAEL W. BALL

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

JUN 20 2011

John A. Clarke, Executive Officer/Clerk
By: Jennifer Amezcua, Deputy

SUPERIOR COURT OF CALIFORNIA

COUNTY OF LOS ANGELS

UNLIMITED JURISDICTION

KATHRYN O. SMITH and MICHAEL W. BALL,

Plaintiffs,

vs.

WELLS FARGO BANK, N.A.; MATRIX SERVICES; FIDELITY NATIONAL TITLE INS., CO.; ASSURED LENDER SERVICES, Inc.; and DOES 1 through 100,inclusive,

Defendants.

Civil Case No: SC113094

**COMPLAINT FOR DAMGES:**

ALLAN J. GOODMAN

1. **Declaratory Relief;**
2. **Breach of Fiduciary Duty**
3. **Breach of the Covenant of Good Faith and Fair Dealing;**
4. **Deceit, California Civil Code § 1709-1710;**
5. **Predatory Lending;**
6. **Business & Professions Code §17200;**
7. **Promissory Estoppel;**
8. **Fraud by Intentional Misrepresentation;**
9. **Fraud by Concealment;**
10. **Quiet Title**
11. **California Rosenthal Act;**
12. **Rescission/Cancellation of Void Instrument;**
13. **Code of Civil Procedure §§ 2934 (e) and 2934 (d);**
14. **Mistake**
15. **RICO**

CASE MANAGEMENT CONFERENCE
OCT 03 2011 8:30am
Date
Dept. F

## PRELIMINARY STATEMENT

1. Plaintiffs, **KATHRYN O. SMITH and MICHAEL W. BALL,** (hereinafter "Plaintiffs") bring this suit in order to recover property of the estate: their real property commonly referred to as 6400 Crescent Park East Drive, Playa Vista, CA 90094, as well as damages for acts of the Defendants.

2. In recent history, the banking industry has taken advantage of unwary and unsophisticated consumers by issuing loans in contravention of underwriting guidelines. Done hastily without regard for correctness, loans with payments much higher than their income were issued to unsuspecting homeowners. The industry originated such loans in order to package up the loans and sell them off to investors for more than the money paid out. In the process both consumers and investors were defrauded and banks profited off the ignorance of those they deceived.

3. After it became clear to the general American public what these banks had done, many of the banks went under. As the banks failed their officers maintained their multi-million dollar bonuses, all the while people were losing their homes.

4. It was clear to some investors that the mortgage industry had gone too far in issuing loans to unqualified buyers in order to sell them off in the secondary market. For this reason, these investors bet against the mortgage backed securities leading to an increasing failure in the industry. These investors later used these funds for purchase of failed banks. Since these investors knew the loans were bad, these investment groups were aware that the entity they were buying held mortgages subject to the claims of these defrauded consumers.

5. Therefore it is clear under the circumstances that Defendants WELLS had not only notice, but knowledge of the defects in the origination of their loans.

6. Plaintiffs were unsophisticated consumers who were defrauded by the banking industry who removed all of the equity in Plaintiffs' home (through its agents and unconscionable underwriting practices) and convinced them they could afford the grossly inappropriate monthly payments.

7. Plaintiffs were told over and over that they could refinance their loans in the future and to not worry about the adjustable rate.

///

///

**... ..ES AND BACKGROUND**

8. Plaintiffs, **KAT...EN C.... ITH and MICHAEL W. BALL** (hereinafter "Plaintiffs" or BALL's") were, and at a... times ... ant herein, a married couple residing in Los Angeles County, California. They current.. reside a.. their home, at 18031 Villofa Place, #439, Playa Vista, CA 90094, however, they also have a .ental p... erty located at 6400 Crescent Park East #120, Playa Vista, CA 90094 ("Subject Propert...") On ... about June 22, 2007 Plaintiffs allegedly singed and entered into a ten year interest only Adjus... .e Rate ...ortgage, hereinafter ARM, loan agreement with WELLS FARGO BANK, N.A. The ARM n..te was secured by the Subject Property by a first priority Deed of Trust.

9. Upon information and belie.., Defendant **WELLS FARGO BANK, N.A.** ("WELLS") is a National Association organized a.. .. existing under the laws of The United States. WELL s FARGO's agent for se...ice of p... ess is Corporation Services Company, which does business in California as CSC-Lawy... Incorp... rating Service 2730 Gateway Oaks Drive, Ste 100, Sacramento, CA 95833.

10. Upon information and belie.., Defendant **MATRIX SERVICING** ("MATRIX") was assigned, sold or transferred the se...icing rig...ts of the subject property on October 18, 2010 per Notice of assignment letter dated N... ember .., 2010, attached hereto as (Exhibit B). Upon information and belief, MATRIX's principal pla... of busi... ss is 1925 W Pinnacle Peak Road, Phoenix, AZ 85027, per Notice Assignment.

11. Upon information and belie.., Defendant **FIDELITY NATIONAL TITLE INS., CO.,** hereinafter ("FNT") is a b...iness e...ity, form unknown. FNT was the original trustee on the subject loan as stated in the Dee... .. Trust, ..t ached hereto as (Exhibit A). Upon information and belief, FNT was not properly substitu... .. out as tr...stee. FNT's principal place of business is 17911 Von Karman, Suite, 200, Irvine, CA 92614, acco...ding to Plaintiff's Deed of Trust.

12. Upon Information ...nd belief, Defendant **ASSURED LENDER SERVICES, INC.** hereinafter ("ASSURED") was the sec... nd "Trustee" on the subject loan, according to the Notice of Trustee's Sale dated May 19, 201. Upon information and belief, Defendant ASSURED's Substitution of Trustee was never recorded. ASSURED's principal place of business is believed to be 2552 Walnut Avenue, Suite, 110, Tustin, CA 92780, according to No...ice of Tr...stee's Sale, attached hereto as (Exhibit C).

13. Defendants have significant contacts with the State of California, and the activities complained of herein occurred, in whole or in part, in Los Angeles County, California. At all times material hereto, Defendants have acted as Servicer in some other control capacity over processing the loan.

14. The true names and capacities, whether individual, corporate, associate or otherwise, of Defendant DOES 1 through 100, inclusive, and each of them, are unknown, to Plaintiffs at this time, and Plaintiffs therefore sue said Defendants by such fictitious names. Plaintiffs allege, on information and belief, that each Doe Defendant is responsible for the actions herein alleged. Plaintiffs will seek leave of Court to amend this Complaint when the names of said Doe Defendants have been ascertained.

15. Plaintiffs believe and thereon allege that the agents and co-conspirators through which the named Defendants operated included, without limitation, financial institutions and other firms that originated loans on behalf of the enterprise acquired by WELLS.

16. These institutions acted at the behest and direction of WELLS, or agreed to participate, knowingly or unknowingly, in the fraudulent scheme described in this Complaint.

17. Those firms originating loans that knowingly participated in the scheme are jointly and severally liable with the Defendants for their acts in devising, directing, knowingly benefitting from and ratifying the wrongful acts of the knowing participants.

18. Plaintiffs are informed, believe, and thereon allege, that at all times mentioned herein, each and all of the aforementioned Defendants, including unknown Defendants, are responsible in some manner, either by act or omission, strict liability, fraud, deceit, fraudulent concealment, negligence, respondent superior or otherwise for the occurrences herein alleged, and that Plaintiffs' injuries, as herein alleged, were directly or proximately caused by the conduct of Defendants.

19. Whenever in this Complaint an act or omission of a corporation or business entity is alleged, the said allegation shall be deemed to mean and include an allegation that the corporation or business entity acted or omitted to act through its authorized officers, directors, agents, servants, and/or employees, acting within the course and scope of their duties. That said act or omission was authorized by corporate managerial officer or directors, and that the act or omission was ratified by the officers and directors of the corporation or business entity.

///

20. For avoidance of doubt, such knowing participants include, without limitation, legal and natural persons owned in whole or in part by Defendants or WELLS Defendants or affiliates thereof, legal and natural persons owning directly or through affiliates financial interests in the enterprise or Defendants; legal and natural persons directly or through affiliates acting pursuant to contracts to share in the benefits of the wrongdoing alleged in this Complaint and knowing to at least some degree committing acts and omissions in support thereof, and legal and natural persons knowing to at least some degree acting in concert with the enterprise or the Defendants.

21. As to those legal and natural persons acting in concert without an express legal relationship with Defendants or their affiliates, on information and belief, the Defendants knowingly induced and encouraged the parallel acts, created circumstances permitting and authorizing the parallel acts and omissions, benefited therefrom and ratified the improper behavior, becoming jointly and severally liable therefor.

22. As to those legal and natural persons whose acts in support of the loan scheme were unwitting, Plaintiffs will consider whether and on what basis such persons might be liable for their acts; however, on information and belief, the Defendants knowingly induced and encouraged the acts and omissions, created circumstances permitting and authorizing the parallel acts and omissions, benefited therefrom and ratified the improper behavior, becoming liable therefor.

23. Plaintiffs are informed and believe, and thereon allege, that: (i) Defendants, and their wholly-owned and controlled subsidiaries are liable (to the extent provided in this Complaint) for all wrongful acts relating to their acquired enterprise prior to the date thereof as the successor/purchaser of various other parties, (ii) Defendants directly and through their subsidiaries and other agents sued herein as Does have continued the unlawful mortgage lending and collection practices, including, without limitation thereof, writing fraudulent mortgages as set forth above and concealing wrongful acts that occurred in whole or in part prior thereto, and (iii) Defendants and their subsidiaries are jointly and severally liable as alter egos and as a single, greater unified whole.

**THE REAL PROPERTY**

24. The real property which is the subject of this action is located and generally described as 6400 Crescent Park East Dr, Playa Vista, CA 90094, and is more particularly described as follows:

///

The land referred to this guarantee is situated in the State of California, County of Los Angeles and is described as follows:

A Condominium Composed of:

Parcel 1:

Unit No. 120 as shown in the Phase 1 Condominium Plan, which plan was recorded on September 6, 2005 as Instrument No. 05-2137312, an and the First Amendment to the Phase 1 Condominium Plan, which amendment was recorded on November 21, 2005 as Instrument No. 05-2821270, both of Official Records, Constituting portion of combined Lots 18, 19 and 20 of Tract No. 49104-05, in the City of Los Angeles, as per map recorded in Book 1272, Pages 88 to 93 inclusive of Maps, in the Office of the County Recorder of said County.

Excepting therefrom, any and all oil rights, minerals, mineral rights, natural gas rights and other hydrocarbon by whatsoever name known, geothermal steam or other resources, and all products derived from any of the foregoing, that may be within or under the Unit, together with the perpetual rights of drilling, mining or exploring and operating therefore and storing in and removing the same from the unit or any other land, including the right to whipstock or directionally drill and mine from lands other than those conveyed hereby, oil or gas wells,

tunnels and shafts into, through or across the subsurface of the land, and to bottom such whipstocked or directionally drilled wells, tunnels and shafts under and beneath or beyond the exterior limits thereof, and to redrill, retunnel, equip, maintain, repair, deepen and operate any such wells or mines; without, whoever, the right to enter upon, drill, mine, store, explore and operate through the surface of the upper five hundred (500) feet of the subsurface of the Unit as reserved by Playa Capital Company, LLC, a Delaware limited liability company ("Playa Capital"), by deed

recorded September 2, 2003 as Instrument No. 03-2543669 of Official Records. Further excepting and reserving therefrom, for the benefit of Playa Capital, exclusive Blanker easements ("Telecommunications Easements") over the Unit for access and for purposes of constructing, installing, locating, altering, operating, maintaining, inspecting, upgrading, removing and enhancing Telecommunications facilities (as defined in the Master Declaration) and providing Telecommunication Services (as defined in the Master Declaration). Reserving therefrom, for the benefit of grantor, its successors in interest and others, easements for access, encroachment, support, maintenance, drainage, use, enjoyment, repairs and for other purposes, all as shown in the map and the plan, and as described in the following documents:

A. The Master Declaration of Covenants, Conditions and Restrictions and Reservation of easements for Playa Vista, as amended or restated, which was recorded on February 7, 2000 as Instrument No. 00-187083 and amended by a first amendment thereto recorded on March 26, 2001 as Instrument No. 01-481376, a second amendment thereto recorded on November 26, 2002 as Instrument No. 02-2875170, and a third amendment thereto recorded November 26, 2002 as Instrument No 02-2875171, all of Official Records.

B. The superseding supplemental Declaration of Covenants, Conditions and Restrictions and Reservation of easements for Playa Vista (Waterstone), as amended or restated, which was recorded September 6, 2005 as Instrument No. 05-2137211 of Official Records; and

C. The Declaration of Covenants, Conditions and Restrictions and Reservation of easement for Waterstone, as amended or restated, which was recorded on September 6, 2005 as Instrument No. 05-2137313 of Official Records.

Further reserving therefrom, the right to enter the unit to complete and repair any improvements or landscaping located thereon as determined necessary by grantor, in

its sole discretion, in order to comply with requirements for the recordation of the map, the grading of said tract and/or as to an uindivided compliance with the requirements of applicable governmental agencies, the Condominium Estate (defined below) shall also be subject to a right of entry by the grantor until the expiration of all applicable statutes of limitations for the filing of a complaint or suite or other legal remedies against grantor in any way relating to or arising out of the development, construction, transfer

and/or sale of the Condominium Estate by grantor. Said entry of grantor shall be preceded by reasonable notice of grantee before said entry. If this reservation of a right of entry is not complied with by grantee, grantor may enforce this right of entry in a court of law. Grantee shall be responsible for all damages arising out of said breach including Attorney's Fees and Court Costs. This reservation of a right of entry shall automatically expire eleven (11) years from the last close of escrow for a Condominium in the Community (as those terms are defined in the Declaration).

An undivided 1/64th interest as a tenant-in-common in and to the common area described in the plan which encumber Lots 18, 19 and 20 of said Tract No. 49104-05.

Exclusive use area easements for patio purposes as assigned to the unit in the plan, and exclusive use area easements for subterranean parking and storage purposes, if applicable, as assigned to the unit pursuant to descriptions and/or depictions of the Declaration of Covenants, Conditions and Restrictions and Reservation of easements for Waterstone, recorded September 6, 2005 as Instrument No. 05-1137313, official records, and/or plan, and subject to the provisions of said declaration (including, without limitation, the reservation of the Declarant's right to relocate an assigned subterranean parking space to another area of the garage.)

A.P.N. # 4211-025-085

25. As shown in the 2007 NOTE, attached hereto as Exhibit A the original loan was for a 30 year term with 10 years of said payments being for interest only. The initial interest rate of the loan was 6.125% per annum with an adjusting interest rate as high as 11.125%. (Exhibit A)

26. At this point, to Plaintiffs' knowledge, a Notice of Default/Election to sell has been filed against the property and recorded in Los Angeles County Recorder Office, and a Trustee's Sale was scheduled for June 13, 2011. (Exhibit B)

## JURISDICTION

27. This Court has personal jurisdiction over the parties in this action by the fact that Defendants are either individuals who reside in the State of California, County of Los Angeles or are corporations or business entities doing business in the State of California, County of Los Angeles.

28. The real property that is subject of this Complaint is located in Los Angeles County, California.

## AGENCY ALLEGATIONS

29. Plaintiffs are informed and believe and thereon allege that at all times herein mentioned, each of the Defendants was acting as the agent, servant, employee, partner, co-conspirator, and/or joint venture of each of the remaining Defendants, and was acting in concert with each remaining Defendant in doing the things herein alleged, and, additionally has inherited any violations and/or the liability of their predecessors-in-interest, and has also passed on liability to their successors-in-interest, and at all times was acting within the course and scope of such agency, employment, partnership, and/or concert of action.

## FACTUAL ALLEGATIONS

30. Plaintiffs in July 2007, were looking to refinance their initial mortgage as they were placed into a controlled price unit which was to be held for 15 years before it could be sold for market value by CHASE HOME MORTGAGE. (Exhibit C)

31. The loan officers Plaintiffs dealt with initially with CHASE had since moved to WELLS, and therefore Plaintiffs followed him to WELLS.

32. Plaintiffs were offered a 30 year term loan with 10 years of said payments being for interest only, and were told at that time that they could refinance in year nine, and to not worry about the adjustable rate.

33. Loan documents were only signed by Kathryn even though Michael made more money. Plaintiffs were informed to proceed this way as Michael's credit score was not as good as Kathryn's.

34. Plaintiffs ARM loan was a stated income loan, in which WELLS informed Plaintiffs what to state for their income in order to be approved. No financial documentation was ever produced by Plaintiffs at any time.

35. Defendant WELLS sent an appraiser to the property who appraised the property for $620,000.00 even though the purchased price of the house just one year earlier was for $321,000.00. After the appraisal, Plaintiffs were given a different name and contact information for the appraiser and thus could never get a hold of the actual appraisal.

36. Due to Michael fracturing his shoulder and subsequently being placed on disability, Plaintiffs rented out the properly in order to pay the mortgage. Plaintiffs were able to rent out the property, however, the rent had to be continually reduced as the economy continued to fall, and renters would not pay the mortgage rate for rent.

37. Plaintiffs contacted Defendant WELLS in November 2009 to request a home modification due to the financial hardship they were having as Michael was on disability. Plaintiffs were repeatedly told that WELLS did not receive their information or applications and thus would need to be re-sent multiple times. This continued for over a year, during which time Kathryn was also pregnant. Due to the stress from the modification process Kathryn began to have health problems and was thus taken off work due to complications with her pregnancy.

38. In January of 2010 **Plaintiffs were instructed by WELLS to miss payments** on their loan in order to get the departments attention, as there was no urgency to modify borrowers who were current on their payments.

39. Plaintiffs wishing to stay in their house, tried to settle their tax debt with Los Angeles County. Plaintiffs were successful and negotiated payments with the County.

40. Soon after WELLS informed Plaintiffs, WELLS had already worked out a payment plan with County Tax Assesor. WELLS had paid all back and upcoming taxes, and thus Plaintiffs would now have a new mortgage reflecting these paid taxes. The new mortgage increased Plaintiffs mortgage payment by $1,000.00 a month. Plaintiffs were already having difficulty making the original payment due to heath issues, temporary disability, and therefore were not be able to afford the new mortgage payment.

41. Plaintiffs continued to pay under their original mortgage agreement, however, Defendant WELLS stopped taking their payments as WELLS considered them partial payments.

42. In November 2010, Matrix was assigned as the new servicer for Plaintiffs mortgage. (Exhibit D) At this time, Plaintiffs began the modification process all over with MATRIX. In March 2011, Defendant MATRIX denied Plaintiffs modification due to Plaintiffs having insufficient income to support a modification.

43. In April 11, 2011 a Notice of Default was filed against the property and recorded in Los Angeles County Recorder office. In May 2011, Plaintiffs received a Notice of Trustee Sale for June 13, 2011. (Exhibit E) Plaintiffs contacted MATRIX in order to reapply for a modification, however, were told the paperwork was not received and would need to be resent.

44. In June 2011, Plaintiffs hired United Foreclosure Attorney Network, ("UFAN") to help them with regards to the issue they were having against Defendants.

45. UFAN diligently requested a postponement of the sale so that we could possibly work with Defendants, however Defendant ASSURED denied the postponement.

46. Plaintiffs are informed and believe and thereon allege that their house was appraised for far more than it was worth.

**FIRST CAUSE OF ACTION**
**(Declaratory Relief)**
Against all Defendants

47. Plaintiffs re-allege and incorporate paragraphs 1 through 46 as though they were fully set forth herein.

48. Parties disagree as to their rights and duties under the contract. Therefore, Plaintiffs seeks declaratory relief on disputed matters. Disputed matters are as follows:

49. The Defendants claim that they have the right to enforce the contract as successors-in-interest to WELLS. Under such belief, the Defendants MATRIX have demanded payment of the Note from Plaintiffs.

50. Plaintiffs' Note states in Paragraph 4(A) that their interest rate may change on the first day of July, 2017 and on that day every 12th month thereafter. And, Paragraph 4(D) states, "My interest rate will not be greater than 11.125% or less than 2.000%."

51. Upon filling out the loan in July 2007, no financial documents were checked on behalf of Plaintiffs, but rather, Plaintiffs were advised by Defendant WELLS what to state for their income in order for the loan to be approved.

52. Plaintiffs contacted Defendant WELLS in November of 2009 requesting a loan modification due to financial hardship. After over a year of applying for a modification, Plaintiffs received notice that their loan was transferred to MATRIX.

53. Plaintiffs in October 2010 started all over with the modification process with MATRIX, which was eventually denied in March 2011.

54. Defendant WELLS sent an appraiser to the property, who appraised the Property $620,000.00. Believing the appraisal was inflated Plaintiffs attempted to contact the appraiser without success.

55. When mortgage backed securities were at their peak of popularity, a group of investors realized that many consumers were being approved for loans they did not have a dream of affording. These investors noticed that underwriting standards were ignored in order to package up and sell mortgage backed securities to unsuspecting investors. Because of these realizations, a group of investors began to bet against the mortgage backed securities market by the use of credit default swaps – a kind of stock insurance that was issued even to non-stockholders.

56. As evidenced by their investment in credit default swaps, the Defendants knew that there were significant deficiencies in the mortgage held by WELLS

57. Therefore, Defendants had notice of the issues present in the mortgages held by WELLS.

58. A judicial declaration is necessary and appropriate at this time and so that the Plaintiffs may ascertain their rights and duties and avoid any illegal Trustee Sale of the property to occur.

59. As a result of the actions of Defendants, Plaintiffs have suffered damages according to proof and seek declaratory relief that Defendants' do not have a right to foreclose and that Defendants' purported power of sale in the Deed of Trust is void and has no force or effect against Subject Property.

60. Further the loan was a refinance, thereby giving Plaintiffs the right to cancel. The copies of the right Cancel documents were not fully nor correctly filled out, nor provided to Plaintiffs, thereby giving Plaintiffs an extended right of rescission when in foreclosure.

61. Defendants' actions in this matter have been willful and knowing.

**SECOND CAUSE OF ACTION**
**Breach of Fiduciary Duty**
(Against all Defendants)

62. Plaintiffs re-allege and incorporate paragraphs 1 through 61 as though they were fully set forth herein.

63. At all times relevant Defendants created, accepted, and acted in a fiduciary relationship of great trust and acted for and were the processors of property for the benefit of Plaintiffs.

64. Defendants, collectively and individually, further placed themselves in a position of trust by virtue of the expertise represented by and through their employees, representatives, and or agents.

65. Defendants, and each of them, breached their fiduciary duties owed to Plaintiffs as they acted and continued to act for their own benefit and to the detriment of Plaintiffs.

66. Defendants, and each of them, breached their fiduciary duties owed to Plaintiffs by placing and negotiating a loan without due care to the best interest of Plaintiffs or for the protection of their rights.

67. Defendants, and each of them, breached their fiduciary duties owed to Plaintiffs by informing Plaintiffs they would be able to refinance the ARM and to not worry about the adjustable rate. Plaintiffs, relying on Defendants statements, expertise, and knowledge of the industry entered into the loan.

68. As a direct and proximate result of the breach of fiduciary duties, Plaintiffs have suffered economic damages including loss of funds and payment of fees improperly

69. incurred in an amount to be proved at trial. In addition Plaintiffs' title and ownership of the Subject Property have been clouded.

70. Plaintiffs are informed and believe Defendants have acted willfully, maliciously, oppressively, and fraudulently and in conscious disregard for the rights of Plaintiffs and as such, Plaintiffs are entitled to punitive damages, among other remedies.

**THIRD CAUSE OF ACTION**
**(Breach of Covenant of Good Faith and Fair Dealing)**
Against all Defendants

71. Plaintiffs re-allege and incorporate paragraphs 1 through 69 as though they were

fully set forth herein.

72. Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement. This implied covenant of good faith and fair dealing requires that no party will do anything that will have the effect of impairing, destroying, or injuring the rights of the other party to receive the benefits of their agreement. The Covenant implies that in all contracts each party will do all things reasonably contemplated by the terms of the contract to accomplish this purpose. This covenant protects the benefits of the contract that the parties reasonably contemplated when they entered into the agreement.

73. Plaintiffs allege that at all times there existed an implied covenant of good faith and fair dealing represented by the terms of the ARM loan, Note, and the Deed of Trust, which imposed upon Defendants a duty of good faith and fair dealing in this matter to safeguard, protect, or otherwise care for the assts and rights of Plaintiffs. Said covenant prohibited Defendants from activities interfering with or contrary to the rights of Plaintiffs.

74. Defendants enjoyed substantial discretionary power affecting the rights of Plaintiffs during the events alleged in this complaint. Defendants were required to exercise such power in good faith.

75. Plaintiffs are informed and believe, and thereon allege, Defendants willfully breached their implied covenant of good faith and fair dealing with Plaintiffs when Defendants;

1. Failed to provide all the proper disclosures;
2. Failed to provide documentation of the loan;
3. Failed to verify Plaintiffs' income;
4. Failed to provide accurate lending disclosures on the ARM loan;
5. Informing Plaintiffs that they would be able to refinance in nine years, therefore they need not worry about the adjustable rate loan;
6. Attempted and did place Plaintiffs into usurious transactions that any reasonably mortgage broker or mortgage lender would know would ruin Plaintiffs financially, or attempted to profit form servicing these loans when it was obvious that they were entirely illegitimate.

76. As a result of Defendants' breach of said covenant, **Plaintiffs have suffered the loss of possession of their real property**. Plaintiffs have incurred and continue to incur attorney's fees and other costs and expenses to right this wrong.

77. Defendants' actions in this matter have been willful, knowing, malicious, fraudulent and oppressive, entitling Plaintiffs to punitive damages in an amount appropriate to punish Defendants and to deter others from engaging in the same behavior.

**FOURTH CAUSE OF ACTION**
**(Deceit California Civil Code §§1709-1710)**

Against all Defendants

78. Plaintiffs re-allege and incorporate paragraphs 1 through 76 as though they were fully set forth herein.

79. California Civil Code § 1709 provides that:

> "One, who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damages, which he thereby suffers."

80. Deceit, within the meaning of CC § 1709, can take any of these forms (CC§ 1710):

1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;
2. The assertion, as a fact, of that which is not true, by one who has no reasonably ground for believing it to be true;
3. The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or
4. Promise, made without any intention of performing it.

81. Upon information and belief, Defendants made misrepresentation to Plaintiffs, as set forth above, including but not limited to statements that Defendants would act in Plaintiffs' best interest to obtain a loan which would be to Plaintiffs' benefit and to obtain a loan with the best possible terms for Plaintiffs. In fact, Defendants did not obtain a loan which was to Plaintiffs' benefit and in fact induced Plaintiffs to accept a loan in which the underwriter would have never approved. Defendants informed Plaintiffs that they would be able to refinance their loan before the interest rate adjusted.

///

///

82. Defendants' misleading acts and statements regarding Defendants' products and services in fact did mislead Plaintiffs and proximately damaged Plaintiffs by causing them to pay more for products (their loan) and services (broker), then the amount originally purported to be the price of these products and services.

83. Defendants knew their assertion that they would procure the best loan on the best terms for Plaintiffs were false and they had no reasonable ground for believing this assertion to be true.

84. Under California Civil Code § 1572, the party to a contract further engages in fraud by committing "any other act fitted to deceive."

85. At the time of entering into the note and deed of trust referenced herein with respect to Plaintiff, WELLS was bound and obligated to fully and accurately disclose:

1. Who the true lender and mortgagee were.
2. That to induce a Plaintiff to enter into the mortgage, the Defendants' caused the appraised value of Plaintiff's home to be overstated.
3. That to disguise the inflated value of Plaintiff's home, the Defendants' were orchestrating the over-valuation of homes throughout Plaintiff's community.
4. That to induce a Plaintiff to enter into a mortgage, the Defendants disregarded its underwriting requirements, thereby causing Plaintiffs to falsely believe that Plaintiffs were financially capable of performing Plaintiffs' obligations under the mortgage, when the Defendants knew that was untrue.
5. That WELLS not only had the right to securitize and sell Plaintiffs' mortgage to third-party investors, but that it specifically planned and intended to do so as to virtually all mortgages at highly –inflated and unsustainable values.
6. That as to the intended sales:
   a. The sales would include sales to nominees who were not authorized under law at the time to own a mortgage.;
   b. Plaintiffs' true financial condition and the true value of Plaintiffs' home and mortgage would not be disclosed to investors to whom the mortgage would be sold;

c. The Defendants intended to sell the mortgage together with other mortgages as to which it also intended not to disclose the true financial condition of the borrowers or the true value of their homes or mortgages;

d. The consideration to be sought from investors would be greater than the actual value of the said note and deed of trust; and

e. The consideration to be sought from investors would be greater than the income stream that could be generated from the instruments even assuming a 0% default rate thereon;

7. That the mortgage would thereby be used as part of a scheme by which the Defendants would bilk investors by selling collateralized mortgage pools at an inflated value.

8. That, at the time they did the foregoing, the Defendants knew the foregoing would lead to a liquidity crisis and the likely collapse of the Defendants;

9. That the Defendants also knew the foregoing would lead to grave damage to each Plaintiffs' property value and thereby result in the Plaintiffs' loss of the equity Plaintiffs invested in the Plaintiffs' house, as well as damaging the Plaintiffs' credit rating, thereby causing the Plaintiffs additional severe financial damage; and

10. That the Defendants knew at the time of making each loan, but did not disclose to Plaintiffs, that entire communities would become "ghost-town-foreclosure-communities" after a domino effect of foreclosures hit them.

86. When property values started falling, as the Defendants knew would occur, the Defendants could no longer continue the pretense, concealment and affirmative misrepresentations. Plaintiffs, and ultimately the US taxpayer have footed the bill for the deceit and losses proximately caused by the Defendants actions through TARP and other government aid programs Defendants received.

87. The Defendants not only continue to ratify the scheme, but they aggressively seek to maximize profits from it.

///

///

88. Defendants, knowing of the massive fraud perpetrated by the enterprise they sought to acquire, sought to conceal the fraud of which they were aware and which gave legitimate defenses to borrowers and to push through foreclosures.

89. This was all done while the Defendants, at an expedited pace, masked their business strategy seeking to obfuscate their actions by press releases of diametrically opposite actions. This conspiracy has all been to further crush values, realize losses and collect government bail-out money.

90. Defendants, however, cannot improve their position in the mortgages and must stand in the shoes of their predecessor. As a result, they are subject to the shortcomings of the assets they purchased, and not only those the Defendants can control for their profit. They are also subject to all defenses to the mortgages.

91. Defendants high-pressure and aggressive foreclosure tactics have been designed to push their fraudulent acts through the legal process to avoid these defenses. Defendants, however, cannot accept the benefits of the mortgage assets contained in their acquired assets without also accepting said assets liabilities.

92. Defendants have hatched their scheme with calm deliberation, including carefully investigating the assets they were acquiring, interviewing executives of the enterprise, and forming their own vehicles to ratify and execute the fraudulent plan. After numerous months had elapsed from the failure of the enterprise, after the emergence of government bail-outs and support, including privately negotiated help and TARP assistance, and in full recognition of the latent and patent frauds that had been perpetrated on Plaintiff in connection with the mortgage, the Defendants stepped into those dirty shoes.

93. As a result of all of these actions of Defendants, Plaintiffs have lost their equity in their home, their credit rating and history were damaged or destroyed, and incurred other material costs and expenses, described herein. At the same time, Defendants took from Plaintiffs and other borrowers billions of dollars in interest payments and fees in addition to generating billions of dollars in profits by selling their loan at an inflated value.

94. With government backing, the Defendants, have sought to obliterate the last vestiges of value held by Plaintiffs, lock in government "bailout" money and flip distressed assets for a profit.

95. Defendants cannot claim that the market would have worked its way out of the fraud, because they knew of the liquidity crisis and devastation that the fraud they had created. Notwithstanding this knowledge,

the Defendants embarked on a massive campaign to crush the values of homes to feed their profiteering scheme.

96. Defendants knew through their investigation that, in violation of their own underwriting guidelines, the enterprise had covertly offered Plaintiffs and others loans at a loan-to-value ratio that was unsustainable and without income verification. The Defendants knew this, but concealed from Plaintiffs that they knew, Plaintiffs would soon be unable to afford the loans once introductory discount interest rates ended, and variable interest and balloon payments kicked in. Defendants saw this fraud and the disjoint it had created in the market, and their ability to act fast and profit from the US taxpayer.

97. Defendants knew that when interest payments increased and balloon payments became due, if not before, Plaintiffs and other borrowers would begin defaulting on their mortgages and would suffer grievous losses from mortgages for which they were not qualified. Indeed, at the time of their acquisition of the tainted assets this was going on.

98. Given the inflated appraised value of their residence, even without a decline in property values, Plaintiffs would not be able to refinance without suffering a significant loss. It was a pivotal confluence of events that the Defendants sought to exploit for gain.

99. The Defendants knew that the scale of the lending, based on inflated property values, lack of income verification and in violation of numerous underwriting guidelines, would lead to widespread declines property values thereby putting Plaintiffs and others into extremes through which they would lose the equity invested in their homes and have no means of refinancing or selling, other than at a complete loss. That is precisely what happened to Plaintiffs herein.

100. Defendants did not just make misrepresentations and conceal material facts from investors. First, each of the foregoing misrepresentations was made in public documents or forums given wide communication to the public, including Plaintiffs herein. Second, the identical affirmative misrepresentations and concealment pertained to the Plaintiffs and other borrowers.

101. Defendants have and continue to perpetuate lies by affirmative misrepresentations and by concealing the truth from Plaintiffs and other borrowers because to do otherwise would mean immediate wash-back into their investor fraud since Plaintiffs and other borrowers are part of the investing public receiving all other investor communications. Additionally it would decapitate the source of the supply of mortgages needed for

the scheme to operate. The Defendants knew this when they acquired the tainted assets and then ratified and profited from them in the manner herein alleged.

102. The concealment of the scheme from borrowers was absolutely essential because the Defendants knew it would soon be delivering Plaintiffs' note and deed of trust to investors and their representatives at intentionally inflated values as collateral for Defendants fraudulent securitized pools. Defendants' knew this when they acquired the tainted assets.

103. By not disclosing the truth of the inflated appraisals, lax lending standards, deficient loan portfolios, shaky secondary market collateralized securities, and overall scheme to its borrowers, as set forth above, the Defendants not only made said borrowers unwitting accomplices, but also put them into a no win situation in which the price of taking a mortgage from the enterprise would be, and has been, defaults and foreclosure that has wiped out the equity invested by Plaintiffs in their home. The Defendants knew this when they acquired the tainted assets and intended at the time, and have in fact, profited from it in violation of law and in a manner deceitful toward Plaintiffs.

104. The Defendants exacerbated this situation by setting off cascading foreclosures in entire cities and counties in California, leading to unemployment and economic turmoil. Plaintiffs, have been damaged by their foregoing actions.

105. Despite billions of dollars of taxpayer-funded relief programs, property values continue to fall and unemployment and underemployment remain terribly high. However, this is all key to the Defendants' profiteering scheme. The bigger the carnage now, the more government relief they get, and the more upside that remains in the assets they have confiscated from homeowners.

106. The Defendants concealed and did not accurately or fully disclose to Plaintiffs any of the foregoing facts. Further, the Defendants failed to disclose or explained their schemes to Plaintiffs at any time.

107. Defendants committed the foregoing acts with the intent to deceive Plaintiffs, the investing public, and the US taxpayer. Plaintiffs did not know the massive scheme the enterprise had started and that the Defendants diabolically enhanced and accelerated.

108. To the contrary, the Defendants affirmatively misrepresented its underwriting processes, the value of its mortgages and the fundamental nature of its business model in its press releases, annual report and securities filings, all of which were widely distributed to the public, including Plaintiffs.

109. Defendants through the enterprise intended the public, including Plaintiffs, to rely upon its misrepresentations and made those misrepresentations to create false confidence in the enterprise and to further its fraud on borrowers and investors.

110. Plaintiffs would never have done business with the Defendants or entered into the mortgage or continued to interact with Defendants if the scheme had ever been disclosed to them. Had the Plaintiffs known the facts concealed from them, Plaintiffs would have never entered into bogus and predatory transactions creating the tainted assets acquired by the Defendants, designed only to line the pockets of the lenders and their executives and not to actually and justifiably create value and generate capital from the Plaintiffs' equity investments in their real property.

111. If the Plaintiffs had later learned the truth, they would have either rescinded the loan transaction under applicable law and/or refinanced the loan transaction with a reputable institution prior to the decline in mortgage values in late 2008.

112. Instead, Plaintiffs reasonably relied on the deceptions of the Defendants in originating their loan and forbearing from exercising their rights to rescind or refinance their loan. The Defendants knew of this massive fraud and step into all the infirmities of these mortgages.

113. The Defendants hid from Plaintiffs that they were engaged in an effort to increase market share and sustain revenue generation through unprecedented expansions of their underwriting guidelines, taking on ever-increasing risky loans from borrowers. The Defendants knew all of this when they acquired the tainted assets, as it was a critical component of their own scheme to further victimize the Plaintiffs.

114. When Defendants first induced Plaintiffs to enter into mortgages, the Defendants knew their scheme would lead to a liquidity crisis and grave damage to the Plaintiffs' property value and thereby result in the loss of the equity Plaintiffs invested in their house, as well as damaging the Plaintiffs' credit rating, thereby causing the Plaintiffs additional severe financial damage consisting of the foregoing damages and damages described elsewhere in this Complaint. The Defendants concealed the foregoing from, among other, Plaintiffs, California consumers and regulators. The Defendants' tainted assets have all the imperfections resulting from these fraudulent actions, and the Defendants knew this when they embarked on their campaign to profiteer off of the mortgage carnage and government bail-out money.

115. Based upon the Defendants' position as leading financial institution and the public statements made by representatives of the Defendants, including in its securities or other public filings, the Plaintiffs reasonably relied upon the statements made by the foregoing and reasonably relied that no material information necessary to their decisions would be withheld or incompletely inaccurately or otherwise improperly disclosed. In so relying, the Plaintiffs were gravely damaged as described herein.

116. The Defendants initially acted willfully with the intention to conceal and deceive in order to benefit therefrom at the expense of the Plaintiffs. The Defendants thereafter acted deliberately in a massive scheme to crush the last vestiges of wealth from the Plaintiffs, all in a mission to profit from the fraud the Defendants had conducted.

117. Defendants followed each other's direction because they are either subsidiaries of each other, directly or indirectly, owned, controlled and dominated by each other, are the agents or servants of each other, or because they are in an unequal economic and/or legal relationship with each other by which they are beholden to one another and are thereby controlled and dominated by each other.

118. As a proximate and foreseeable result of the sale of the note and deed of trust regarding Plaintiffs properties and others similarly situated for more than the actual value of such instruments, securitization pools lacked the cash flow necessary to maintain the securitization pools in accordance with their indentures.

119. The unraveling of the fraudulent scheme has materially depressed the price of real estate throughout California, and the entire Country, including the real estate owned by Plaintiffs, resulting in the losses to Plaintiffs described herein. It is precisely this loss of value on which the Defendants now seek to capitalize. They would transfer a material portion of that wealth to themselves or those in collusion with them. This scheme includes acquiring the real property at reduced values, collecting US government money for paper losses, and harvesting the future increase on the value of these artificially depressed homes.

120. On information and belief, during periods relevant to the other acts complained of in this Complaint, Defendants did not: (1) establish due diligence policies, procedures and controls reasonably designed to detect and report instances of money laundering, (2) establish procedures to take reasonable and practicable measures to verify the identity of those applying for an account with the institution and maintain records of the information used to verify a person's identity, including name, address, and other identifying information, (3) determine and report the sources of funds used for the mortgages they originate and service, as well as the

source of funds used to acquire any mortgages, or (4) disclose to Plaintiffs the identities address and telephone numbers of transferees of their mortgages.

121. At the same time, Defendants continue to issue notices of default in violation of Cal. Civil Code § 2923.5 and despite assurances that the failures will be remedied, corrective action is dilatory, at best.

122. The foregoing is indicative of the Defendants' bad acts. Those bad acts include, but are not limited to:

i. The intentional efforts to frustrate Plaintiffs and other borrowers seeking information about their mortgages and loan modifications.

ii. Wanton violations of laws designed to keep un-sourced money out of the United States real estate market.

iii. Intentional violation of Cal. Civil Code § 2923.5 and dilatory steps to remedy those failures, even when notified thereof.

123. By the foregoing acts, Defendants are intentionally making it difficult or impossible for victims of Defendants' massive mortgage fraud and statutory violations to enforce their rights. This is all in furtherance of Defendants' scheme to profit from the misery of the Plaintiffs.

124. The acts of Defendants as set forth above constitute Deceit under California Civil Code Section 1710 thereby entitling Plaintiffs to their actual damages, including but not limited to: loan with actual approval rates and loan terms at the actual approval rates rather than increasing rates and more oppressive terms.

## FIFTH CAUSE OF ACTION

**Predatory Lending in Violation of Fin. C. §§ 4970-4979.8**

(Against all Defendants)

125. Plaintiffs re-allege and incorporate paragraphs 1 through 122 as though they were fully set forth herein.

126. The 1st Mortgage which is the subject of this litigation is covered by California's anti-predatory loan statutes, Fin. C. §§ 4970-4979.8.

127. In carrying out the acts described above, Defendants conspired to violate California's anti-predatory lending statutes, Fin. C. §§ 4970-4979.8 as follows:

128. Defendants violated the law which states that one who originates the loan must reasonably believe the consumer has the ability to repay the loan, taking into consideration, among other things, the consumer's income, obligations, employment status, and other financial resources. Fin. C. § 4973(f)(1).

129. In Plaintiffs' case, Defendants upon information and belief not only had no suchreasonable belief but actually tampered with documents in the loan application in an attempt to create a false picture of Plaintiffs' ability to repay in order to sell a more profitable product.

130. Defendants guided and trained in the proper way to sell the predatory loan to Plaintiffs while maintaining the appearance of compliance with the predatory lending laws, as well as turning a blind eye to obvious insufficiencies and wrongdoing in the origination of the loan.

131. Defendant WELLS, perpetrated the following predatory lending acts including but not limited to:

1. Stripping equity from Plaintiffs' home.
2. Large, undisclosed yield spread premium
3. Putting Plaintiffs in a loan they could not afford.
4. Falsifying Plaintiffs' income in order to facilitate approval.
5. High undisclosed fees
6. Repeated financing of Plaintiffs' property stripping the equity

132. The above described acts were carried out in conscious violation of California's predatory lending statutes, and in fact, in a manner which attempts to feign compliance.

133. As a result of Defendants' predatory lending practices, Plaintiffs have been damaged, and are entitled to actual damages including, but not limited to, loss of money and property. The loss of money and property includes, but is not limited to, losses through overcharges and unlawfully unfavorable loan terms, incurred attorney's fees, and costs to save their home, a loss of reputation and goodwill, destruction of credit, severe emotional distress, loss of appetite, frustration, fear, anger, helplessness, nervousness, anxiety, sleeplessness, sadness, and depression, according to proof at trial but within the jurisdiction of this Court.

134. Wherefore, Plaintiffs request that all loan terms which violate this law be deemed unenforceable, and that an order be granted reforming the loan to be in compliance with the law.

135. Plaintiffs further requests that the greater of his actual damages to be proven at trial, or

$15,000.00 under statute Fin. C. § 4978(a), as well as attorney's fees and costs be awarded.

**SIXTH CAUSE OF ACTION**
**(Violation of California's Unfair Competition Law, Bus. & Prof. Code §17200 et. Seq.-Unlawful Business Acts or Practices)**
Against all Defendants

136. Plaintiffs re-allege and incorporate paragraphs 1 through 133 as though they were fully set forth herein.

137. Defendants' actions in implementing, perpetrating and then extending their fraudulent scheme of inducing Plaintiffs to accept mortgage for which they were not qualified based on inflated property valuations and undisclosed disregard of their own underwriting standards and the sale of overpriced collateralized mortgage pools, all the while knowing that the plan would crash and burn, costing Plaintiffs the equity in their home and other damages. Defendants' actions violate numerous federal and state statutes and common law protections enacted for consumer protection, privacy, trade disclosure, and fair trade and commerce.

138. Defendants' first perpetrated this fraudulent scheme of selling off overpriced loans by making willful and inaccurate credit disclosures regarding borrowers, including Plaintiffs, to third parties. This false credit disclosure was critical to the success of defendants' continued sales of the massive pools of mortgage loans necessary to perpetuate the scheme to acquire these assets at deflated values, knowing the fraud that had been committed, but with the specific intent to seek to attempt to enforce the mortgage as a sound and legitimate instrument.

139. Defendants' were first aware that if the true credit profiles of the borrowers and the values of their real estate were accurately disclosed, the massive fraudulent scheme would end. As a result, the Defendants' repeated, reinforced and embellished their false disclosures.

140. The Defendants were aware of the fraudulent scheme that had been perpetrated by the enterprise whose assets and operations it was acquiring.

141. The Defendatns' knew the borrowers' credit was inadequate to support continued loan payments, absent unsustainable inflation of property values. These pervasive false credit disclosures to third parties (including purchasers of bundled mortgage pools created by the Defendants') constituted false credit

reports in violation of the Fair Credit Reporting Act, 15 USC §§ 1681 et seq. and these pervasive false disclosures permitted the Defendants to continue their scheme and victimize the Plaintiffs.

142. These pervasive false disclosures also caused the real estate bubble to burst. Once it became known that some of the information provided by the enterprise was false, the market for the sale of bundled loans dried up. Notwithstanding their knowledge of the fraudulent nature of the assets they were seeking to enforce, the Defendants began to issue foreclosure notices. Property values continued to drop, and then, under the weight of deflation in a market that requires inflation, the equity investments made by Plaintiffs and others in their homes were lost in a scale not seen since the great depression.

143. The foregoing violations were in furtherance of the fraudulent scheme perpetrated on Plaintiffs. In fact, the enterprise could not have told the truth in their public filings without that truth becoming known to Plaintiffs.

144. Conversely, the false filings gave additional credence and support to omissions, concealment, promises and inducements. The Defendants knew of all of these violations of law in acquiring the tainted assets and operations and then in seeking to enforce these mortgage obligations, when the Defendants knew of these meritorious defenses.

145. The forgoing fraudulent concealment, material misstatements, and the intentional violations of state and federal statutes cited herein constitute unlawful, unfair and fraudulent business acts or practices and so constitute unfair business practices within the meaning of the California Unfair Practices Act. Cal. Bus. & Prof. Code §§ 17200, 17500. Sections 17200 et seq. of the California Business & Professions Code provides, in the disjunctive, for liability in the event of any such "unlawful, unfair or fraudulent business act or practice."

146. California Civil Code § 2923.5 requires that each mortgagee, trustee, beneficiary, or authorized agent may not file a notice of default pursuant to California Civil Code § 2924 until 30 days after initial contact is made as required therein, or 30 days after satisfying the due diligence requirements to contact the mortgage described therein.

147. Defendants violated the foregoing law by causing a notice of default to be filed against Plaintiffs without the mandatory notice. Defendants did not diligently endeavor to contact the Plaintiffs as required by § 2923.5(g) and Defendants thereby also violated California Civil Code §§ 2923.5.

148. As a result of the foregoing unlawful conduct, Plaintiff suffered further injury in fact by the filing of notices of default and as such the Plaintiff suffered monetary and property loss.

149. Such injuries and loss included diminished credit scores with a concurrent increase in borrowing costs and diminished access to credit, fees and costs including, but not limited to, attorneys' fees and costs with respect to wrongful notices of default and loss of some or all of the benefits appurtenant to the ownership and possession of real property.

150. The foregoing unlawful activities were pervasive and violate Business and Professions Code §§ 17200 et seq.

151. As a result of Defendants' unfair competition, Plaintiff is entitled to restitution for all sums received by Defendants with respect to Defendants' unlawful and/or unfair and/or fraudulent conduct, including, without limitation, interest payments made by Plaintiff, fees paid to Defendants, including, without limitation, the excessive fees paid at Defendants' direction, premiums received upon selling the mortgage at an inflated value and moneys received from government agencies for "losses" incurred by Defendants.

152. Plaintiff is also entitled to the issuance of a temporary restraining order, a preliminary injunction, and a permanent injunction restraining and enjoining Defendants from any further concealment with respect to the sale or enforcement of notes and mortgages, or any of the other misconduct set forth above.

153. Each of the enterprise whose assets Defendants purchased has an affirmative burden to ascertain verify and prove, among other things, the identity, source, character, origin, and legitimacy of the funds which they controlled, handled, and/or facilitated in its transactions.

154. California Business and Professions Code Section 17200 prohibits unlawful, unfair, or fraudulent business acts and/or practices.

155. Plaintiffs bring this cause of action on behalf of themselves and in their capacity as private attorneys general against Defendants for their unlawful business acts and/or practices pursuant to California Business and Professions Code Section 17200 et. Seq., which prohibits all unlawful business acts and/or practices.

156. Plaintiffs assert these claims as they are a representative of an aggrieved group and as private attorneys general on behalf of the general public and other persons who have expended funds that the

Defendants should be required to pay or reimburse under the equitable and restitutionary remedies provided by California Business and Professions Code Section 17200 et. Seq.

157. Defendants, and each of them, have committed one or more acts of unfair business practices defined by California Business and Professions Code Section 17200 et. Seq. by engaging in acts and practices as alleged above, including but not limited to: continuously making loans without providing borrowers with sufficient, accurate and understandable information regarding the terms and conditions of the loan, making loans in which an underwriter would have never approved due to borrowers financial status, and making loans without providing borrowers with sufficient, accurate and understandable information regarding the nature and extent of the financial risk being assumed by the borrowers.

158. The unlawful acts and practices of Defendants alleged above constitute unlawful business acts and/or practices within the meaning of California Business and Professions Code Section 17200 et. Seq. in the manner alleged above, and based on information and belief, in the following further respects: the conduct of Defendants, and each of them, threatens an incipient violation of various consumer protection status, or which violate the policy or spirit of such laws, including, but not limited to, California Business and Professions Code Section s10130, California Civil Code Sections 1709, 1710, 1711, 1770, and 1921 and Section 1639 of Title 15 of the United States Code, together with the Regulation Z, 12 C.F.R. 226.1.

159. Defendants misconduct, as alleged herein, gave Defendants an unfair competitive advantage over their competitors,

160. As a direct and proximate result of the aforementioned, Defendants received monies and continue to hold the monies expended by Plaintiffs and others similarly situated who purchased the original ARM loans as described herein.

161. In addition to the relief requested in the Prayer below, Plaintiffs seek the imposition of a constructive trust over, and restitution of, the monies collected and realized by Defendants.

162. The unlawful acts and practices, as fully described herein, present a continuing threat to members of the public to be mislead and/or deceived by Defendants as described herein. Plaintiffs have no other remedy of law that will prevent Defendants' misconduct, as alleged herein, from occurring and/or reoccurring in the future.

///

163. As a direct and proximate result of Defendants' unlawful conduct alleged herein, Plaintiffs face financial ruin. Plaintiffs are a direct victim of Defendants' unlawful conduct, as herein alleged, and have suffered injury in fact, and have lost money or property because of Defendants' unfair competition.

164. Due to Defendant's egregious Plaintiffs are entitled to equitable relief, including restitution, restitutionary disgorgement of all profits accruing to Defendants because of their unlawful, deceptive acts and practices, attorney's fees and costs, declaratory relief, and a permanent injunction enjoining Defendants form their unlawful activity.

**SEVENTH CAUSE OF ACTION**
**(Promissory Estoppel)**
Against all Defendants

165. Plaintiffs re-allege and incorporate paragraphs 1 through 162 as though they were fully set forth herein.

166. Plaintiffs justifiably and detrimentally relied on the false promises, representations and assurances of Defendants.

167. Based on such justifiable reliance by Plaintiffs, Plaintiffs were lulled into a false sense of security resulting in inactions and failure to discover the numerous violations of federal and state law and other legal causes of action, which they had. Based on justifiable reliance, Plaintiffs failed to act as early as they would have otherwise.

168. Defendants in equity cannot and should not be allowed to retain any income, profits and gains acquired by way of their false promises, representations and assurances that induced Plaintiffs to enter into the Defendants' fraudulent scheme resulting in justifiable detrimental reliance by Plaintiffs and delay in seeking their legal remedies.

169. Equity regards as done what ought to be done. Thus, Defendants must pay for all damages incurred by Plaintiffs due to Defendants' fraudulent scheme perpetrated upon Plaintiffs.

///

///

///

**EIGHT CAUSE OF ACTION**
**(Fraud by Intentional Misrepresentation)**
Against all Defendants

170. Plaintiffs incorporate all allegations of this complaint and re-alleges them as though they were fully set forth herein.

171. From 2005 through 2007, the Defendants misled the public, including Plaintiffs by falsely assuring them that the enterprise was primarily a prime quality mortgage lender which had avoided the excesses of its competitors. As described herein with specific examples, affirmative misrepresentations and material omissions permeated the enterprise's website, customer and investor materials, required securities filings and presentations.

172. The Defendants underwent unprecedented expansion by, among other things, aggressively making loans which were unsupported by documents, and taken by unworthy borrowers who were destined to be unable to repay the loans at the time the loans were made. From 2005 through 2007, the Defendants misled the public, including Plaintiffs by falsely assuring them that the enterprise was primarily a prime quality mortgage lender which had avoided the excesses of its competitors. As described herein with specific examples, affirmative misrepresentations and material omissions permeated the enterprise's website, customer and investor materials, required securities filings and presentations.

173. The Defendants never disclosed or explained their aggressive business model which was built on making these loans which were destined to become non-performing assets.

174. Upon information and belief Defendants' never made any disclosures in its Forms 10-Q or 10-K for 2005, 2006, or 2007 about the unprecedented expansion of its underwriting guidelines. Instead, the Defendants made public statements from 2005 through 2007 that were intended to mislead Plaintiff about the increasingly aggressive underwriting at the enterprise and the financial consequences of those widened underwriting guidelines.

175. Nothing disclosed or provided by the Defendants' informed Plaintiffs that the enterprise included in its prime category loans with FICO scores below 620. Nor did the Defendants inform Plaintiffs that the "prime non-conforming" category included loan products with increasing amounts of credit risk, such as (1) reduced and/or no documentation loans; (2) stated income loans; or (3) loans with loan to

value or combined loan to value ratios of 95% and higher. Finally, the Defendants did not disclose that enterprise's riskiest loan product, the Pay-Option ARM, was classified as a "prime loan."

176. Upon information and belief the Defendants made affirmative misleading public statements in addition to those in the periodic filings that were designed to falsely reassure Plaintiffs about the nature and quality of the enterprise's underwriting.

177. Specifically, the Defendants repeatedly emphasized the enterprise's underwriting quality in public statements from 2005 through 2007.

178. The growing network of branches, loan offices, and outside originators ("Network") feeding the Defendants' participated in making the loans and knowingly and intentionally assisted in drafting the false and misleading statements delivered to the public, including Plaintiffs herein.

179. The foregoing misrepresentations were made with the intention that Plaintiffs rely thereon. It was vital to the Defendants scheme that Plaintiffs and other borrowers rely on its misrepresentations so that Plaintiffs would come to a false understanding as to the nature of the enterprise. The foregoing misrepresentations were specifically intended to convince Plaintiffs to take a mortgage from the enterprise.

180. The campaign of misinformation succeeded. Plaintiffs relied upon the misrepresentations and entered into mortgages with the Defendants and Plaintiffs have continued to be burdened and to make payments on said mortgage.

181. By reason of the prominence of the Defendants, the campaign of deception as to its business plans and the relationship of trust developed between the Defendants and Plaintiffs, Plaintiff were justified in relying upon the enterprise's representations.

182. The aforementioned Network supporting the Defendants and other representatives of the enterprise cooperated with each other to plan and implement the scheme described herein.

183. The Network participated in developing the misrepresentations to borrowers, including Plaintiffs and to investors. They shared in the financial benefits of the scheme and ratified and approved of the material steps therefore taken by the other Defendants.

184. Conversely, the Defendants approved of, ratified and shared in the fees and other revenue received by the Network arising from its participation in the scheme. The Defendants approved of, ratified and are now

seeking to profit from this same scheme through the acquisition at a discount of tainted mortgages that it is seeking to enforce as if they were not tainted.

185. As a result of relying upon the foregoing misrepresentations Plaintiffs entered into a mortgage contract with the Defendants and Plaintiffs have continued to be economically burdened by their mortgage contract notwithstanding that they have been continually defrauded in entering into the contract all as set forth above.

186. In fact, the appraisals were inflated. The Defendants did not utilize quality underwriting processes. The enterprise's financial condition was not sound, but was a house of cards ready to collapse, as the Defendatns well knew, but Plaintiffs did not. Further, Plaintiffs' mortgage was not refinanced with a better term mortgage since the enterprise nor any of the Defendants ever intended that it would be.

187. As a result of the scheme described herein, Plaintiffs could not afford the mortgage when the economy crashed. Plaintiffs tried to rent out the property in order to cover the mortgage, however, due to the economy the rent was not enough to cover the mortgage.

188. Further, as a result of the scheme, Plaintiffs could not refinance or sell their residence without suffering a loss of their equity investments.

189. As a result of the foregoing, Plaintiffs have lost invested equity in their home and as well as suffer reduced credit ratings and increased borrowing costs, among other damages described herein.

190. The Defendants seek to enforce the new mortgage irrespective of this massive fraud on the original mortgage.

191. The Defendants acquired the mortgage or rights related thereto with knowledge of the fraudulent operations of the enterprise.

192. The Defendants can have no more rights in the mortgage assets than their predecessors.

193. Plaintiffs' reliance on the misrepresentations of the Defendants, appraisers, all ratified by the Defendants, was a substantial factor in causing Plaintiffs' harm.

194. Without limiting the damages as described elsewhere in this Complaint, Plaintiffs'

damages arising from the matters complained of in this Cause of Action also include loss of equity in their home, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation attorneys' fees and costs.

195. Plaintiffs' reliance on the representations made by the Defendants was a substantial factor in causing Plaintiffs' harm.

196. Plaintiffs are entitled to such relief as is set forth in this Cause of Action and such further relief as is set for the below in the section captioned Prayer for Relief which is by this reference incorporated herein as though fully set forth at length. Inclusive of all damages, all costs, all attorneys fees and all exemplary damages, the Plaintiffs are entitled to compensation for Defendants' wrongful acts.

## NINTH CAUSE OF ACTION

**(Fraud by Concealment)**

Against all Defendants

197. Plaintiffs re-allege and incorporate paragraphs 1 through 95 as though they were fully set forth herein.

198. The enterprise purchased by the Defendants, had exclusive knowledge, not accessible to Plaintiffs, including material facts pertaining to its mortgage lending activities that it did not disclose to Plaintiffs at the time it was entering into contracts with Plaintiffs. As more fully alleged herein, these facts included false appraisals, violation of underwriting guidelines, the intent to sell Plaintiffs' mortgage above the actual value to bilk investors and knowledge that the scheme would result in a liquidity crisis that would gravely damage Plaintiffs.

199. Further, in connection with entering into contracts with Plaintiffs, the Defendants made partial (though materially misleading) statements and other disclosures as to their prominence and underwriting standards in the public releases, on their website, in their literature and at their branch offices. However, the Defendants suppressed material facts relating thereto as set forth above. The Defendants knew that the mortgages would be "pooled," and "securitized" for sale.

200. The Defendants also knew that within a reasonably foreseeable period, its investors

would discover that the enterprise's mortgagors could not afford their loans and the result would be foreclosures and economic devastation.

201. The Defendants were more dependent than many of their competitors on selling loans it originated into the secondary mortgage market, an important fact it disclosed to investors. The enterprise expected that the deteriorating quality of the loans that the enterprise was writing, and the poor performance over time of those loans, would ultimately curtail the enterprise's ability to sell those loans in the secondary mortgage market.

202. The Defendants misled borrowers, potential borrowers and investors by failing to disclose substantial negative information regarding the Defendants' loan products, including:

1. The increasingly lax underwriting guidelines used by the enterprise in originating loans;
2. The enterprise's pursuit of a "matching strategy" in which it matched the terms of any loan being offered in the market, even loans offered by primarily subprime originators;
3. The high percentage of loans it originated that were outside its own already widened underwriting guidelines due to loans made as exceptions to guidelines;
4. The enterprise's definition of "prime" loans included loans made to borrowers with FICO scores well below any industry standard definition of prime credit quality;
5. The high percentage of the enterprise's subprime originations that had a loan to value ratio of 100%; and
6. The enterprises' subprime loans had significant additional risk factors, beyond the subprime credit history of the borrower, associated with increased default rates, including reduced documentation, stated income, piggyback second liens, and LTVs in excess of 95%.

203. The Defendants' knew this negative information from numerous reports they regularly received and from mails and presentations prepared by the enterprise's chief credit risk officer. The enterprise nevertheless hid this negative information from the Plaintiffs.

204. Plaintiffs did not know the concealed facts, but advanced money to Defendants at the demand of Defendants throughout all periods up to and including the date of this Complaint.

205. The Defendants intended to deceive Plaintiffs. As described herein, that deception

was essential to their overall plan to bilk investors, trade on inside information and otherwise pump the value of the enterprise's stock.

206. The Defendants were one of the nation's leading providers of mortgages. It was highly regarded and by its common scheme and campaign of deception through securities filings, press releases, website and branch offices, the Defendants had acquired a reputation for performance and quality underwriting. As a result, Plaintiffs reasonably relied upon the deception of the enterprise.

207. As a proximate result of the foregoing concealment by the enterprise, California property values have precipitously declined and continue to decline, gravely damaging Plaintiffs by materially reducing the value of their primary residence, depriving them of access to equity lines, and other financings previously available based upon ownership of a primary residence in California, in numerous instances leading to payments in excess of the value of their property, thereby resulting in payments with no consideration and often subjecting them to reduced credit scores (increasing credit card and other borrowing costs) and reduced credit availability.

208. In fact, property values across the United States of America precipitously declined prior to the Defendants acquiring the tainted mortgage assets and the property values continue to decline, gravely damaging Plaintiffs by materially reducing the value of their primary residence, depriving them of access to equity lines, and other financings previously available based upon ownership of their primary residence, in numerous instances leading to payments in excess of the value of their property, thereby resulting in payments with no consideration and often subjecting them to reduced credit scores (increasing credit card and other borrowing costs) and reduced credit availability.

209. The Defendants acquired the mortgage or rights related thereto with knowledge of the fraudulent operations of the enterprise.

210. The Defendants can have no more rights in the mortgage assets than their predecessors.

211. Without limiting the damages as described elsewhere in this Complaint. Plaintiffs' damages arising from this Cause of Action also include loss of equity in their home, costs and expenses related to protecting themselves, reduced credit score, unavailability of credit, increased costs of credit,

reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

212. As a result of the foregoing, Plaintiffs' damages herein are exacerbated by a continuing decline in residential property values and further erosion of their credit records.

213. First the enterprise's concealments as to the pervasive mortgage fraud, and then the Defendants' concealments, both as to the scheme to profiteer from the mortgage melt-down and as to their purported efforts to resolve loan modifications with Plaintiffs, are substantial factors in causing the harm to Plaintiffs as described in this Complaint.

214. Defendants acted outrageously and persistently with actual malice in performing the acts alleged herein and continue to do so. Accordingly, Plaintiff is entitled to exemplary and punitive damages in a sum according to proof and to such other relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

**TENTH CAUSE OF ACTION**
**(Quiet Title)**
Against all Defendants

215. Plaintiffs re-allege and incorporate paragraphs 1 through 213 as though they were fully set forth herein.

216. Defendant MATRIX claimed an interest adverse to Plaintiffs' title in the property. In particular, they claim a right to collect payments indicated by the Trust Deed.

217. Plaintiffs seek a determination of their fee simple title clear of all encumbrances as of the date this Complaint is filed.

218. Additionally, Plaintiffs seek attorney's fees pursuant to the Deed of Trust for having to bring this action.

**ELEVENTH CAUSE OF ACTION**
**(California Rosenthal Act)**
Against all Defendants

219. Plaintiffs re-allege and incorporate paragraphs 1 through 217 as though they were

fully set forth herein.

220. Plaintiffs are informed and believe and thereon allege that Defendants and each of them, in taking the actions aforementioned, have violated provisions of California's Rosenthal Fair Debt Collection Practices Act, including but not limited to Civil Codes §1788(e) and (f), and the Federal Fair Debt Collections Act, 15 U.S.C., Title 41, Subchap. V, § 1692 *et seq*, and the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2601-2617.

221. As a direct result of said violations, Plaintiffs are entitled to statutory damages according to the determination of this court, to actual damages according to proof and costs and reasonably attorney's fees.

**TWELTH CAUSE OF ACTION**
(Rescission/Cancellation of Void Instrument)
Against all Defendants

222. Plaintiffs incorporate all allegations of this complaint and re-alleges them as though they were fully set forth herein.

223. The Loan Agreement and Deed of Trust are illegal, unconscionable, were procured by fraud, and are thus void and/or voidable..

224. Plaintiffs' consent to the loan was obtained by Defendants, and each of them through mistake and fraud by engaging in deceptive practices as alleged above.

225. Defendants, and each of them, with intent to deceive Plaintiffs to consent to the loan, knew or should have known Plaintiffs were not capable of understanding or comprehending the true cost of the loan and which Defendants, and each of them, did fraudulently conceal from Plaintiffs.

226. The active misrepresentations of Defendants, and each of them, and their silence and deceit, were false and fraudulent.

227. At the time Defendants, and each of them, made the misrepresentations and engaged in the concealment and deceit as herein alleged, and at the time Plaintiffs applied for the loan, Plaintiffs did not know that the misrepresentations, deceit and inducements by Defendants, and each of them were false and fraudulent, but instead believed them to be truthful and reasonably relied on them, thereby entering into the loan transaction without the benefit of true facts, and by coercion and mistake.

228. As a result of the fraudulent misrepresentations and deceit by Defendants, and

each of them, Plaintiffs have incurred substantial financial damages as herein alleged. Plaintiffs hereupon serve notice of their demand for recessionary damages on the grounds of fraudulent misrepresentations, deceit and mistake by Defendants, and each of them as alleged herein. To the extent Plaintiffs' loan transaction documents contain an exculpatory clause in favor of Defendants, and each of them purporting to release Defendants, and each of them from their own fraud, Plaintiffs allege that such a clause is unenforceable pursuant to Civil Code Section 1668 and other applicable law.

229. If left outstanding, the Loan Agreement and Deed of Trust will cause serious injury to Plaintiffs, in that they will face foreclosure and a permanent loss of the Property, along with the equity built up therein.

230. Plaintiffs hereby demand restitution from Defendants, and each of them, in an amount that will restore Plaintiffs to a position they would have been in had Defendants, and each of them, not engaged in the conduct herein alleged. Plaintiffs further allege that Defendants, and each of them, have been unjustly enriched by the actions herein alleged and all the fees, profits, payments and commissions earned by Defendants, and each of them must be disgorged by Defendants, and each of them, to Plaintiffs.

**THIRTEENTH CAUSE OF ACTION**
**(Violation of Code of Civil Procedure §§ 2934 (e) and 2934(d))**
Against All Defendants

231. Plaintiffs re-allege and incorporate paragraphs 1 through 229 as though they were fully set forth herein.

232. Plaintiffs are informed and believe and thereupon allege that California Civil Code Section 2934 (d) provides as follows:

> "A trustee named in a recorded substitution of trustee shall be deemed to be authorized to act as the trustee under the mortgage deed of trust for all purposes ***from the date the substitution is executed by the mortgager, beneficiaries, or by their authorized agent.***"

233. Plaintiffs are informed and believe that a Substitution of Trustee was never recorded and thus, Defendant FNT is still the trustee.

234. Plaintiffs are informed and believe and thereupon allege that California Civil Code Section 2934 (e) provides as follows:

> "Notwithstanding any provision of this section or any provision in any deed of trust, unless a new notice of sale containing the name, street address, and telephone number of the substituted trustee is given pursuant to Section 2924f after execution of the substitution, any sale conducted by the substituted trustee shall be void."

**FOURTEENTH CAUSE OF ACTION**
**(Mistake)**
Against all Defendants

235. Plaintiffs re-allege and incorporate by reference all paragraphs of this complaint as though fully set forth herein.

236. The Restatement (Second) of Contract, § 17 states that "the formation of a contract requires a bargain in which there is a manifestation of mutual assent..." American Law Institute, Restatement (Second) of Contract, § 17(1).

237. The bargain between the parties is often referred to as the "meeting of the minds." *See, e.g.*, American Law Institute, Restatement (Second) of Contracts, § 17, comment 2.

238. The California Fourth District Appellate Court has held that a lack of meeting of the minds, a mistake as to fact, can justify a rescission of the contract. "A mutual mistake, whether of fact or law, which affects an essential element of the contract and is harmful to one of the parties, is subject to rescission by the party harmed." Guthrie v. Times-Mirror Co., 51 Cal.App.3d 879 (1975).

239. The mistake or missing of the minds does not have to be mutual. A single party mistaken justifies the voiding or rescinding of the contract when the mistake is known to the non-mistaken party.

240. The Restatement (Second) of Contracts, § 153 States:

> "Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performance that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and;
>
> 1. The effect of the mistake is such that enforcement of the contract would be unconscionable, or
> 2. The other party had reason to know of the mistake or his fault caused the mistake.

241. The Plaintiffs in this action executed their Loan documents based on the mistaken belief that they would remain in a borrower/lender relationship.

242. The Lenders knew there would be no borrower/lender relationship.

243. Because of this mistake, the Plaintiffs' benefit from their Loan agreement is far less than they thought they would receive. Instead of a lender who had fully authority to deal with their contractual relationship and the economic value to the lender, the Plaintiffs received a relationship with a party who lacked the full authority of the lender and lacked the economic incentive to modify the loan rather than foreclose.

244. The mistake was not a future contingency, but a reality present at the contract formation, the Defendants knew the securitization of the conduit Loans would occur with certainty and they knew no borrower/lender relationship was contemplated or planned as a result of the Loan.

245. It would be unconscionable for the Defendants, having withheld material information regarding the Loans from Plaintiffs, to still receive the benefits of the Loans.

246. As illustrated by the Wells Fargo publication attached herein as the Defendants knew that the Plaintiffs did not understand that the securitization of the Loans would destroy the lender/borrower relationship.

247. Based on the material mistake in the formation of their contracts, Plaintiffs are, therefore, entitled to an order of this Court rescinding the Loans and/or declaring the Loans void, invalid and unenforceable.

248. In addition, Plaintiffs request restitution and damages in an amount in excess of $75,000 each, the specific amount to be determined at trial.

**FIFTENNTH CAUSE OF ACTION**
**(RICO)**

Against all Defendants

250. Plaintiff's reallege paragraphs 1 through 249 as if fully set forth herein.

251. In doing the aforementioned acts, Defendants and each of them were participating in and have participated in a scheme of racketeering as that term is defined in RICO, 18 U.S.C. § 1961 *et seq.*

252. Plaintiffs are therefore entitled to the remedies available under RICO in civil actions.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants and each of them as follows:

1. General and special damages according to proof at trial;
2. Declaratory relief voiding the note and deed of trust of Plaintiffs held or serviced by the Defendants and temporary, preliminary, and permanent injunctive relief under the First, Second, Fourth, Fifth, and Sixth Cause of Action.
3. Statutory relief according to proof under the Fifth Cause of Action;
4. Restitution according to proof under the Fifth Cause of Action;
5. Temporary, preliminary, and permanent injunctive forfeiture relief under all causes of action;
6. On all causes of action, for costs of suit herein;
7. On all causes of action, for pre- and post-judgment interest;
8. On all causes of action for which attorneys' fees may be awarded pursuant to the governing contract, by statute or otherwise, reasonable attorneys fees; and
9. On all causes of action, for such other and further relief as this Court may deem just and proper so that Plaintiff shall recover restitutionary or compensatory damages and so that Plaintiff shall receive a judicial determination that the mortgage lien alleged to exist against their particular property is null and void *ab initio*.

**PLAINTIFFs HEREIN DEMAND A JURY TRIAL.**

Dated: June 17, 2011 Respectfully Submitted

_/s/Moses A. Cohen______
Moses A. Cohen, Esq.
Kristin Crone, Esq.
Attorneys for Plaintiffs

Page 42

COMPLAINT FOR DAMAGES SMITH v. WELLS FARGO BANK, N.A.

# EXHIBIT A

# INITIAL INTEREST[SM] ADJUSTABLE RATE NOTE

(1-Year Treasury Index - Rate Caps)
(Assumable after Initial Period)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

JUNE 22, 2007 [Date] BEVERLY HILLS [City] CALIFORNIA [State]

6400 CRESCENT PARK EAST DR., PLAYA VISTA, CA 90094
[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ *****496,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is WELLS FARGO BANK, N.A.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 6.125 %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will make a payment every month on the first day of the month beginning on AUGUST 01, 2007. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and if the payment consists of both principal and interest, it will be applied to interest before Principal. If, on JULY 01, 2037, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at WELLS FARGO HOME MORTGAGE, P.O. BOX 11701, NEWARK, NJ 071014701 or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Before the first fully amortizing principal and interest payment due date stated in subsection (C) below (the "First P&I Payment Due Date"), my monthly payments will be only for the interest due on the unpaid principal of this Note.

Each of my initial monthly payments will be in the amount of U.S. $ *********2,531.67. This amount may change in accordance with subsection (C) below.

**(C) Monthly Payment Changes**

The First P&I Payment Due Date is the first day of 08/01/17.

0076843887
MULTISTATE INITIAL INTEREST ADJUSTABLE RATE NOTE - 1-Year Treasury Index (Assumable after Initial Period) - Single Family - Freddie Mac UNIFORM INSTRUMENT Form 5507 5/04 (rev. 7/05)
NMFL #8380 (MS1C) Rev 2/27/2006
VMP-191N (0506)
VMP Mortgage Solutions, Inc. (800)521-7291
Page 1 of 5 Initials: ________

Prior to the First P&I Payment Due Date, my monthly payment may change to reflect changes in the interest rate I must pay in accordance with Section 4 of this Note or to reflect changes in the unpaid principal of my loan in accordance with Section 5 of this Note. Beginning with the First P&I Payment Due Date my monthly payment will change to an amount sufficient to repay the principal and interest at the rate described in Section 4 of this Note.

Before the effective date of any change in my monthly payment, the Note Holder will deliver or mail to me a notice of the change in accordance with Section 8 of this Note. The notice will include the title and telephone number of a person who will answer any question I may have regarding the notice.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Interest Change Dates**

The interest rate I will pay may change on the first day of JULY, 2017, and may change on that day every 12th month thereafter. Each date on which my interest rate could change is called an "Interest Change Date."

**(B) The Index**

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Interest Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding TWO AND THREE-QUARTERS percentage point(s) ( 2.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Interest Change Date.

The Note Holder will then determine the amount of my monthly payment. For payment adjustments occurring before the First P&I Payment Due Date, my monthly payment will be the amount sufficient to repay all accrued interest each month on the unpaid principal balance at the new interest rate. For payment adjustments occurring on or after the First P&I Payment Due Date, my monthly payment will be an amount sufficient to repay the unpaid principal that I am expected to owe at the Interest Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Interest Change Date will not be greater than 11.125 % or less than 2.750 %. Thereafter, my interest rate will never be increased or decreased on any single Interest Change Date by more than TWO percentage point(s) ( 2.000 %) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.125 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Interest Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Interest Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to the changes.

If I make a partial Prepayment during the period ending with the due date of my last interest only monthly payment, my partial Prepayment will reduce the amount of my monthly payment. If I make a partial Prepayment after the last interest only monthly payment, my partial Prepayment may reduce the amount of my monthly payments beginning with the monthly payment due after the Interest Change Date following the partial Prepayment. After the first Interest Change Date, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of interest during the period when my payment is interest only, and of principal and interest after that. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

   This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

   **(A) UNTIL MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT IS DESCRIBED AS FOLLOWS:**

   **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

   If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

   If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

   **(B) AFTER MY INITIAL INTEREST RATE CHANGES UNDER THE TERMS STATED IN SECTION 4 ABOVE, UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT DESCRIBED IN SECTION 11(A) ABOVE SHALL THEN CEASE TO BE IN EFFECT, AND UNIFORM COVENANT 18 OF THE SECURITY INSTRUMENT SHALL INSTEAD BE DESCRIBED AS FOLLOWS:**

   **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

   If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

   To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

   If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_______________ (Seal)
KATHRYN O SMITH -Borrower

_______________ (Seal)
-Borrower

_______________ (Seal)
-Borrower

_______________ (Seal)
-Borrower

_______________ (Seal)
-Borrower

_______________ (Seal)
-Borrower

_______________ (Seal)
-Borrower

_______________ (Seal)
-Borrower

*[Sign Original Only]*

0076843887

# RELATIONSHIP ARM ALLONGE AND ADDENDUM TO NOTE

| JUNE 22, 2007 | BEVERLY HILLS | CALIFORNIA |
|---|---|---|
| [Date] | [City] | [State] |

6400 CRESCENT PARK EAST DR., PLAYA VISTA, CA 90094

[Property Address]

THIS RELATIONSHIP ARM ALLONGE AND ADDENDUM TO NOTE (the "Addendum") is made this 22ND day of JUNE ,2007, is incorporated into and shall be deemed to amend and supplement the Note made by the undersigned Borrower ("Borrower" whether one or more) in favor of WELLS FARGO BANK, N.A. ("Lender") and dated the same date as this Addendum (the "Note"). The Note is secured by a certain Deed of Trust/Mortgage/Security Deed, in favor of Lender dated the same date as this Addendum (the "Security Instrument"), covering the premises described in the Security Instrument.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Note, Borrower and Lender further covenant and agree as follows:

1. RELATIONSHIP ARM

Borrower has agreed to pay the rate of interest set forth in Section 2 of the Note (the "Base Rate") until that interest rate may change in accordance with Section 4 of the Note (the "Initial Interest Rate Period"). Borrower and Lender acknowledge and agree that the Base Rate was determined in reliance on the Borrower maintaining certain account balances and relationships in Eligible Accounts with Wells Fargo Bank (the "Bank") (collectively the "Bank Relationship") during the Initial Interest Rate Period of the loan evidenced by this Note, as more particularly described in the Relationship ARM Supplement to the Loan Disclosure. Balances held in the following types of Wells Fargo accounts will be considered as part of the Bank Relationship: Checking, Savings, Money Market, Certificate of Deposit, Individual Retirement Account, Brokerage (Full Service or Discount), Investment Management, Credit Card, Auto Loan, Student Loan, Consumer Loans or Lines of Credit (excluding first mortgage loans) and Home Equity Loans or Lines of Credit (excluding the subject property). Other types of accounts may be considered on a case-by-case basis. Borrower acknowledges that the Base Rate reflects a reduction in the market interest rate of ONE-EIGHTH percent (.125 %) (the "Relationship Discount") based on a Bank Relationship in Eligible Accounts of

A CHECKING ACCOUNT AND IF YOUR ORIGINAL LOAN AMOUNT IS GREATER THAN $1,500,000, A CHECKING ACCOUNT AND 10% OF YOUR ORIGINAL LOAN AMOUNT.

In the event the Borrower increases the Bank Relationship after closing, no additional discounts will be applied to the Base Rate. In the event a sufficient Bank Relationship does not exist in the Borrower's Eligible Accounts during the Initial Interest Rate Period, Borrower and Lender agree that the Lender may increase the Base Rate in accordance with Section 2 of this Addendum. A sufficient Bank Relationship means the minimum Bank Relationship that was established in support of the Relationship Discount prior to your loan closing.

2. ADJUSTMENT TO INTEREST RATE AND MONTHLY PAYMENT CHANGES

Reviews of your Bank Relationship will be conducted periodically during the Initial Interest Rate Period. If at any time, it is determined that a sufficient Bank Relationship does not exist, Lender will send to Borrower a written reminder and allow a grace period of at least sixty (60) days from the date of the notice for Borrower to restore a sufficient Bank Relationship. If a sufficient Bank Relationship has not been restored by the end of the grace period, Lender will send to Borrower a written notice of interest rate adjustment increasing the Base Rate.

The amount of your interest rate increase will vary from .125% to .500% and will be effective the date of the first payment due date occurring immediately after the date of the interest rate increase notice. The amount of your rate increase will be based on the amount of your existing Relationship Discount and the amount of your reduced Bank Relationship determined in accordance with the Relationship ARM Supplement to the Loan Disclosure. Your Bank Relationship will be determined as of the last day of the grace period. The interest increase will be added to the Base Rate set forth in Section 2 of the Note. Lender will deliver or mail to Borrower the notice of the increase to the Base Rate at least twenty-five (25) days before the due date of the new monthly payment amount. The notice will include the new interest rate, the effective date of the interest rate change, the amount of the new monthly payment due under the Note, the effective date of that new payment, and the outstanding principal balance of the Note.

**3. NO OTHER CHANGE TO NOTE**

Except as otherwise specifically provided in this Addendum, the Note and Security Instrument will remain unchanged, and Borrower and Lender will be bound by, and comply with, all of the terms and provisions thereof, as amended by this Addendum.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Relationship ARM Allonge and Addendum to Note.

KATHRYN O SMITH -Borrower

-Borrower

-Borrower

-Borrower

# EXHIBIT B

Assured Lender Services, Inc
PO Box 9083
Temecula, CA 92589-9083

7196 9006 9295 0437 6850

PRESORT
First-Class Mail
U.S. Postage and
Fees Paid
WSO

*Send Correspondence to:*
Assured Lender Services, Inc
2552 Walnut Avenue
Suite 110
Tustin, CA 92780

20110228-122

KATHRYN SMITH
6400 CRESCENT PARK EAST DRIVE #120
PLAYA VISTA, CA 90094

*CA 10DayMailingFC*

COPY of Document Recorded at Los Angeles County Recorder
11 0271867 02/18/2011
has not been compared with original. Original will be returned when process has been completed.

Fee: 27.00 DTT: 0.00 Total 27.00

RECORDING REQUESTED BY

AND WHEN RECORDED MAIL TO
Assured Lender Services, Inc.
2552 Walnut Avenue
Suite 110
Tustin, CA 92780

Space above this line for recorder's use only

Trustee Sale No. F11-00115 DW Loan No. XXXXXX9977 Title Order No.140-1225584-32

# IMPORTANT NOTICE
# NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION,** and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until three months from the date this Notice of Default and Election to Sell Under Deed of Trust (this "Notice of Default") is recorded (which date of recordation appears on this notice).

This amount is $42,237.97 as of 02/15/2011 and will increase until your account becomes current.

While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the end of the three-month period stated above) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in this Notice of Default, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of property by paying the entire amount demanded by your creditor.

To find out the amount you must pay, to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

Marix Servicing, LLC
1925 W. Pinnacle Peak Rd.
Phoenix, AZ 85027
Telephone: (623)249-2000

# EXHIBIT C

TO: ( ABER SAUNDERS
UFAN
916-669-9698

**First American Title Company**
**2829 Townsgate Road Suite #103, Westlake Village, CA 91361**
**Phone - (805)449-4199 Fax - (805)497-0752**

## AMENDED/SUPPLEMENTAL ESCROW INSTRUCTIONS

To: **First American Title Company**

**November 28, 2005**
File No: **VWL-1734888 (NB)**

Re: **6400 Crescent Park East #120, Playa Vista, CA 90094**
Unit: 120 Lot: Tract: 49104-05

The above referenced escrow is hereby modified in the following particulars only:

| | |
|---|---|
| Base Sales Price | $304,058.00 |
| Flooring Added to Sales Price | 4,105.00 |
| Windows Added to Sales Price | 2,817.00 |
| Options Added to Sales Price | 4,155.00 |
| Storage Added to Sales Price | 6,250.00 |
| Final Sales Price | $321,385.00 |

Escrow holder to credit buyer the sum of $5,000.00 for earnest money deposit.

Escrow holder to credit buyer the sum of $3,125.00 for storage money deposit.

Escrow holder to debit seller and credit buyer the sum of $2,832.00 for upgrade deposits.

Escrow holder to debit seller and pay the sum of $8,245.00 to RDS for balance due on upgrades.

ALL OTHER TERMS AND CONDITIONS OF THIS ESCROW WILL REMAIN THE SAME.

KATHRYN SMITH/ 25006298 1st

# SETTLEMENT AGENT CLOSING INSTRUCTIONS
## ESCROW CLOSING

Lender: [illegible] BANK, N.A. [illegible] BLVD, STE 131 [illegible] ATTN: [illegible] CANALES

Closing Agent: FIRST AMERICAN TITLE
2829 TOWNGATE ROAD #103
WESTLAKE VILLAGE, CA 91361
805-449-4199
ATTN: NONA BOLEN

Borrower: [illegible] SMITH

Property: 6400 CRESCENT PARK EAST 120
PLAYA VISTA CA 90094

Lender [illegible] 06298

Signing Date: April 27 2006

Escrow/Title #: 1734888
1734888

Lender Contact: FRANCISCO CANALES

To: Clos[illegible]

You ha[illegible] engaged as the Closing Agent for the referenced Loan and will be acting on behalf of Lender when you close the loa[illegible] authorized to act only in accordance with these written closing instructions. You may not disburse our fun[illegible] you fully comply with all closing instructions. Any changes to these instructions must be made in writing and signed by the Lender. These instructions may differ from those of other mortgage lenders and you are required to read these instructions in their entirety. If you have any questions with these instructions, call the Lender immediately.

I HAVE READ THESE CLOSING INSTRUCTIONS AND I UNDERSTAND THAT ANY VIOLATION OF THESE INSTRUCTIONS MAY RESULT IN A CLAIM BY THE LENDER AGAINST THE CLOSING AGENT AND/OR THE TITLE INSURANCE COMPANY WHICH ISSUED ANY INSURED CLOSING LETTER OR INDEMNIFICATION LETTER. FAILURE TO EXECUTE AND RETURN THIS DOCUMENT DOES NOT ABSOLVE YOU OF YOUR OBLIGATION TO CLOSE THE LOAN ONLY IN ACCORDANCE WITH THESE WRITTEN CLOSING INSTRUCTIONS.

Nona Bolen 5/1/06 ← SIGN/DATE/RETURN

CLOSING AGENT DATE

## PART I
## SUMMARY INFORMATION

| | |
|---|---|
| Borrower Name: KATHRYN SMITH | Loan Number: 25006298 |
| Est. Disbursement Date: May 01 2006 / April 27 2006 | Est. Closing/Signing Date: April 27 2006 |
| First Payment Date: June 01 2006 | Lender Source of Funds: WIRE |
| Loan Amount: 257,105.00 | Loan Purpose: Purchase |
| Loan Type: Conventional | Interest Rate: 5.750 % |
| Product Type: Interest Only Loan | Property Type: Condominium |
| Property Street: 6400 CRESCENT PARK EAST 120 | Property State: California |
| New York CEM: No | Document Expiration Date: 08/03/06 |
| Lock Expiration: 05/09/06 | Rescission Transaction/ Expiration Dates: To be completed by Closing Agent |
| Escrow Reference #: 1734888 | |

## PART II
## GENERAL

Closing Agent must review all sections of these instructions prior to closing and immediately contact the Lender if the Loan cannot be settled in strict accordance with these instructions.

- Lender must receive and approve the HUD-1/HUD-1A worksheet closing statement prior to borrower signing

documents.

- Closing Agent must contact Lender to confirm funding.
- Closing Agent must contact the Lender immediately if the loan does not fund on the designated funding date. Failure to do so will subject your company to payment of any interest charges or penalties we incur during the days that we have not been notified.
- Closing Agent must contact Lender immediately if the loan does not record on the day of or the day after funding.
- Closing Agent must provide Lender with an Insured Closing Protection letter per Lender's requirements.
- Closing Agent must attach the legal description of the collateral Property to the Security instruments prior to closing.
- If "Schedule A - Conditions To Be Satisfied for Closing," references the simultaneous closing of any second lien/home equity loan, then Closing Agent must follow the closing instructions delivered with respect to such second lien/home equity documents as to such documents.

## PART III
## CONDITIONS

Closing Agent must satisfy the following conditions prior to closing:

1. The HUD-1/HUD-1A Closing Statement and HUD-1 Addendum must show all correct providers of services, correct HUD-1 line numbers as directed by the Lender, and must be fully executed by all parties, all in compliance with the requirements of RESPA and HUD Regulation X's. All charges made for FHA or VA loans must conform to FHA/VA requirements. The attached "Addendum to Closing Instructions" advises of the parties that will be compensated for services provided in connection with this transaction.

2. Closing Agent must confirm the Borrower's identity at closing with an original government issued photo identification (i.e. photo driver's license or passport) or two (2) original alternate industry acceptable proofs of identification (i.e. Social Security card, major credit card.) Closing Agent must see the actual form of identification and may not accept copies of any identification.

3. All signatures must conform exactly to the security instruments and note/bond. A Power of Attorney is not permitted without Lender's and the Title Company's written prior approval prior to closing.

4. The Closing Agent, or any other party, is not permitted to change any forms or amounts without the Lender's approval; any repair escrows must be approved by Lender prior to closing; Lender must approve any sales price and/or seller concessions/credits for any changes or adjustments between buyers and sellers prior to closing.

5. Real estate taxes, hazard insurance premiums and flood insurance premiums (if applicable) attributable to the period beginning on the closing date and ending on the first payment date must be collected. All collected taxes and premiums must be shown on the HUD-1/HUD-1A Closing Statement.

6. For all purchase transactions, Closing Agent must receive a copy of the original hazard insurance and flood insurance (if applicable) policy or binder (or a copy of the Condominium or PUD Master Policy), together with a copy of a paid receipt for the annual premium. The Closing Agent is required to return such policies or binders insuring "Lender, its successors and/or assigns."

7. The hazard insurance policy must insure the Lender for the lesser of 100% of the insurable value of the improvements as established by the insurer, or the unpaid principal balance as long as it is equal to the minimum amount required to compensate for damage or loss on a replacement cost basis (the replacement value is the insurer's estimate of the cost to replace a home, excluding the land value.) In the event a policy cannot be issued based on the "lesser of" requirements noted, the policy must contain "Guaranteed Full Replacement" coverage providing for full reconstruction of the dwelling.

8. The flood insurance policy, if applicable, must insure the Lender for lesser of the mortgage amount, the value of the dwelling securing the loan, or the maximum amount of coverage available through the NFIP. An application for a policy accompanied by a paid receipt for the annual premium is acceptable.

9. The Closing Agent is responsible for satisfying all conditions noted on **"Schedule A - Conditions To Be Satisfied for Closing"** attached to these Closing Instructions.

## PART IV
## DOCUMENTATION

WITHIN 48-HOURS OF BOTH BORROWER AND SELLER EXECUTING DOCUMENTS, Closing Agent must

return/remit all documents and [illegible]ence of satisfaction of conditions (fully executed and [illegible]rized as applicable) to the address of the Lender noted on Page 1 with the notation: "ATTENTION: CLOSING DEPARMTENT." The Closing Agent is required to provide the Lender with executed documents 48 hours prior to the required disbursement date.

The Closing Agent is required to return the hazard insurance policy and the flood insurance policy (if applicable) (or condominium certificate and master policy for condominiums and PUDS) insuring "Lender, its successors and/or assigns," to ATIMA, P.O. BOX 47020, DORAVILLE, GA 30362.

**Standard Documents:**

Closing Agent must verify that all documents are properly executed where noted and returned in accordance with these closing instructions. The Closing Agent should immediately contact the Lender if there are any questions regarding the documents and/or the instructions for this transaction. The Closing Agent may not alter any document prepared by the Lender without the Lender's consent.

If no reference is made to a required number of copies with respect to a particular document, then only the original executed document needs to be returned to Lender. Reference to certified true and correct copies means copies that are stamped "certified true".

1. _X_ Lender Closing Instructions with attached **Addendum to Closing Instructions and Schedule-A Conditions To Be Satisfied for Closing.** The Closing Agent to fully comply with all instructions as noted within this document and return fully signed and dated (Page 1 and Page 4's Closing Agent Certification).

2. _X_ Security instruments and accompanying Rider(s) and Schedules (collectively the "Security instruments"). The Subject Property legal description should be attached to the security instruments and otherwise included in the return package. Lender requires one (1) original executed and notarized security instruments with the attached collateral Property legal description to be sent out for recording and three (3) certified true and correct copies of the executed and notarized security instruments with the attached collateral Property legal description.

3. _X_ Note/Bond and Rider(s) (collectively the "Note"). Lender requires the original Note and three (3) certified true and correct copies of the executed Note.

4. _X_ HUD-1/HUD-1A Closing Statement. Lender requires three (3) certified true and correct copies of the final executed document.

5. _X_ Truth-In-Lending Disclosure Statement and, the ARM or Balloon Disclosure if applicable.

6. _X_ Document Correction Agreement

7. _X_ Dear Homeowner Letter

8. _X_ Transfer of Servicing Disclosure Statement

9. _X_ W-9 Tax Form

10. ____ FNMA Typed 1003 Loan Application

11. ____ Notice of Right to Cancel – Must be signed and dated by all parties who have executed the security instrument. Each party entitled to rescind must receive two (2) copies of the Notice of Right to Cancel in addition to one (1) copy of the Truth-In-Lending Disclosure Statement.

12. _X_ All documents required for Consolidated Extension and Modification (CEM) Agreements, if applicable.

13. _X_ All other applicable state, Federal and Lender documents included in this first lien package; including all applicable FHA/VA documents.

14. _X_ If **"Schedule A - Conditions To Be Satisfied for Closing,"** references any second lien/home equity loan documents being executed with the above described Loan documents, then Closing Agent must follow the closing instructions delivered with respect to such second lien/home equity documents as to such documents, and must return all such second lien/home equity documents together with the above described Loan documents. Lender requires that HUD-1/HUD-1A Closing Statements be completed for each transaction individually. No exceptions to this requirement will be made.

---

## PART V
## TITLE POLICY

---

**Within ten (10) days of recording the security instruments, Closing Agent must deliver a title policy to Lender that will:**

KATHRYN SMITH 25006298

1. Insure that our security instrument is a first lien. Schedule A of the policy must recite full recording data pertinent to the security instrument.

2. Any Second Mortgage(s) must be subordinate to the Lender's first mortgage lien and must be approved by the Lender prior to closing via the "Schedule A – Conditions To Be Satisfied for Closing." Schedule A must recite mortgage recording data regarding any approved second mortgage. Any second mortgage may not contain a prepayment penalty clause.

3. Insure Lender for the full amount of the Loan as referenced in these instructions and the security instrument and Note.

4. Reference the full and accurate legal description as it appears in the security instrument and on any survey.

5. States the borrower(s) name(s) and marital status exactly as they appear in the security instrument. If a spouse is not a co-mortgagor, the title policy must insure that our mortgage is superior in all respects to any and all rights of the non-mortgagor spouse.

6. Includes the following standard ALTA Endorsements (as applicable):
   ALTA Form 4 (if Condominium) ALTA Form 5 (if PUD) ALTA Form 6 (if VRM, ARM, or GPM) ALTA Form 8 or 8.1 (Environmental Protection Lien) ALTA Form 9 Florida
   All other Endorsements noted on "Schedule A – Conditions To Be Satisfied for Closing"

7. Insures the following interests: "JPMORGAN CHASE BANK, N.A. ______________, ITS SUCCESSORS AND ASSIGNS," and
   If FHA add: "and/or the Secretary of Housing and Urban Development, as their interests may appear."
   If VA add: "and/or the Secretary of Veterans Affairs, as their interest may appear."

8. Insures that all municipal assessments and all condo/cooperative/homeowner's association and maintenance assessments, if any, are current through the date of the policy; insures that any applicable ground rents have been paid through the date of the policy and proper notification has been made to the ground lessor regarding Lender's interests.

9. There can be no exceptions or conditions in the title policy, unless otherwise noted on "Schedule A – Conditions To Be Satisfied for Closing" or approved by Lender in writing. Any Lender agreed upon exceptions with respect to covenants, easements or restrictions may only remain if the policy provides affirmative coverage as follows: THIS POLICY AFFIRMATIVELY INSURES THAT NONE OF THE REFERENCED COVENANTS, EASEMENTS OR RESTRICTIONS HAVE BEEN VIOLATED, AND THAT ANY FUTURE VIOLATIONS WILL NOT RESULT IN A FORFEITURE OR REVERSION OF TITLE, OR ANY LOSS TO THE MORTGAGEE.

10. A Power of Attorney is not permitted without the Lender's and the Title Company's written approval prior to closing (Lender will make notations on "Schedule A – Conditions To Be Satisfied for Closing.") The Closing Agent must provide a copy of the recorded Power of Attorney and evidence that the Title Company is insuring over the Power of Attorney (and confirmation, for VA loans, that the grantor is alive.) If the loan is closed with an approved Power of Attorney, the Power of Attorney must be recorded before the Deed or the security instrument.

---

## PART VI
## CLOSING AGENT CERTIFICATION

---

CLOSING AGENT HEREBY CERTIFIES THAT:

(1) I HAVE SETTLED THIS LOAN IN ACCORDANCE WITH ALL PAGES OF THESE INSTRUCTIONS;

(2) A CURRENT INSURED CLOSING LETTER OR INDEMNIFICATION LETTER IS ON FILE WITH LENDER WITH RESPECT TO THIS LOAN;

(3) IF REQUESTED BY THE BORROWER, I HAVE PROVIDED THE HUD-1/HUD-1A CLOSING STATEMENT WITH ALL AVAILABLE CLOSING FIGURES TO THE BORROWERS FOR THEIR INSPECTION PRIOR TO THE CLOSING;

(4) IN ACCORDANCE WITH RESPA & VARIOUS STATE REGULATIONS, I HAVE DISCLOSED ON THE HUD-1/HUD-1A ALL FEES AND CHARGES INCURRED BY THE BORROWER AND SELLER, INCLUDING FEES RECEIVED BY THE CLOSING AGENT OR ATTORNEY HIRED BY THE BORROWER; IN ADDITION, I HAVE SHOWN THE NAME OF THE RECIPIENT OF FUNDS WITH THE LETTERS P.O.C. NEXT TO EACH ENTRY PAID OUTSIDE OF CLOSING.

(5) WHERE I HAVE COLLECTED A FEE FOR THE PURPOSE OF CONDUCTING THE CLOSING, THE FEE IS

KATHRYN SMITH 5006298

PERMITTED BY S LAW AND DOES NOT EXCEED THE AMOUNT LISTI HUD-1/HUD-1A AS SETTLEMENT/CLOSING FEE.

(6) I HAVE CONFIRMED BORROWER'S IDENTITY AT CLOSING WITH AN ORIGINAL GOVERNMENT ISSUED FORM OF PHOTO IDENTIFICATION (I.E. PHOTO DRIVER'S LICENSE OR PASSPORT) OR TWO (2) ALTERNATE ORIGINAL FORMS OF PROOF OF IDENTIFICATION (I.E. SOCIAL SECURITY CARD, MAJOR CREDIT CARD.).

I UNDERSTAND THAT ANY VIOLATION OF THESE INSTRUCTIONS MAY RESULT IN A CLAIM BY LENDER AGAINST THE CLOSING AGENT AND/OR THE TITLE INSURANCE COMPANY WHICH ISSUED THE INSURED CLOSING LETTER OR INDEMNIFICATION LETTER. FAILURE TO EXECUTE AND RETURN THIS DOCUMENT DOES NOT ABSOLVE YOU OF YOUR OBLIGATION TO CLOSE THE LOAN ONLY IN ACCORDANCE WITH THESE WRITTEN CLOSING INSTRUCTIONS.

Lorna Bolen 5/1/06 SIGN/DATE/RETURN

CLOSING AGENT DATE

KATHRYN SMITH

TO: FIRST AMERICAN TITLE
2829 TOWNGATE ROAD #103 WESTLAKE VILLAGE, CA 91361

04/27/06
17:43:51

FROM: JPMORGAN CHASE BANK, N.A. 776-1200

7340 FIRESTONE BLVD, STE 131 DOWNEY, CA 90241

| | | | |
|---|---|---|---|
| LOAN# | 25006298\1250062980 | P & I | 1,231.98 |
| ESCROW# | 1734888 | TAXES | .00 |
| ORDER/TITLE# | 1734888 | HAZARD | .00 |
| FHA/VA PMI# | | MIP/PMI | .00 |
| TYPE | C-584 | FLOOD | .00 |
| RATE | 5.750 | WEATHER-RELATED | .00 |
| TERM | 30.000 YEARS | | |
| SALES PRICE | 321,385.00 | TOTAL MONTHLY PAYMENT | 1,231.98 |

BORROWERS: KATHRYN SMITH

SELLERS: WESTWIND CRESCENT PARK CONDOS

PROPERTY ADDRESS 6400 CRESCENT PARK EAST 120, PLAYA VISTA, CA 90094
MAILING ADDRESS 6400 CRESCENT PARK EAST 120, PLAYA VISTA, CA 90094-

The seller is authorized to pay up to $ 2,571.08 towards the borrower's settlement costs. Unless otherwise indicated below, this sum cannot include prepayables. All of the items below have been deducted from our check and must be shown as settlement expenses on the HUD-1(or HUD-1A) Settlement Statement. Items marked "POC" must be shown on the HUD-1(or HUD-1A) as "Paid Outside of Closing" All providers/payees must be disclosed on the HUD-1(or HUD-1A).

*** ALL TAXES ARE TO BE PAID THRU ***
FUNDING DATE 05/01/06
CLOSING DATE 04/27/06

| FEES | BUYER'S COSTS | SELLER'S COSTS | THRU SUBSIDY | THIRD PARTY |
|---|---|---|---|---|
| 0801 LOAN ORIGINATION FEE (1.000% OF LOAN) | 2,571.08 | | | |
| 0803a APPRAISAL | 400.00 | | | |
| 0808a TAX SERVICE CONTRACT FEE-PERMANENT FINANCING | 69.00 | | | |
| 0810 DOCUMENT PREPARATION FEE | 150.00 | | | |
| 0816 PROCESSING FEE | 250.00 | | | |
| 0818 MESSENGER/DELIVERY SERVICE/COURIER FEES | | | | 75.00 |
| 0820 FLOOD CERTIFICATION FEE | 14.00 | | | |
| 1111 ESCROW FEE | | | | 895.00 |
| 1123 SUB ESCROW FEE | | | | 125.00 |
| **PREPAYABLES** | | | | |
| 901 INTEREST FROM 05/01/06 TO 05/01/2006 @ 40.50 PER DIEM .00, 0 DAYS | .00 | .00 | .00 | |
| | 3,454.08 | 0.00 | 0.00 | 1,095.00 |

| | | |
|---|---|---|
| MORTGAGE AMOUNT | | 257,108.00 |
| BUYER'S CHARGES | (3,454.08) | |
| SELLER'S CHARGES | 0.00 | |
| * ADDITIONAL SUBSIDY | 0.00 | |
| TOTAL FEES DEDUCTED | | (3,454.08) |
| WIRE NET AMOUNT | | 253,653.92 |

BY: JPMORGAN CHASE BANK, N.A.

See Addendum to Closing Instructions for provider/payee information

SETTLEMENT AGENT'S INSTRUCTION SHEET
C-6078 PAGE 4 OF 4 (REV. 7/99)

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ 1,231.98 until the first Change Date. After the first Change Date, my monthly payment will be in an amount sufficient to pay accrued interest, at the rate determined as described in Section 4 of this Note until the First Principal and Interest Payment Due Date. On that date and thereafter, my monthly payment will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of changes in monthly payment.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of May 2009 , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Two and One-Half percentage points ( 2.500 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of my monthly payment. For payment adjustments occurring before the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay all accrued interest each month on the unpaid principal balance at the new interest rate. If I make a voluntary payment of principal before the First Principal and Interest Payment Due Date, my payment amount for subsequent payments will be reduced to the amount necessary to repay all accrued interest on the reduced principal balance at the current interest rate. For payment adjustments occurring on or after the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay unpaid principal and interest that I am expected to owe in full on the Maturity Date at the current interest rate in substantially equal payments.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 7.750 % or less than 3.750 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.750 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Date of First Principal and Interest Payment**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be that date which is the 10th anniversary date of the first payment due date, as reflected in Section 3(A) of the Note.

**5.   BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.   LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.   BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be     6.000   % of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.   GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

9. **OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

10. **WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11. **UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Recording Requested By:
FIRST AMERICAN TITLE
2829 TOWNGATE ROAD #103
WESTLAKE VILLAGE, CA 91361

Return To:

CHASE HOME FINANCE, LLC.
1500 N 19TH STREET
MONROE LA 71201

Attention:
CHASE HOME FINANCE

Prepared By: FRANCISCO CANALES

[Space Above This Line For Recording Data]

# DEED OF TRUST

25006298
1250062980

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated April 27, 2006, together with all Riders to this document.

(B) "Borrower" is KATHRYN SMITH, A SINGLE WOMAN AND MICHAEL W BALL, A SINGLE MAN, AS JOINT TENANTS

Borrower is the trustor under this Security Instrument.

(C) "Lender" is JPMORGAN CHASE BANK, N.A.

Lender is a BANK organized and existing under the laws of the U.S.A.



**LEGAL DESCRIPTION**

Real property in the City of Los Angeles, County of Los Angeles, State of California, described as follows:

A CONDOMINIUM COMPRISED OF:

PARCEL NO. 1:

UNIT NO. 120 AS SHOWN IN THE PHASE 1 CONDOMINIUM PLAN, WHICH PLAN WAS RECORDED ON SEPTEMBER 6, 2005 AS INSTRUMENT NO. 05-2137312, AND THE FIRST AMENDMENT TO THE PHASE 1 CONDOMINIUM PLAN, WHICH AMENDMENT WAS RECORDED ON NOVEMBER 21, 2005 AS INSTRUMENT NO. 05-2821270, BOTH OF OFFICIAL RECORDS, CONSTITUTING A PORTION OF COMBINED LOTS 18, 19 AND 20 OF TRACT NO. 49104-05, IN THE CITY OF LOS ANGELES, AS PER MAP RECORDED IN BOOK 1272, PAGES 88 TO 93 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM, ANY AND ALL OIL, OIL RIGHTS, MINERALS, MINERAL RIGHTS, NATURAL GAS RIGHTS AND OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN, GEOTHERMAL STEAM OR OTHER RESOURCES, AND ALL PRODUCTS DERIVED FROM ANY OF THE FOREGOING, THAT MAY BE WITHIN OR UNDER THE UNIT, TOGETHER WITH THE PERPETUAL RIGHT OF DRILLING, MINING OR EXPLORING AND OPERATING THEREFORE AND STORING IN AND REMOVING THE SAME FROM THE UNIT OR ANY OTHER LAND, INCLUDING THE RIGHT TO WHIPSTOCK OR DIRECTIONALLY DRILL AND MINE FROM LANDS OTHER THAN THOSE CONVEYED HEREBY, OIL OR GAS WELLS, TUNNELS AND SHAFTS INTO, THROUGH OR ACROSS THE SUBSURFACE OF THE LAND, AND TO BOTTOM SUCH WHIPSTOCKED OR DIRECTIONALLY DRILLED WELLS, TUNNELS AND SHAFTS UNDER AND BENEATH OR BEYOND THE EXTERIOR LIMITS THEREOF, AND TO REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE ANY SUCH WELLS OR MINES; WITHOUT, WHOEVER, THE RIGHT TO ENTER UPON, DRILL, MINE, STORE, EXPLORE AND OPERATE THROUGH THE SURFACE OR THE UPPER FIVE HUNDRED (500) FEET OF THE SUBSURFACE OF THE UNIT AS RESERVED BY PLAYA CAPITAL COMPANY, LLC, A DELAWARE LIMITED LIABILITY COMPANY ("PLAYA CAPITAL"), BY DEED RECORDED SEPTEMBER 2, 2003 AS INSTRUMENT NO. 03-2543669 OF OFFICIAL RECORDS.

FURTHER EXCEPTING AND RESERVING THEREFROM, FOR THE BENEFIT OF PLAYA CAPITAL, EXCLUSIVE BLANKET EASEMENTS ("TELECOMMUNICATIONS EASEMENTS") OVER THE UNIT FOR ACCESS AND FOR PURPOSES OF CONSTRUCTING, INSTALLING, LOCATING, ALTERING, OPERATING, MAINTAINING, INSPECTING, UPGRADING, REMOVING AND ENHANCING TELECOMMUNICATIONS FACILITIES (AS DEFINED IN THE MASTER DECLARATION) AND PROVIDING TELECOMMUNICATIONS SERVICES (AS DEFINED IN THE MASTER DECLARATION).

RESERVING THEREFROM, FOR THE BENEFIT OF GRANTOR, ITS SUCCESSORS IN INTEREST AND OTHERS, EASEMENTS FOR ACCESS, ENCROACHMENT, SUPPORT, MAINTENANCE, DRAINAGE, USE, ENJOYMENT, REPAIRS AND FOR OTHER PURPOSES, ALL AS SHOWN IN THE MAP AND THE PLAN, AND AS DESCRIBED IN THE FOLLOWING DOCUMENTS:

A. THE MASTER DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS AND RESERVATION OF EASEMENTS FOR PLAYA VISTA, AS AMENDED OR RESTATED, WHICH WAS RECORDED ON FEBRUARY 7, 2000 AS INSTRUMENT NO. 00-187083 AND AMENDED BY A FIRST AMENDMENT THERETO RECORDED ON MARCH 26, 2001 AS INSTRUMENT NO. 01-481376, A




SECOND AMENDMENT THERETO RECORDED ON NOVEMBER 26, 2002 AS INSTRUMENT NO. 02-2875170, AND A THIRD AMENDMENT THERETO RECORDED NOVEMBER 26, 2002 AS INSTRUMENT NO. 02-2875171, ALL OF OFFICIAL RECORDS.

B. THE SUPERSEDING SUPPLEMENTAL DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS AND RESERVATION OF EASEMENTS FOR PLAYA VISTA (WATERSTONE), AS AMENDED OR RESTATED, WHICH WAS RECORDED SEPTEMBER 6, 2005 AS INSTRUMENT NO. 05-2137311 OF OFFICIAL RECORDS; AND

C. THE DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS AND RESERVATION OF EASEMENTS FOR WATERSTONE, AS AMENDED OR RESTATED, WHICH WAS RECORDED ON SEPTEMBER 6, 2005 AS INSTRUMENT NO. 05-2137313 OF OFFICIAL RECORDS.

FURTHER RESERVING THEREFROM, THE RIGHT TO ENTER THE UNIT TO COMPLETE AND REPAIR ANY IMPROVEMENTS OR LANDSCAPING LOCATED THEREON AS DETERMINED NECESSARY BY GRANTOR, IN ITS SOLE DISCRETION, IN ORDER TO COMPLY WITH REQUIREMENTS FOR THE RECORDATION OF THE MAP, THE GRADING OF SAID TRACT AND/OR IN COMPLIANCE WITH THE REQUIREMENTS OF APPLICABLE GOVERNMENTAL AGENCIES. THE CONDOMINIUM ESTATE (DEFINED BELOW) SHALL ALSO BE SUBJECT TO A RIGHT OF ENTRY BY THE GRANTOR UNTIL THE EXPIRATION OF ALL APPLICABLE STATUTES OF LIMITATIONS FOR THE FILING OF A COMPLAINT OR SUITE OR OTHER LEGAL REMEDIES AGAINST GRANTOR IN ANY WAY RELATING TO OR ARISING OUT OF THE DEVELOPMENT, CONSTRUCTION, TRANSFER AND/OR SALE OF THE CONDOMINIUM ESTATE BY GRANTOR. SAID ENTRY BY GRANTOR SHALL BE PRECEDED BY REASONABLE NOTICE TO GRANTEE BEFORE SAID ENTRY. IF THIS RESERVATION OF A RIGHT OF ENTRY IS NOT COMPLIED WITH BY GRANTEE, GRANTOR MAY ENFORCE THIS RIGHT OF ENTRY IN A COURT OF LAW. GRANTEE SHALL BE RESPONSIBLE FOR ALL DAMAGES ARISING OUT OF SAID BREACH INCLUDING ATTORNEY'S FEES AND COURT COSTS. THIS RESERVATION OF A RIGHT OF ENTRY SHALL AUTOMATICALLY EXPIRE ELEVEN (11) YEARS FROM THE LAST CLOSE OF ESCROW FOR A CONDOMINIUM IN THE COMMUNITY (AS THOSE TERMS ARE DEFINED IN THE DECLARATION).

PARCEL NO. 2:

AN UNDIVIDED 1/64TH INTEREST AS A TENANT-IN-COMMON IN AND TO THE COMMON AREA DESCRIBED IN THE PLAN WHICH ENCUMBERS LOTS 18, 19 AND 20 OF SAID TRACT NO. 49104-05.

PARCEL NO. 3:

EXCLUSIVE USE AREA EASEMENTS FOR PATIO PURPOSES AS ASSIGNED TO THE UNIT IN THE PLAN, AND EXCLUSIVE USE AREA EASEMENTS FOR SUBTERRANEAN PARKING AND STORAGE PURPOSES, IF APPLICABLE, AS ASSIGNED TO THE UNIT PURSUANT TO DESCRIPTIONS AND/OR DEPICTIONS OF THE DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS AND RESERVATION OF EASEMENTS FOR WATERSTONE, RECORDED SEPTEMBER 6, 2005 AS INSTRUMENT NO. 05-2137313, OFFICIAL RECORDS, AND/OR PLAN, AND SUBJECT TO THE PROVISIONS OF SAID DECLARATION (INCLUDING, WITHOUT LIMITATION, THE RESERVATION OF THE DECLARANT'S RIGHT TO RELOCATE AN ASSIGNED SUBTERRANEAN PARKING SPACE TO ANOTHER AREA OF THE GARAGE).

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

Initials: ________

SECOND AMENDMENT THERETO RECORDED ON NOVEMBER 26, 2002 AS INSTRUMENT NO. 02-2875170, AND A THIRD AMENDMENT THERETO RECORDED NOVEMBER 26, 2002 AS INSTRUMENT NO. 02-2875171, ALL OF OFFICIAL RECORDS.

B. THE SUPERSEDING SUPPLEMENTAL DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS AND RESERVATION OF EASEMENTS FOR PLAYA VISTA (WATERSTONE), AS AMENDED OR RESTATED, WHICH WAS RECORDED SEPTEMBER 6, 2005 AS INSTRUMENT NO. 05-2137311 OF OFFICIAL RECORDS; AND

C. THE DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS AND RESERVATION OF EASEMENTS FOR WATERSTONE, AS AMENDED OR RESTATED, WHICH WAS RECORDED ON SEPTEMBER 6, 2005 AS INSTRUMENT NO. 05-2137313 OF OFFICIAL RECORDS.

FURTHER RESERVING THEREFROM, THE RIGHT TO ENTER THE UNIT TO COMPLETE AND REPAIR ANY IMPROVEMENTS OR LANDSCAPING LOCATED THEREON AS DETERMINED NECESSARY BY GRANTOR, IN ITS SOLE DISCRETION, IN ORDER TO COMPLY WITH REQUIREMENTS FOR THE RECORDATION OF THE MAP, THE GRADING OF SAID TRACT AND/OR IN COMPLIANCE WITH THE REQUIREMENTS OF APPLICABLE GOVERNMENTAL AGENCIES. THE CONDOMINIUM ESTATE (DEFINED BELOW) SHALL ALSO BE SUBJECT TO A RIGHT OF ENTRY BY THE GRANTOR UNTIL THE EXPIRATION OF ALL APPLICABLE STATUTES OF LIMITATIONS FOR THE FILING OF A COMPLAINT OR SUITE OR OTHER LEGAL REMEDIES AGAINST GRANTOR IN ANY WAY RELATING TO OR ARISING OUT OF THE DEVELOPMENT, CONSTRUCTION, TRANSFER AND/OR SALE OF THE CONDOMINIUM ESTATE BY GRANTOR. SAID ENTRY BY GRANTOR SHALL BE PRECEDED BY REASONABLE NOTICE TO GRANTEE BEFORE SAID ENTRY. IF THIS RESERVATION OF A RIGHT OF ENTRY IS NOT COMPLIED WITH BY GRANTEE, GRANTOR MAY ENFORCE THIS RIGHT OF ENTRY IN A COURT OF LAW. GRANTEE SHALL BE RESPONSIBLE FOR ALL DAMAGES ARISING OUT OF SAID BREACH INCLUDING ATTORNEY'S FEES AND COURT COSTS. THIS RESERVATION OF A RIGHT OF ENTRY SHALL AUTOMATICALLY EXPIRE ELEVEN (11) YEARS FROM THE LAST CLOSE OF ESCROW FOR A CONDOMINIUM IN THE COMMUNITY (AS THOSE TERMS ARE DEFINED IN THE DECLARATION).

PARCEL NO. 2:

AN UNDIVIDED 1/64TH INTEREST AS A TENANT-IN-COMMON IN AND TO THE COMMON AREA DESCRIBED IN THE PLAN WHICH ENCUMBERS LOTS 18, 19 AND 20 OF SAID TRACT NO. 49104-05.

PARCEL NO. 3:

EXCLUSIVE USE AREA EASEMENTS FOR PATIO PURPOSES AS ASSIGNED TO THE UNIT IN THE PLAN, AND EXCLUSIVE USE AREA EASEMENTS FOR SUBTERRANEAN PARKING AND STORAGE PURPOSES, IF APPLICABLE, AS ASSIGNED TO THE UNIT PURSUANT TO DESCRIPTIONS AND/OR DEPICTIONS OF THE DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS AND RESERVATION OF EASEMENTS FOR WATERSTONE, RECORDED SEPTEMBER 6, 2005 AS INSTRUMENT NO. 05-2137313, OFFICIAL RECORDS, AND/OR PLAN, AND SUBJECT TO THE PROVISIONS OF SAID DECLARATION (INCLUDING, WITHOUT LIMITATION, THE RESERVATION OF THE DECLARANT'S RIGHT TO RELOCATE AN ASSIGNED SUBTERRANEAN PARKING SPACE TO ANOTHER AREA OF THE GARAGE).

Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Condominium Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay condominium dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

25006298
1250062980

# ADJUSTABLE RATE RIDER

**(LIBOR One-Year Index (As Published In *The Wall Street Journal*–Rate Caps)**

THIS ADJUSTABLE RATE RIDER is made this 27th day of April, 2006, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to JPMORGAN CHASE BANK, N.A. (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

6400 CRESCENT PARK EAST 120, PLAYA VISTA, CA 90094
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of 5.750 %. The Note provides for changes in the interest rate and the monthly payments as follows:

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of May, 2009, and on that day every 12th month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding Two and One-Half percentage points (2.500 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of my monthly payment. For payment adjustments occurring before the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay all accrued interest each month on the unpaid principal balance at the new interest rate. If I make a voluntary payment of principal before the First Principal and Interest Payment Due Date, my payment amount for subsequent payments will be reduced to the amount necessary to repay all accrued interest on the reduced principal balance at the current interest rate. For payment adjustments occurring on or after the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay unpaid principal and interest that I am expected to owe in full on the Maturity Date at the current interest rate in substantially equal payments.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 7.750 % or less than 3.750 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.750 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

| | |
|---|---|
| KATHRYN SMITH _______________ (Seal) Borrower | Michael W. Ball _______________ (Seal) Borrower |
| _______________ (Seal) Borrower | _______________ (Seal) Borrower |
| _______________ (Seal) Borrower | _______________ (Seal) Borrower |
| _______________ (Seal) Borrower | _______________ (Seal) Borrower |



***First American Title Insurance Company***

To Whom It May Concern:

Please be advised that First American Title Company is not a taxing authority and cannot complete, nor certify the attached tax information form.

Information regarding property taxes may be obtained from your Tax Service Contract.

Sincerely,

BY: ______________________________

# FAIR DEBT COLLECTION PRACTICES ACT NOTICE

KATHRYN O SMITH AND MICHAEL W BALL
6400 CRESCENT PARK EAST DR.
PLAYA VISTA, CA 90094

Pursuant to 15 U.S.C. §1692g, you are given the following notice:

1. Amount of Debt: $42,237.97, plus interest, late charges and attorneys fees.

2. Name of Creditor to whom debt is owed: TRUCAP GRANTOR TRUST (MARIX LOAN SERVICING, AS SERVICER)

3. Unless within 30 days after you receive this notice, you dispute the validity of the debt or a portion thereof, the debt will be assumed to be valid.

4. If you notify us in writing within 30 days after you receive this notice that you dispute the debt or a portion thereof, we will obtain and mail to you verification of the debt.

5. If you request in writing within 30 days after you receive this notice, we will provide you with the name and address of the original creditor, if different from the current creditor.

THIS COMMUNICATION IS AN ATTEMPT TO COLLECT A DEBT.
ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

7196 9006 9295 0437 6850

Trustee Sale No. F11-00115 DW Loan No. XXXXXX9977 Title Order No. 140-1225584-32

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan. Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure.

**REMEMBER, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION. NOTICE IS HEREBY GIVEN THAT:** Assured Lender Services, Inc. (the "Trustee") is either the original trustee, the duly appointed substituted trustee or acting as agent for the Beneficiary under a Deed of Trust dated 06/22/2007, executed by KATHRYN O SMITH AND MICHAEL W BALL; WIFE AND HUSBAND, as trustor, to secure obligations in favor of WELLS FARGO BANK, N.A., as beneficiary, recorded on 07/05/07 as Document No. 20071597806 of official records in the Office of the Recorder of Los Angeles County, California, as more fully described on said Deed of Trust.

Said obligations include 1 NOTE(S) FOR THE ORIGINAL sum of $496,000.00; the beneficial interest under said Deed of Trust and the obligations secured thereby are presently held by the Beneficiary; and a breach of, and default in, the obligations for which said Deed of Trust is security has occurred in that payment has not been made of the following:

FAILURE TO PAY THE MONTHLY INSTALLMENT OF PRINCIPAL, INTEREST AND ESCROWS WHICH BECAME DUE ON 03/01/2010 AND SUBSEQUENT INSTALLMENTS; LATE CHARGES, FEES AND COSTS, AND FORECLOSURE FEES AND COSTS.

That by reason thereof, the Beneficiary, the current beneficiary under the Deed of Trust, has executed and delivered to said Trustee, a written Declaration and Demand for Sale, and has deposited with said duly appointed Trustee, such Deed of Trust and all documents evidencing the obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

The mortgagee, beneficiary or authorized agent for the mortgagee or beneficiary pursuant to California Civil Code 2923.5(b) declares that the mortgagee, beneficiary or the mortgagee's or beneficiary's authorized agent has either contacted the borrower or tried with due diligence to contact the borrower as required by California Civil Code 2923.5 – See Attached

DATE: 2/17/11

Assured Lender Services, Inc., as Agent for the Beneficiary
By: SPL, INC., as Agent

GANTUUL TOLYA



**NOTICE OF DEFAULT DECLARATION**
**FOR NOD'S RECORDED AFTER 9-6-08 ON LOANS MADE 1-1-03 TO 12-31-07 ON OWNER OCCUPIED PROPERTY**

**BENEFICIARY DECLARATION OF COMPLIANCE WITH (OR EXCEPTION FROM) CIVIL CODE §2923.5 AND AUTHORIZATION OF AGENT (FOR NOTICE OF DEFAULT)**

Quality Loan Service Corp
2141 5th Avenue
San Diego, CA 92101

Borrower(s): Kathryn O Smith
Lender/Servicer: MARIX SERVICING
Property: 6400 CRESCENT PARK E
PLAYA VISTA CA 90094
Loan No.: [redacted]77

The undersigned beneficiary[1] or authorized agent for the beneficiary hereby represents and declares that [check the applicable box and fill in any blanks so that the trustee/foreclosure agent can insert, on the beneficiary's behalf, the applicable declaration in the notice of default required pursuant to Civil Code § 2923.5]:

1. [ ] The beneficiary or beneficiary's authorized agent has contacted the borrower pursuant to, and has complied with, Civil Code § 2923.5(a)(2) (contact provision to "assess the borrower's financial situation and explore options for the borrower to avoid foreclosure"). State the date "contact" with the borrower(s) was accomplished pursuant to Civil Code § 2923.5(a)(2).

2. [x ] The beneficiary or beneficiary's authorized agent has exercised due diligence to contact the borrower as required by California Civil Code § 2923.5(g) by sending a first class letter and, after waiting two weeks after the telephone call requirements of Civil Code § 2923.5(g)(2) were satisfied, the beneficiary or the beneficiary's authorized agent sent to the borrower(s), by certified mail, return receipt requested, the letter required by Civil Code § 2923.5(g)(3); 11/09/2010

3. [ ] Pursuant to Civil Code § 2923.5(h)(1), the borrower has surrendered the secured property as evidenced by either a letter confirming the surrender or by delivery of the keys to the secured property to the beneficiary, the beneficiary's authorized agent or to the trustee.

4. [ ] Pursuant to Civil Code § 2923.5(h)(2), the beneficiary or beneficiary's authorized agent has evidence in its file, and reasonably believes, that the borrower has contracted with an organization, person, or entity whose primary business is advising people who have decided to leave their homes on how to extend the foreclosure process and avoid their contractual obligations to beneficiaries.

5. [ ] Pursuant to Civil Code § 2923.5(h)(3), the beneficiary or the beneficiary's authorized agent verified information that, on or before the date of this declaration, the borrower(s) has filed for bankruptcy, and the proceedings have not been finalized. "Finalized" is not defined

[1] "Beneficiary" as used herein shall include "mortgagee".

by § 2923.5(h)(3). For purposes of this Code section, trustee, foreclosure agent and/or their authorized agent is defining the term as either: (1) an order closing the file by the court entered on the court's docket; or, (2) an order dismissing the bankruptcy case entered on the court's docket. If the beneficiary or the beneficiary's agent interprets "finalized" in another manner, please state the basis upon which the beneficiary believes that the bankruptcy has not been "finalized". ______________________________

6. [ ] This loan is exempt. You are instructed that compliance with Civil Code §§ 2923.5 and 2924.8 is not necessary to proceed with preparing and processing a notice of default.

The undersigned authorizes the trustee, foreclosure agent and/or their authorized agent to sign, on behalf of the beneficiary, the notice of default containing the declaration required pursuant to Civil Code § 2923.5(b).

Dated: 01/07/2011

Karen McKnight-Fisher

Foreclosure Specialist



Order Number: VWL-1734888 (56)
Page Number: 1

**Unit 120, Tract 49104-5WA1**

# First American Title Company

**520 North Central Avenue**
**Glendale, CA 91203**

| | |
|---|---|
| Customer Reference: | |
| Order Number: | VWL-1734888 (56) |
| Title Officer: | Janet Yoshitake |
| Phone: | (818)242-5800 |
| Fax No.: | (818)242-4521 |
| E-Mail: | jyoshitake@firstam.com |
| Escrow Officer: | Nona Bolen (NB) |
| Phone: | (805)449-4199 |
| Fax No.: | (805)497-0752 |
| E-Mail: | nbolen@firstam.com |
| E-Mail Loan Documents to: | wemail@firstam.com |
| Buyer: | Ball |
| Owner: | Westwind Crescent Park Condos, LLC |
| Property: | 6400 Crescent Park East, Unit 120 (Playa Vista Area) Los Angeles, CA |

## PRELIMINARY REPORT

In response to the above referenced application for a policy of title insurance, this company hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Policy or Policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an Exception below or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations of said Policy forms.

The printed Exceptions and Exclusions from the coverage of said Policy or Policies are set forth in Exhibit A attached. Copies of the Policy forms should be read. They are available from the office which issued this report.

**Please read the exceptions shown or referred to below and the exceptions and exclusions set forth in Exhibit A of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered.**

**It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects, and encumbrances affecting title to the land.**

This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.

Dated as of December 09, 2005 at 7:30 A.M.

The form of Policy of title insurance contemplated by this report is:

1987 ALTA Residential Title Insurance Policy (6-1-87)

1992 ALTA Loan Policy (10-17-92)

A specific request should be made if another form or additional coverage is desired.

Title to said estate or interest at the date hereof is vested in:

Westwind Crescent Park Condos, LLC, a California Limited Liability Company

The estate or interest in the land hereinafter described or referred to covered by this Report is:

A condominium in fee, as defined in Section 783 of the California Civil Code.

The Land referred to herein is described as follows:

(See attached Legal Description)

At the date hereof exceptions to coverage in addition to the printed Exceptions and Exclusions in said policy form would be as follows:

1. General and special taxes and assessments for the fiscal year 2005-2006.

| | |
|---|---|
| First Installment: | $49,958.54, PAID |
| Penalty: | $4,698.85 |
| Second Installment: | $46,958.53, OPEN |
| Penalty: | $4,705.85 |
| Tax Rate Area: | 0151 |
| A. P. No.: | 4211-025-018 |
| Affects: | The land and other property. |

2. General and special taxes and assessments for the fiscal year 2005-2006.

| | |
|---|---|
| First Installment: | $38,513.04, PAID |
| Penalty: | $3,851.30 |
| Second Installment: | $38,513.02, OPEN |
| Penalty: | $3,861.30 |
| Tax Rate Area: | 01515 |
| A. P. No.: | 4211-025-019 |

Affects: The land and other property.

3. General and special taxes and assessments for the fiscal year 2005-2006.

| | |
|---|---|
| First Installment: | $54,282.79, PAID |
| Penalty: | $5,428.28 |
| Second Installment: | $54,282.78, OPEN |
| Penalty: | $5,438.28 |
| Tax Rate Area: | 01515 |
| A. P. No.: | 4211-025-020 |

Affects: The land and other property.

4. The terms and provisions contained in the document entitled "Notice of Special Tax Lien District No. 04" pursuant to the requirement of Section 3114.5 of the California Streets and Highways Codes and Section 53328.3 of the Mello Roos Community Facilities Act of 1982, recorded February 16, 2000 as Instrument No. 00-240766 of Official Records.

5. The lien of supplemental taxes, if any, assessed pursuant to Chapter 3.5 commencing with Section 75 of the California Revenue and Taxation Code.

6. The terms and provisions contained in the document entitled "Covenant and Agreement Regarding Plot Plan" recorded August 10, 1995 as Instrument No. 95-1309269 of Official Records.

7. The terms and provisions contained in the document entitled "Covenant and Agreement" recorded July 3, 1997 as Instrument No. 97-997546 of Official Records.

8. The terms and provisions contained in the document entitled "Covenant and Agreement" recorded July 3, 1997 as Instrument No. 97-997547 of Official Records.

9. The terms and provisions contained in the document entitled "Covenant and Agreement" recorded July 3, 1997 as Instrument No. 97-997553 of Official Records.

10. The terms and provisions contained in the document entitled "Covenant and Agreement" recorded July 3, 1997 as Instrument No. 997554 of Official Records.

11. The terms and provisions contained in the document entitled "Covenant and Agreement" recorded July 3, 1997 as Instrument No. 97-997555 of Official Records.

12. The terms and provisions contained in the document entitled "Covenant and Agreement" recorded July 7, 1997 as Instrument No. 97-1005692 of Official Records.

13. The terms and provisions contained in the document entitled "Covenant and Agreement" recorded October 21, 1998 as Instrument No. 98-1925955 of Official Records.

By Playa Capital Company, LLC, a Delaware Limited Liability Company and the City of Los Angeles.

14. The terms and provisions contained in the document entitled "Covenant and Agreement" recorded October 21, 1998 as Instrument No. 98-1925956 of Official Records.

15. The terms and provisions contained in the document entitled "Covenant and Agreement" recorded October 21, 1998 as Instrument No. 98-1925957 of Official Records.

16. The terms and provisions contained in the document entitled "Covenant and Agreement" recorded October 21, 1998 as Instrument No. 98-1925958 of Official Records.

17. The terms and provisions contained in the document entitled "Covenant and Agreement" recorded October 21, 1998 as Instrument No. 98-1925959 of Official Records.

18. The terms and provisions contained in the document entitled "Covenant and Agreement" recorded October 23, 1991 as Instrument No. 91-1947587 of Official Records.

19. The terms and provisions contained in the document entitled "Covenant and Agreement" recorded April 9, 1999 as Instrument No. 99-618238 of Official Records.

20. The terms and provisions contained in the document entitled "Covenant and Agreement" recorded June 2, 1999 as Instrument No. 99-999855 of Official Records.

21. The terms and provisions contained in the document entitled "Covenant and Agreement" recorded June 10, 1999 as Instrument No. 99-1067016 of Official Records.

    An Assignment and Assumption Agreement by and between Playa Capital Company, LLC, a Delaware Limited Liability Company and Playa Vista and Landscape Corporation, a California nonprofit public benefit corporation, upon the terms and conditions and covenants therein provided recorded April 11, 2001 as Instrument No. 01-608185 of Official Records.

22. The terms and provisions contained in the document entitled "Covenant and Agreement" recorded April 19, 2000 as Instrument Numbers 00-588364 and 00-588365 of Official Records.

23. The terms and provisions contained in the document entitled "Maintenance Agreement Waiver of Damages and Indemnification Agreement Covenant to Run with the Land" recorded June 23, 2000 as Instrument No. 00-972697 of Official Records.

    An Assignment and Assumption Agreement by and between Playa Capital Company, LLC, a Delaware Limited Liability Company, Playa Phase I Apartments, LLC, a Delaware Limited Liability Company and Playa Vista Parks and Landscape Corporation, a California non-profit benefit corporation upon the terms and conditions and covenants therein provided, recorded April 2, 2001 as Instrument No. 01-535753.

24. The terms and provisions contained in the document entitled "Affidavit Regarding Maintenance of Uncertified Fill/Underground Structures" recorded October 31, 2001 as Instrument No. 01-2083155 of Official Records.

25. An easement for construction, storage, ingress, egress and incidental purposes in the document recorded September 2, 2003 as Instrument No. 03-2543669 of Official Records.

Terms and provisions contained in the above document.

26. Covenants, conditions, restrictions and easements in the document recorded February 7, 2000 as Instrument No. 00-187083 of Official Records, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status, national origin, sexual orientation, marital status, ancestry, source of income or disability, to the extent such covenants, conditions or restrictions violate Title 42, Section 3604(c), of the United States Codes or Section 12955 of the California Government Code. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

A declaration of annexation recorded September 6, 2005 as Instrument No. 05-2137311 of Official Records.

27. The terms and provisions contained in the document entitled "Community Enhancement Fee Agreement" recorded September 12, 2003 as Instrument No. 03-2678383 of Official Records.

Terms and provisions contained in the above document.

28. An easement for avigation and incidental purposes in the document recorded September 12, 2003 as Instrument No. 03-2678384 of Official Records.

Terms and provisions contained in the above document.

29. An easement for telecommunications and incidental purposes in the document recorded September 12, 2003 as Instrument No. 03-2678385 of Official Records.

Terms and provisions contained in the above document.

30. Covenants, conditions, restrictions and easements in the document recorded September 12, 2003 as Instrument No. 03-2678387 of Official Records, which provide that a violation thereof shall not defeat or render invalid the lien of any first mortgage or deed of trust made in good faith and for value, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status, national origin, sexual orientation, marital status, ancestry, source of income or disability, to the extent such covenants, conditions or restrictions violate Title 42, Section 3604(c), of the United States Codes or Section 12955 of the California Government Code. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

A document recorded August 16, 2004 as Instrument No. 04-2098738 of Official Records provides that the above document was subordinated to the document recorded August 16, 2004 as Instrument No. 04-2098739 of Official Records.

31. The terms and provisions contained in the document entitled "Agreement of Right of First Refusal" recorded September 12, 2003 as Instrument No. 03-2678388 of Official Records.

A document recorded August 16, 2004 as Instrument No. 04-2098738 of Official Records provides that the above document was subordinated to the document recorded August 16, 2004 as Instrument No. 04-2098739 of Official Records.

Affects: The land and other property.

Said Deed of Trust was subordinated to the Declaration shown as Item No. 42, by Agreement recorded September 6, 2005 as Instrument No. 05-2137313.

38. A financing statement recorded August 16, 2004 as Instrument No. 04-2098740 of Official Records.
Debtor: Westwind Crescent Park Condos, LLC
Secured party: Keybank National Association

39. The terms and provisions contained in the document entitled "Covenant and Agreement Regarding Maintenance of Building (Methane)" recorded March 22, 2005 as Instrument No. 04-675621 of Official Records.

40. The terms and provisions contained in the document entitled "Affidavit Regarding Maintenance of Sump Pump" recorded March 22, 2005 as Instrument No. 04-675622 of Official Records.

41. An Agreement containing Covenants affecting real property between the City of Los Angeles and Maguire Thomas Partners - Playa Vista First Phase of the Playa Vista Project (controlled price units), subject to terms, conditions and provisions contained therein, recorded April 20, 2005 as Instrument No. 05-924519

42. Covenants, conditions, restrictions, easements, assessments, liens, charges, terms and provisions in the document recorded September 6, 2005 as Instrument No. 05-2137313 of Official Records, which provide that a violation thereof shall not defeat or render invalid the lien of any first mortgage or deed of trust made in good faith and for value, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status, national origin, sexual orientation, marital status, ancestry, source of income or disability, to the extent such covenants, conditions or restrictions violate Title 42, Section 3604(c), of the United States Codes or Section 12955 of the California Government Code. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

Note: You may wish to contact the homeowners association referred to in the above document for information regarding assessments, transfer requirements or other matters.

43. The terms and provisions contained in the document entitled "Mutual Benefit Agreement Regarding Joint Use of Garage" recorded November 21, 2005 as Instrument No. 05-2821273 of Official Records.

44. Requirement:

Prior to the recording of the first lot, it is necessary that a deed to the "Homeowners Association" be recorded conveying the common area lot(s)and necessary easements, if any.

| The name of the Homeowners Association is: | Waterford Condominium Association, a California nonprofit corporation |
|---|---|

45. With respect to Westwind Crescent Park Condos LLC, a California Limited Liability Company:
a. A copy of its operating agreement and any amendments thereto;
b. If it is a California limited liability company, that a certified copy of its articles of organization (LLC-1) and any certificate of correction (LLC-11), certificate of amendment (LLC-2), or restatement of articles of organization (LLC-10) be recorded in the public records;
c. If it is a foreign limited liability company, that a certified copy of its application for registration (LLC-5) be recorded in the public records;
d. With respect to any deed, deed of trust, lease, subordination agreement or other document or instrument executed by such limited liability company and presented for recordation by the Company or upon which the Company is asked to rely, that such document or instrument be executed in accordance with one of the following, as appropriate:
(i) If the limited liability company properly operates through officers appointed or elected pursuant to the terms of a written operating agreement, such document must be executed by at least two duly elected or appointed officers, as follows: the chairman of the board, the president or any vice president, and any secretary, assistant secretary, the chief financial officer or any assistant treasurer;
(ii) If the limited liability company properly operates through a manager or managers identified in the articles of organization and/or duly elected pursuant to the terms of a written operating agreement, such document must be executed by at least two such managers or by one manager if the limited liability company properly operates with the existence of only one manager.
e. Other requirements which the Company may impose following its review of the material required herein and other information which the Company may require.

46. Statement of information from buyers.

**INFORMATIONAL NOTES**

1. This report is preparatory to the issuance of an ALTA Loan Policy. We have no knowledge of any fact which would preclude the issuance of the policy with CLTA endorsement forms 100 and 116 and if applicable, 115 and 116.2 attached, provided a valid notice of completion is recorded in the public records.

   When issued, the CLTA endorsement form 116 or 116.2, if applicable will reference a(n) Condominium known as 6400 Crescent Park East, Unit 120 (Playa Vista Area), Los Angeles, California.

2. According to the public records, there has been no conveyance of the land within a period of twenty-four months prior to the date of this report, except as follows:

   None

The map attached, if any, may or may not be a survey of the land depicted hereon. First American expressly disclaims any liability for loss or damage which may result from reliance on this map except to the extent coverage for such loss or damage is expressly provided by the terms and provisions of the title insurance policy, if any, to which this map is attached.

Order Number: VWL-1734888 (56)
Page Number: 10

Note: Wire instructions for Escrow Accounts :

**First American Trust Company**
Santa Ana Branch
421 North Main Street
Santa Ana, California 92701

**ABA 122241255**
**Credit to First American Title Company**
**Account No. 2000022504**

When wiring, please reference our Escrow Order Number **VWL-1734888** and the Escrow Officer **Nona Bolen.**

*First American Title*

**LEGAL DESCRIPTION**

Real property in the City of Los Angeles, County of Los Angeles, State of California, described as follows:

A CONDOMINIUM COMPRISED OF:

PARCEL NO. 1:

UNIT NO. 120 AS SHOWN IN THE PHASE 1 CONDOMINIUM PLAN, WHICH PLAN WAS RECORDED ON SEPTEMBER 6, 2005 AS INSTRUMENT NO. 05-2137312, AND THE FIRST AMENDMENT TO THE PHASE 1 CONDOMINIUM PLAN, WHICH AMENDMENT WAS RECORDED ON NOVEMBER 21, 2005 AS INSTRUMENT NO. 05-2821270, BOTH OF OFFICIAL RECORDS, CONSTITUTING A PORTION OF COMBINED LOTS 18, 19 AND 20 OF TRACT NO. 49104-05, IN THE CITY OF LOS ANGELES, AS PER MAP RECORDED IN BOOK 1272, PAGES 88 TO 93 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM, ANY AND ALL OIL, OIL RIGHTS, MINERALS, MINERAL RIGHTS, NATURAL GAS RIGHTS AND OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN, GEOTHERMAL STEAM OR OTHER RESOURCES, AND ALL PRODUCTS DERIVED FROM ANY OF THE FOREGOING, THAT MAY BE WITHIN OR UNDER THE UNIT, TOGETHER WITH THE PERPETUAL RIGHT OF DRILLING, MINING OR EXPLORING AND OPERATING THEREFORE AND STORING IN AND REMOVING THE SAME FROM THE UNIT OR ANY OTHER LAND, INCLUDING THE RIGHT TO WHIPSTOCK OR DIRECTIONALLY DRILL AND MINE FROM LANDS OTHER THAN THOSE CONVEYED HEREBY, OIL OR GAS WELLS, TUNNELS AND SHAFTS INTO, THROUGH OR ACROSS THE SUBSURFACE OF THE LAND, AND TO BOTTOM SUCH WHIPSTOCKED OR DIRECTIONALLY DRILLED WELLS, TUNNELS AND SHAFTS UNDER AND BENEATH OR BEYOND THE EXTERIOR LIMITS THEREOF, AND TO REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE ANY SUCH WELLS OR MINES; WITHOUT, WHOEVER, THE RIGHT TO ENTER UPON, DRILL, MINE, STORE, EXPLORE AND OPERATE THROUGH THE SURFACE OR THE UPPER FIVE HUNDRED (500) FEET OF THE SUBSURFACE OF THE UNIT AS RESERVED BY PLAYA CAPITAL COMPANY, LLC, A DELAWARE LIMITED LIABILITY COMPANY ("PLAYA CAPITAL"), BY DEED RECORDED SEPTEMBER 2, 2003 AS INSTRUMENT NO. 03-2543669 OF OFFICIAL RECORDS.

FURTHER EXCEPTING AND RESERVING THEREFROM, FOR THE BENEFIT OF PLAYA CAPITAL, EXCLUSIVE BLANKET EASEMENTS ("TELECOMMUNICATIONS EASEMENTS") OVER THE UNIT FOR ACCESS AND FOR PURPOSES OF CONSTRUCTING, INSTALLING, LOCATING, ALTERING, OPERATING, MAINTAINING, INSPECTING, UPGRADING, REMOVING AND ENHANCING TELECOMMUNICATIONS FACILITIES (AS DEFINED IN THE MASTER DECLARATION) AND PROVIDING TELECOMMUNICATIONS SERVICES (AS DEFINED IN THE MASTER DECLARATION).

RESERVING THEREFROM, FOR THE BENEFIT OF GRANTOR, ITS SUCCESSORS IN INTEREST AND OTHERS, EASEMENTS FOR ACCESS, ENCROACHMENT, SUPPORT, MAINTENANCE, DRAINAGE, USE, ENJOYMENT, REPAIRS AND FOR OTHER PURPOSES, ALL AS SHOWN IN THE MAP AND THE PLAN, AND AS DESCRIBED IN THE FOLLOWING DOCUMENTS:

A. THE MASTER DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS AND RESERVATION OF EASEMENTS FOR PLAYA VISTA, AS AMENDED OR RESTATED, WHICH WAS RECORDED ON FEBRUARY 7, 2000 AS INSTRUMENT NO. 00-187083 AND AMENDED BY A FIRST AMENDMENT THERETO RECORDED ON MARCH 26, 2001 AS INSTRUMENT NO. 01-481376, A

SECOND AMENDMENT THERETO RECORDED ON NOVEMBER 26, 2002 AS INSTRUMENT NO. 02-2875170, AND A THIRD AMENDMENT THERETO RECORDED NOVEMBER 26, 2002 AS INSTRUMENT NO. 02-2875171, ALL OF OFFICIAL RECORDS.

B. THE SUPERSEDING SUPPLEMENTAL DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS AND RESERVATION OF EASEMENTS FOR PLAYA VISTA (WATERSTONE), AS AMENDED OR RESTATED, WHICH WAS RECORDED SEPTEMBER 6, 2005 AS INSTRUMENT NO. 05-2137311 OF OFFICIAL RECORDS; AND

C. THE DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS AND RESERVATION OF EASEMENTS FOR WATERSTONE, AS AMENDED OR RESTATED, WHICH WAS RECORDED ON SEPTEMBER 6, 2005 AS INSTRUMENT NO. 05-2137313 OF OFFICIAL RECORDS.

FURTHER RESERVING THEREFROM, THE RIGHT TO ENTER THE UNIT TO COMPLETE AND REPAIR ANY IMPROVEMENTS OR LANDSCAPING LOCATED THEREON AS DETERMINED NECESSARY BY GRANTOR, IN ITS SOLE DISCRETION, IN ORDER TO COMPLY WITH REQUIREMENTS FOR THE RECORDATION OF THE MAP, THE GRADING OF SAID TRACT AND/OR IN COMPLIANCE WITH THE REQUIREMENTS OF APPLICABLE GOVERNMENTAL AGENCIES. THE CONDOMINIUM ESTATE (DEFINED BELOW) SHALL ALSO BE SUBJECT TO A RIGHT OF ENTRY BY THE GRANTOR UNTIL THE EXPIRATION OF ALL APPLICABLE STATUTES OF LIMITATIONS FOR THE FILING OF A COMPLAINT OR SUITE OR OTHER LEGAL REMEDIES AGAINST GRANTOR IN ANY WAY RELATING TO OR ARISING OUT OF THE DEVELOPMENT, CONSTRUCTION, TRANSFER AND/OR SALE OF THE CONDOMINIUM ESTATE BY GRANTOR. SAID ENTRY BY GRANTOR SHALL BE PRECEDED BY REASONABLE NOTICE TO GRANTEE BEFORE SAID ENTRY. IF THIS RESERVATION OF A RIGHT OF ENTRY IS NOT COMPLIED WITH BY GRANTEE, GRANTOR MAY ENFORCE THIS RIGHT OF ENTRY IN A COURT OF LAW. GRANTEE SHALL BE RESPONSIBLE FOR ALL DAMAGES ARISING OUT OF SAID BREACH INCLUDING ATTORNEY'S FEES AND COURT COSTS. THIS RESERVATION OF A RIGHT OF ENTRY SHALL AUTOMATICALLY EXPIRE ELEVEN (11) YEARS FROM THE LAST CLOSE OF ESCROW FOR A CONDOMINIUM IN THE COMMUNITY (AS THOSE TERMS ARE DEFINED IN THE DECLARATION).

PARCEL NO. 2:

AN UNDIVIDED 1/64TH INTEREST AS A TENANT-IN-COMMON IN AND TO THE COMMON AREA DESCRIBED IN THE PLAN WHICH ENCUMBERS LOTS 18, 19 AND 20 OF SAID TRACT NO. 49104-05.

PARCEL NO. 3:

EXCLUSIVE USE AREA EASEMENTS FOR PATIO PURPOSES AS ASSIGNED TO THE UNIT IN THE PLAN, AND EXCLUSIVE USE AREA EASEMENTS FOR SUBTERRANEAN PARKING AND STORAGE PURPOSES, IF APPLICABLE, AS ASSIGNED TO THE UNIT PURSUANT TO DESCRIPTIONS AND/OR DEPICTIONS OF THE DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS AND RESERVATION OF EASEMENTS FOR WATERSTONE, RECORDED SEPTEMBER 6, 2005 AS INSTRUMENT NO. 05-2137313, OFFICIAL RECORDS, AND/OR PLAN, AND SUBJECT TO THE PROVISIONS OF SAID DECLARATION (INCLUDING, WITHOUT LIMITATION, THE RESERVATION OF THE DECLARANT'S RIGHT TO RELOCATE AN ASSIGNED SUBTERRANEAN PARKING SPACE TO ANOTHER AREA OF THE GARAGE).

***NOTICE***

Section 12413.1 of the California Insurance Code, effective January 1, 1990, requires that any title insurance company, underwritten title company, or controlled escrow company handling funds in an escrow or sub-escrow capacity, wait a specified number of days after depositing funds, before recording any documents in connection with the transaction or disbursing funds. This statute allows for funds deposited by wire transfer to be disbursed the same day as deposit. In the case of cashier's checks or certified checks, funds may be disbursed the next day after deposit. In order to avoid unnecessary delays of three to seven days, or more, please use wire transfer, cashier's checks, or certified checks whenever possible.

If you have any questions about the effect of this new law, please contact your local First American Office for more details.

**EXHIBIT A**
**LIST OF PRINTED EXCEPTIONS AND EXCLUSIONS (BY POLICY TYPE)**

**1. CALIFORNIA LAND TITLE ASSOCIATION STANDARD COVERAGE POLICY - 1990**
**SCHEDULE B**

**EXCEPTIONS FROM COVERAGE**

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records. Proceedings by a public agency which may result in taxes or assessments, or notice of such proceedings, whether or not shown by the records of such agency or by the public records.
2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.
3. Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the public records.

**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy; or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.
4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable "doing business" laws of the state in which the land is situated.
5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.
6. Any claim, which arises out of the transaction vesting in the insured the estate or interest insured by their policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

**2. AMERICAN LAND TITLE ASSOCIATION OWNER'S POLICY FORM B - 1970**
**SCHEDULE OF EXCLUSIONS FROM COVERAGE**

1. Any law, ordinance or governmental regulation (including but not limited to building and zoning ordinances) restricting or regulating or prohibiting the occupancy, use or enjoyment of the land, or regulating the character, dimensions or location of any improvement now or hereafter erected on the land, or prohibiting a separation in ownership or a reduction in the dimensions of area of the land, or the effect of any violation of any such law, ordinance or governmental regulation.
2. Rights of eminent domain or governmental rights of police power unless notice of the exercise of such rights appears in the public records at Date of Policy.
3. Defects, liens, encumbrances, adverse claims, or other matters (a) created, suffered, assumed or agreed to by the insured claimant; (b) not known to the Company and not shown by the public records but known to the insured claimant either at Date of Policy or at the date such claimant acquired an estate or interest insured by this policy and not disclosed in writing by the insured claimant to the Company prior to the date such insured claimant became an insured hereunder; (c) resulting in no loss or damage to the insured claimant; (d) attaching or

created subsequent to Date of Policy; or (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the estate or interest insured by this policy.

**3. AMERICAN LAND TITLE ASSOCIATION OWNER'S POLICY FORM B - 1970
WITH REGIONAL EXCEPTIONS**

When the American Land Title Association policy is used as a Standard Coverage Policy and not as an Extended Coverage Policy the exclusions set forth in paragraph 2 above are used and the following exceptions to coverage appear in the policy.

**SCHEDULE B**

This policy does not insure against loss or damage by reason of the matters shown in parts one and two following:
Part One

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of said land or by making inquiry of persons in possession thereof.
3. Easements, claims of easement or encumbrances which are not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by public records.
5. Unpatented mining claims; reservations or exceptions in patents or in Acts authorizing the issuance thereof; water rights, claims or title to water.
6. Any lien, or right to a lien, for services, labor or material heretofore or hereafter furnished, imposed by law and not shown by the public records.

**4. AMERICAN LAND TITLE ASSOCIATION LOAN POLICY - 1970
WITH A.L.T.A. ENDORSEMENT FORM 1 COVERAGE
SCHEDULE OF EXCLUSIONS FROM COVERAGE**

1. Any law, ordinance or governmental regulation (including but not limited to building and zoning ordinances) restricting or regulating or prohibiting the occupancy, use or enjoyment of the land, or regulating the character, dimensions or location of any improvement now or hereafter erected on the land, or prohibiting a separation in ownership or a reduction in the dimensions or area of the land, or the effect of any violation of any such law ordinance or governmental regulation.
2. Rights of eminent domain or governmental rights of police power unless notice of the exercise of such rights appears in the public records at Date of Policy.
3. Defects, liens, encumbrances, adverse claims, or other matters (a) created, suffered, assumed or agreed to by the insured claimant, (b) not known to the Company and not shown by the public records but known to the insured claimant either at Date of Policy or at the date such claimant acquired an estate or interest insured by this policy or acquired the insured mortgage and not disclosed in writing by the insured claimant to the Company prior to the date such insured claimant became an insured hereunder, (c) resulting in no loss or damage to the insured claimant; (d) attaching or created subsequent to Date of Policy (except to the extent insurance is afforded herein as to any statutory lien for labor or material or to the extent insurance is afforded herein as to assessments for street improvements under construction or completed at Date of Policy).
4. Unenforceability of the lien of the insured mortgage because of failure of the insured at Date of Policy or of any subsequent owner of the indebtedness to comply with applicable "doing business" laws of the state in which the land is situated.

**5. AMERICAN LAND TITLE ASSOCIATION LOAN POLICY - 1970
WITH REGIONAL EXCEPTIONS**

When the American Land Title Association Lenders Policy is used as a Standard Coverage Policy and not as an Extended Coverage Policy, the exclusions set forth in paragraph 4 above are used and the following exceptions to coverage appear in the policy.

**SCHEDULE B**

This policy does not insure against loss or damage by reason of the matters shown in parts one and two following:
Part One

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of said land or by making inquiry of persons in possession thereof.
3. Easements, claims of easement or encumbrances which are not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by public records.
5. Unpatented mining claims; reservations or exceptions in patents or in Acts authorizing the issuance thereof; water rights, claims or title to water.
6. Any lien, or right to a lien, for services, labor or material theretofore or hereafter furnished, imposed by law and not shown by the public records.

**6. AMERICAN LAND TITLE ASSOCIATION LOAN POLICY - 1992
WITH A.L.T.A. ENDORSEMENT FORM 1 COVERAGE
EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy;
(b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims, or other matters:
(a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;
(b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
(c) resulting in no loss or damage to the insured claimant;
(d) attaching or created subsequent to Date of Policy (except to the extent that this policy insures the priority of the lien of the insured mortgage over any statutory lien for services, labor or material or the extent insurance is afforded herein as to assessments for street improvements under construction or completed at date of policy); or
(e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage.
4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable "doing business" laws of the state in which the land is situated.
5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.
6. Any statutory lien for services, labor or materials (or the claim of priority of any statutory lien for services, labor or materials over the lien of the insured mortgage) arising from an improvement or work related to the land which is contracted for and commenced subsequent to Date of Policy and is not financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance.
7. Any claim, which arises out of the transaction creating the interest of the mortgagee insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:
(i) the transaction creating the interest of the insured mortgagee being deemed a fraudulent conveyance or fraudulent transfer; or
(ii) the subordination of the interest of the insured mortgagee as a result of the application of the doctrine of equitable subordination; or
(iii) the transaction creating the interest of the insured mortgagee being deemed a preferential transfer except where the preferential transfer results from the failure:
(a) to timely record the instrument of transfer; or
(b) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

**7. AMERICAN LAND TITLE ASSOCIATION LOAN POLICY - 1992
WITH REGIONAL EXCEPTIONS**

When the American Land Title Association policy is used as a Standard Coverage Policy and not as an Extended Coverage Policy the exclusions set forth in paragraph 6 above are used and the following exceptions to coverage appear in the policy.

**SCHEDULE B**

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of said land or by making inquiry of persons in possession thereof.
3. Easements, claims of easement or encumbrances which are not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by public records.
5. Unpatented mining claims; reservations or exceptions in patents or in Acts authorizing the issuance thereof; water rights, claims or title to water.
6. Any lien, or right to a lien, for services, labor or material theretofore or hereafter furnished, imposed by law and not shown by the public records.

**8. AMERICAN LAND TITLE ASSOCIATION OWNER'S POLICY - 1992**

**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
(b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims, or other matters:
(a) created, suffered, assumed or agreed to by the insured claimant;
(b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
(c) resulting in no loss or damage to the insured claimant;
(d) attaching or created subsequent to Date of Policy; or
(e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the estate or interest insured by this policy.
4. Any claim, which arises out of the transaction vesting in the insured the estate or interest insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:
(i) the transaction creating the estate or interest insured by this policy being deemed a fraudulent conveyance or fraudulent transfer; or
(ii) the transaction creating the estate or interest insured by this policy being deemed a preferential transfer except where the preferential transfer results from the failure:
(a) to timely record the instrument of transfer; or
(b) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

**9. AMERICAN LAND TITLE ASSOCIATION OWNER'S POLICY - 1992
WITH REGIONAL EXCEPTIONS**

When the American Land Title Association policy is used as a Standard Coverage Policy and not as an Extended Coverage Policy the exclusions set forth in paragraph 8 above are used and the following exceptions to coverage appear in the policy.

**SCHEDULE B**

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:
Part One:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of said land or by making inquiry of persons in possession thereof.
3. Easements, claims of easement or encumbrances which are not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by public records.
5. Unpatented mining claims; reservations or exceptions in patents or in Acts authorizing the issuance thereof; water rights, claims or title to water.
6. Any lien, or right to a lien, for services, labor or material theretofore or hereafter furnished, imposed by law and not shown by the public records.

**10. AMERICAN LAND TITLE ASSOCIATION RESIDENTIAL
TITLE INSURANCE POLICY - 1987
EXCLUSIONS**

In addition to the Exceptions in Schedule B, you are not insured against loss, costs, attorneys' fees and expenses resulting from:

1. Governmental police power, and the existence or violation of any law or government regulation. This includes building and zoning ordinances and also laws and regulations concerning:
   * land use
   * improvements on the land
   * land division
   * environmental protection

   This exclusion does not apply to violations or the enforcement of these matters which appear in the public records at Policy Date.
   This exclusion does not limit the zoning coverage described in Items 12 and 13 of Covered Title Risks.

2. The right to take the land by condemning it, unless:
* a notice of exercising the right appears in the public records on the Policy Date
* the taking happened prior to the Policy Date and is binding on you if you bought the land without knowing of the taking.
3. Title Risks:
* that are created, allowed, or agreed to by you
* that are known to you, but not to us, on the Policy Date - unless they appeared in the public records
* that result in no loss to you
* that first affect your title after the Policy Date - this does not limit the labor and material lien coverage in Item 8 of Covered Title Risks
4. Failure to pay value for your title.
5. Lack of a right:
* to any land outside the area specifically described and referred to in Item 3 of Schedule A, or
* in streets, alleys, or waterways that touch your land
This exclusion does not limit the access coverage in Item 5 of Covered Title Risks.

**11. EAGLE PROTECTION OWNER'S POLICY**

**CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE - 1998**
**ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE - 1998**

**Covered Risks 14 (Subdivision Law Violation). 15 (Building Permit). 16 (Zoning) and 18 (Encroachment of boundary walls or fences) are subject to Deductible Amounts and Maximum Dollar Limits of Liability**

**EXCLUSIONS**

In addition to the Exceptions in Schedule B, you are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of any law or government regulation. This includes ordinances, laws and regulations concerning:
   a. building
   b. zoning
   c. land use
   d. improvements on the land
   e. land division
   f. environmental protection

   This exclusion does not apply to violations or the enforcement of these matters if notice of the violation or enforcement appears in the Public Records at the Policy Date.
   This exclusion does not limit the coverage described in Covered Risk 14, 15, 16, 17 or 24.
2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not apply to violations of building codes if notice of the violation appears in the Public Records at the Policy Date.
3. The right to take the Land by condemning it, unless:
a. a notice of exercising the right appears in the Public Records at the Policy Date; or
b. the taking happened before the Policy Date and is binding on You if You bought the Land without Knowing of the taking.
4. Risks:
a. that are created, allowed, or agreed to by You, whether or not they appear in the Public Records;
b. that are Known to You at the Policy Date, but not to Us, unless they appear in the Public Records at the Policy Date;
c. that result in no loss to You; or
d. that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.d, 22, 23, 24 or 25.
5. Failure to pay value for Your Title.
6. Lack of a right:
a. to any Land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
b. in streets, alleys, or waterways that touch the Land.
This exclusion does not limit the coverage described in Covered Risk 11 or 18.

**12. SECOND GENERATION EAGLE LOAN POLICY AMERICAN LAND TITLE ASSOCIATION EXPANDED COVERAGE RESIDENTIAL LOAN POLICY (10/13/01)**

**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the Land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the Land; (iii) a separation in ownership or a change in the dimensions or area of the Land or any parcel of which the Land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy. This exclusion

does not limit the coverage provided under Covered Risks 12, 13, 14 and 16 of this policy.
(b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the Public Records at Date of Policy. This exclusion does not limit the coverage provided under Covered Risks 12, 13, 14 and 16 of this policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the Public Records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without Knowledge.
3. Defects, liens, encumbrances, adverse claims or other matters:
(a) created, suffered, assumed or agreed to by the Insured Claimant;
(b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
(c) resulting in no loss or damage to the Insured Claimant;
(d) attaching or created subsequent to Date of Policy (this paragraph does not limit the coverage provided under Covered Risks 8, 16, 18, 19, 20, 21, 22, 23, 24, 25 and 26); or
(e) resulting in loss or damage which would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of the Insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the Land is situated.
5. Invalidity or unenforceability of the lien of the Insured Mortgage, or claim thereof, which arises out of the transaction evidenced by the Insured Mortgage and is based upon usury, except as provided in Covered Risk 27, or any consumer credit protection or truth in lending law.
6. Real property taxes or assessments of any governmental authority which become a lien on the Land subsequent to Date of Policy. This exclusion does not limit the coverage provided under Covered Risks 7, 8 (e) and 26.
7. Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This exclusion does not limit the coverage provided in Covered Risk 8.
8. Lack of priority of the lien of the Insured Mortgage as to each and every advance made after Date of Policy, and all interest charged thereon, over liens, encumbrances and other matters affecting title, the existence of which are Known to the Insured at:
(a) The time of the advance; or
(b) The time a modification is made to the terms of the Insured Mortgage which changes the rate of interest charged, if the rate of interest is greater as a result of the modification than it would have been before the modification.
This exclusion does not limit the coverage provided in Covered Risk 8.
9. The failure of the residential structure, or any portion thereof to have been constructed before, on or after Date of Policy in accordance with applicable building codes. This exclusion does not apply to violations of building codes if notice of the violation appears in the Public Records at Date of Policy.

**SCHEDULE B**

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. The following existing statutes, reference to which are made part of the ALTA 8.1 Environmental Protection Lien Endorsement incorporated into this Policy following Item 28 of Covered Risks: NONE.

**13. SECOND GENERATION EAGLE LOAN POLICY AMERICAN LAND TITLE ASSOCIATION EXPANDED COVERAGE RESIDENTIAL LOAN POLICY (10/13/01) WITH REGIONAL EXCEPTIONS**

When the American Land Title Association loan policy with EAGLE Protection Added is used as a Standard Coverage Policy and not as an Extended Coverage Policy the exclusions set forth in paragraph 12 above are used and the following exceptions to coverage appear in the policy.

**SCHEDULE B**

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:
Part One:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of said land or by making inquiry of persons in possession thereof.
3. Easements, claims of easement or encumbrances which are not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by public records.
5. Unpatented mining claims; reservations or exceptions in patents or in acts authorizing the issuance thereof; water rights, claims or title to water.
6. Any lien, or right to a lien, for services, labor or material theretofore or hereafter furnished, imposed by law and not shown by the public records.

Part Two:

Order Number: VWL-1734888 (56)
Page Number: 20

1. The following existing statutes, reference to which are made part of the ALTA 8.1 Environmental Protection Lien Endorsement incorporated into this Policy following Item 28 of Covered Risks: None.

*First American Title*

"You may be entitled to receive a $20.00 discount on escrow services if you purchased, sold or refinanced residential property in California between **May 19, 1995 and October 8, 2002.** If you had more than one qualifying transaction, you may be entitled to multiple discounts. If your previous transaction involved the same property that is the subject of this Preliminary Report, you do not have to do anything; First American will provide the discount directly to you within a few weeks, not through your closing. If your previous transaction involved property different from the property that is the subject of your current transaction, you must inform First American of the earlier transaction, provide the address of the property involved in the previous transaction, and the date or approximate date that the escrow closed to be eligible for the discount.  Please mail to Claims Administrator, 2 First American Way, Santa Ana, CA 92707.

Unless you inform First American of the prior transaction on a property that is not the subject of this transaction, First American has no obligation to conduct an investigation to determine if you qualify for a discount. If you provide First American information concerning a prior transaction, First American is required to determine if you qualify for a discount."

"Escrow Services" shall be defined as either title premium or escrow fee payable by you in connection with this transaction. In the event you are entitled to a credit but are not responsible for paying either a title premium or an escrow fee at the close of this transaction, then no credit can be given.

# PRIVACY POLICY

**We Are Committed to Safeguarding Customer Information**

In order to better serve your needs now and in the future, we may ask you to provide us with certain information. We understand that you may be concerned about what we will do with such information – particularly any personal or financial information. We agree that you have a right to know how we will utilize the personal information you provide to us. Therefore, together with our parent company, The First American Corporation, we have adopted this Privacy Policy to govern the use and handling of your personal information.

**Applicability**

This Privacy Policy governs our use of the information which you provide to us. It does not govern the manner in which we may use information we have obtained from any other source, such as information obtained from a public record or from another person or entity. First American has also adopted broader guidelines that govern our use of personal information regardless of its source. First American calls these guidelines its *Fair Information Values*, a copy of which can be found on our website at www.firstam.com.

**Types of Information**

Depending upon which of our services you are utilizing, the types of nonpublic personal information that we may collect include:

- Information we receive from you on applications, forms and in other communications to us, whether in writing, in person, by telephone or any other means;

- Information about your transactions with us, our affiliated companies, or others; and

- Information we receive from a consumer reporting agency.

**Use of Information**

We request information from you for our own legitimate business purposes and not for the benefit of any nonaffiliated party. Therefore, we will not release your information to nonaffiliated parties except: (1) as necessary for us to provide the product or service you have requested of us; or (2) as permitted by law. We may, however, store such information indefinitely, including the period after which any customer relationship has ceased. Such information may be used for any internal purpose, such as quality control efforts or customer analysis. We may also provide all of the types of nonpublic personal information listed above to one or more of our affiliated companies. Such affiliated companies include financial service providers, such as title insurers, property and casualty insurers, and trust and investment advisory companies, or companies involved in real estate services, such as appraisal companies, home warranty companies, and escrow companies. Furthermore, we may also provide all the information we collect, as described above, to companies that perform marketing services on our behalf, on behalf of our affiliated companies, or to other financial institutions with whom we or our affiliated companies have joint marketing agreements.

**Former Customers**

Even if you are no longer our customer, our Privacy Policy will continue to apply to you.

**Confidentiality and Security**

We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities who need to know that information to provide products or services to you. We will use our best efforts to train and oversee our employees and agents to ensure that your information will be handled responsibly and in accordance with this Privacy Policy and First American's *Fair Information Values*. We currently maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

© 2001 The First American Corporation • All Rights Reserved



CONDOMINIUM PLAN
09/06/05
SHEET 11 OF 61
"WATERSTONE" - PHASE 1
BUILDING LOCATION AND SITE PLAN
(1st FLOOR - PODIUM)
PLAYA VISTA DRIVE
NOT TO SCALE
D=04°13'59"
D=02°34'46"
L=142.98'
R=3176.00'
D=01°39'13"
L=91.67'
L=234.64'
D=94°46'37"
R=20.00'
L=33.08'
N61°32'45"E
17.33'
8.11'
N27°38'24"W
15.23'
N27°38'24"W
18.77'
244.56'
249.14'
215.52'
30'
PHASE 1
TRACT 49104 OS
LOT 19
LOT 20
LOT 18
N62°21'36"E
BAY STREET
N62°21'36"E
29.58'
1.41'
142.89'
93.11'
N27°38'24"W
236.00'
CRESCENT PARK EAST
D=90°0'00"
R=20.00'
L=31.42'
CURVE DELTA RADIUS LENGTH
C1 0°16'13" 3176.00' 14.98'
LINE BEARING DISTANCE
L1 N27°38'24"W 15.23'
L2 N62°21'36"E 29.58'
L3 N62°21'36"E 17.15'
05 2137312
V:\projects\14027.00\DWG\PREX0030.dwg 6/30/2005 1:29:06 PM PDT

Description: Los Angeles,CA Document-Year.DocID 2005.2137312 Page: 12 of 62
Order: 49104-05 Comment:

0076843887

# Uniform Settlement Statement

A. Settlement Statement

B. Type of Loan

1. ☐ FHA 2. ☐ FmHA 3. ☒ Conventional Uninsured 4. ☐ VA 5. ☐ Conventional Insured

| 6. File Number | 7. Loan number | 8. Mortgage insurance case number |
|---|---|---|
| 05080721 | 0076843887 | |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for information purposes and are not included in the totals.

| D. Name and address of borrower | E. Name and address of seller | F. Name and address of lender |
|---|---|---|
| KATHRYN O SMITH<br>6400 CRESCENT PARK E #120<br>PLAYA VISTA, CA 90094 | | WELLS FARGO BANK, N.A.<br>1595 SPRUCE ST,<br>RIVERSIDE, CA 925060000 |

| G. Property location | H. Settlement agent | I. Settlement date |
|---|---|---|
| 6400 CRESCENT PARK EAST DR.<br>PLAYA VISTA, CA 90094<br>LOS ANGELES COUNTY, CA | COMMONWEALTH TITLE<br>9454 WILSHIRE BLVD #710<br>BEVERLY HILLS, CA 90212<br>Place of settlement<br>BEVERLY HILLS, CA 90212 | 06/22/07<br>DISBURSEMENT DATE: 06/22/07 |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| 100. Gross Amount Due From Borrower | | 400. Gross Amount Due To Seller | |
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes to | | 406. City/town taxes to | |
| 107. County taxes to | | 407. County taxes to | |
| 108. Assessments to | | 408. Assessments to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 120. Gross amount due from borrower | | 420. Gross amount due to seller | |
| 200. Amounts Paid By Or In Behalf Of Borrower | | 500. Reductions In Amount Due To Seller | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 496000.00 | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. APPLICATION FEE CREDIT | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes to | | 510. City/town taxes to | |
| 211. County taxes to | | 511. County taxes to | |
| 212. Assessments to | | 512. Assessments to | |
| 213. INCLUDED IN 219: | | 513. | |
| 214. HOP -$150 | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. CREDIT PAID BY LENDER | 150.00 | 519. | |
| 220. Total paid by/for borrower | | 520. Total reduction amount due seller | |
| 300. Cash At Settlement From/To Borrower | | 600. Cash At Settlement To/From Seller | |
| 301. Gross amount due from borrower (line 120) | | 601. Gross amount due to seller (line 420) | |
| 302. Less amounts paid by/for borrower (line 220) | ( ) | 602. Less reductions in amt due seller (line 520) | ( ) |
| 303. Cash ☐ From ☐ To Borrower | | 603. Cash ☐ To ☐ From Seller | |

| L. Settlement Charges | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|
| 700. Total Sales/Broker's Commission Based on Price $ @ %= | | |
| Division of commission (line 700) as follows: | | |
| 701. $ | | |
| 702. $ | | |
| 703. Commission paid at settlement | | |
| 704. Sales/Brokers Commissions Sales Tax | | |
| 800. Items Payable In Connection With Loan *Denotes some or all fees paid by lender | | |
| 801. Loan origination fee % Lender | | |
| 802. Loan discount 1.750 % Lender | 8680.00 | |
| 808-817 APPLICATION FEE WFHM | 495.00 | |
| 808-817 FLOOD LIFE OF LOAN FEE WF FLOOD | 19.00 | |
| 808-817 PROCESSING FEE WFHM | 495.00 | |
| 808-817 TAX SERVICE FEE WF R/E TAX | 65.00 | |
| 808-817 UNDERWRITING FEE WFHM | 295.00 | |
| 900. Items Required By Lender To Be Paid In Advance *Denotes some or all fees paid by lender | | |
| 901. Interest from 06/22/07 to 07/01/07 @$ 83.23000 /day | 749.07 | |
| 902. Mortgage Insurance premium / VA Funding Fee / Guarantee Fee | | |
| 903. Hazard insurance premium for YEARS TO | | |
| 904. FLOOD INSURANCE YEARS TO | | |
| 905. | | |
| 1000. Reserves Deposited With Lender *Denotes some or all fees paid by lender | | |
| 1001. Haz. Ins. mths@$ per mth. Other mths@$ per mth. | | |
| 1002. Mortgage insurance months@$ per month | | |
| 1003. City property taxes months@$ per month | | |
| 1004. County property taxes months@$ per month | | |
| 1005. Annual assessments months@$ per month | | |
| 1006. FLOOD INSURANCE months@$ per month | | |
| 1007. months@$ per month | | |
| 1008. months@$ per month | | |
| 1009. AGGREGATE ACCOUNTING ADJUSTMENT | .00 | |
| 1100. Title Charges *Denotes some or all fees paid by lender | | |
| 1106 NOTARY | 150.00 | |
| 1111-1113 CLOSING/ESCROW/SETTLEMENT | 750.00 | |
| 1111-1113 DOC PREP-3RD PARTY | 75.00 | |
| 1107. Attorney's fees to (includes above items numbers: | | |
| 1108. Title insurance to (includes above items numbers: | 1095.00 | |
| 1200. Government Recording and Transfer Charges *Denotes some or all fees paid by lender | | |
| 1201. Recording fees: Deed $ ; Mortgage $ 100.00; Releases $ | 100.00 | |
| 1202. City/county tax/stamps: Deed $ ; Mortgage $ | | |
| 1203. State tax/stamps: Deed $ ; Mortgage $ | | |
| 1300. Additional Settlement Charges * Denotes some or all fees paid by lender | | |
| 1303-1305 COURIER/MSNGR-3RD PARTY | 75.00 | |
| 1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K) | | |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Borrower ____________ Date ________ Seller ____________ Date ________

Borrower ____________ Date ________ Seller ____________ Date ________

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused, or will cause, the funds to be disbursed in accordance with this statement.

If marked, the following riders are attached: (For use when one or more parties are not present at closing.)

☐ Certification of Buyer(s) ☐ Certification of Seller(s)

Settlement Agent ____________ Date ________

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see Title 18 U.S. Code Section 1001 and Section 1010.

NMFL HUD12 Rev. 02/12/2007

0076843887

# Truth-in-Lending Disclosure

Date: 06/22/07

Creditor: WELLS FARGO BANK, N.A.

1595 SPRUCE ST,
RIVERSIDE, CA 925060000

Borrowers: KATHRYN O SMITH

Property Location: 6400 CRESCENT PARK EAST DR. PLAYA VISTA, CA 90094

| Annual Percentage Rate | Finance Charge | Amount Financed | Total of Payments |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The Amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 6.8966 % | $ 796679.10 | $ 484376.93 | $ 1281056.03 |

(E) means estimate

Your payment schedule will be

| Number of Payments | Amount of Payments | | When Payments are Due Monthly, Beginning |
|---|---|---|---|
| 120 | 2531.67 | INT ONLY | AUGUST 01 2007 |
| 239 | 4071.91 | | AUGUST 01 2017 |
| 1 | 4069.14 | | JULY 01 2037 |

**Insurance**
Property insurance is required. Property insurance may be obtained through any person of your choice. If you choose to obtain property insurance through the creditor, the term of the policy will be N/A and the premium for that term will be $ N/A

Flood Insurance ☐ is ☒ is not required. If required, flood insurance may be obtained through any person of your choice. If you choose to obtain flood insurance through the creditor, the term of the policy will be N/A and the premium for that term will be $ N/A

**Security:** You are giving a security interest in the property at 6400 CRESCENT PARK EAST DR., PLAYA VISTA, CA 90094, and fixtures and rents if indicated in the rider to the mortgage.

**Late Charge:** If payment is late, you will be charged 5.000 % of the payment. In Massachusetts, the late charge is 3% of the principal and interest portion of the payment that is overdue.

**Prepayment:** If you pay off early, you
☐ may ☒ will not have to pay a penalty.
☐ may ☒ will not be entitled to a refund of part of the finance charge.
☐ If you prepay your loan other than on the regular installment date you may be assessed interest charges until the end of the month.

**Assumption:** Someone buying your home:
☒ may, subject to conditions, be allowed to assume the remainder of the mortgage on the original terms.
☐ cannot assume the remainder of the mortgage on the original terms.

**Demand Feature:** This obligation ☐ has ☒ does not have a demand feature.

**Variable Rate:** Your loan ☒ does ☐ does not contain a variable-rate feature. Disclosures about the variable-rate feature have been provided to you earlier.

See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, and prepayment refunds and penalties. Included with this disclosure and made a part of it is the Good Faith Estimate of Settlement Services.

By signing below, I/we acknowledge that I/we received a copy of this disclosure on ______________.

| | |
|---|---|
| Applicant | Applicant KATHRYN O SMITH |
| Applicant | Applicant |
| Applicant | Applicant |
| Applicant | Applicant |

FINAL PRINT 06/22/07 18:26

# EXHIBIT D

Attn: Foreclosure Debt

fax # 623-241-2077
or 2070

Marix Servicing
1925 W Pinnacle Peak Rd
Phoenix AZ 85027

November 1, 2010

KATHRYN SMITH
13031 VILLOSA PL APT 439
PLAYA VISTA CA 90094-6504

RE: NOTICE OF ASSIGNMENT, SALE OR TRANSFER OF SERVICING RIGHTS

Property Location: 6400 CRESCENT PARK E DR PLAYA VISTA CA 90094

Marix Account #: 0000189977
Exiting Servicer Account #: 0000076843887

Effective Date of Transfer: 10/18/2010

You are hereby notified that the servicing of your mortgage loan, that is the right to collect payments from you, is being assigned, sold, or transferred from Wells Fargo Home Mortgage to Marix Servicing LLC effective 10/18/2010.

The assignment, sale or transfer of the servicing of the mortgage loan does not affect any term or condition of the mortgage instruments, other than the terms directly related to the servicing of your loan.

Except in limited circumstances, the law requires that your present servicer send you this notice at least 15 days before the effective date of transfer, or at closing. Your new servicer must also send you this notice no later than 15 days after this effective date or closing.

Your present servicer is Wells Fargo Home Mortgage. If you have any questions relating to the transfer of servicing from your present servicer, please call the Customer Service Department between 8:00 AM and 7:00 PM (CST), Monday - Friday. The toll free number is 1-866-234-8271.

Your new servicer will be Marix Servicing LLC.

The business address for Marix Servicing LLC is:
1925 W Pinnacle Peak Road
Phoenix, AZ 85027

Your new loan number with Marix Servicing will be 0000189977.

The toll free telephone number for Marix Servicing is 1-866-406-2749. If you have any questions relating to the transfer of servicing to your new servicer, please call the Customer Service Department at 1-866-406-2749 between 6:00 AM and 5:00 PM (MST), Monday through Thursday and between 6:00 AM and 4:00 PM (MST), Friday.

The date your present servicer will stop accepting payments from you is 10/17/10. The date your new servicer will start accepting payments from you is 10/18/10. Send all payments due on or after that date to Marix Servicing LLC.

As part of this transfer Wells Fargo Home Loans is required to terminate any automatic drafting of payments from your bank account. Termination will be effective with your first payment due to your new servicer, requiring you to mail that and all subsequent payments directly to the new servicer. If your automatic deduction of payments is terminated and you wish to continue this service please contact Marix Servicing LLC at their toll free number above.

The transfer of servicing rights may affect the terms of or the continued availability of mortgage life or disability insurance or any other type of optional insurance in the following manner. Mortgage life, accidental death, disability insurance or other optional products billed and collected with your mortgage payment will not be continued upon the transfer to Marix Servicing and you should take the following action to maintain coverage, contact your insurance carrier for arrangements to maintain your coverage by direct billing, if available.

You should also be aware of the following information, which is set out in more detail in Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. 2605):

During the 60 day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new servicer as late, and a late fee may not be imposed upon you.

Section 6 of RESPA (12 U.S.C. 2605) gives you certain consumer rights. If you send a "qualified written request" to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgement within 20 Business Days of receipt of your request. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and your reasons for the request. If you want to send a "qualified written request" regarding the servicing of your loan, it must be sent to this address:

Marix Servicing LLC - Correspondence Group
P.O. Box 42008
Phoenix, AZ 85080

Not later than 60 business days after receiving your request, your servicer must make any appropriate corrections to your account, and must provide you with a written clarification regarding any dispute. During this 60 business day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request. However, this does not prevent the servicer from initiating foreclosure if proper grounds exist under the mortgage documents.

A business day is a day on which the offices of the business entity are open to the public for carrying on substantially all of its business functions.

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that Section. You should seek legal advice if you believe your rights have been violated.

Marix Servicing is a debt collector and is attempting to collect a debt, any information obtained will be used for that purpose.

Sincerely,

Marix Servicing LLC

# Temporary Mortgage Statement Notice

Dear Borrower(s):

Welcome to Marix Servicing. We want to assure you that we will do our best to make the servicing of your loan as professional and responsive as you expect. For your convenience, we have attached a temporary billing statement.

In the event your new billing statement does not reach you before you are ready to make your next payment, you may use the document below to enclose with your check in the enclosed envelope.

You may reach us at 1-866- 406-2749 with any questions regarding your account.

Your New Loan Number: 0000189977

Sincerely,

Marix Servicing, LLC

## Temporary Billing Statement

KATHRYN SMITH
13031 VILLOSA PL APT 439
PLAYA VISTA CA 90094-6504

Borrower Loan Number: 0000189977

| | |
|---|---|
| Regular Payment Amount | $3,353.56 |
| Additional Principal | $ ____________ |
| Additional Escrow | $ ____________ |
| Other Specify______________ | $ ____________ |
| Total Amount Enclosed | $____________ |

Marix Servicing LLC
P.O. Box 650461
Dallas TX 75265-0461

# EXHIBIT E

RECORDING REQUESTED BY

AND WHEN RECORDED MAIL TO

Assured Lender Services, Inc.
2552 Walnut Avenue
Suite 110
Tustin, CA 92780

Space above this line for recorder's use only

Trustee Sale No. F11-00115 DW Loan No. 0000189977 Title Order No. 140-1225584-32

# NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 06/22/2007 AND MORE FULLY DESCRIBED BELOW. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDINGS AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

A public auction sale to the highest bidder for cash or cashiers check (payable at the time of sale in lawful money of the United States) (payable to Assured Lender Services, Inc.), will be held by a duly appointed trustee. The sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by the Deed of Trust, with interest and late charges thereon, as provided in the note(s), advances, under the terms of the Deed of Trust, interest thereon, fees, charges and expenses of the undersigned trustee ("Trustee") for the total amount (at the time of the initial publication of this Notice of Trustee's Sale) reasonably estimated to be set forth below. The amount may be greater on the day of sale.

Trustor(s): **KATHRYN O SMITH AND MICHAEL W BALL, WIFE AND HUSBAND**

Recorded: **Recorded on 07/05/07 as Document No. 20071597806** of Official Records in the office of the Recorder of **Los Angeles** County, California;

Date of Sale: **06/13/2011 at 10:30AM**

Place of Sale: **At the front entrance to the Pomona Superior Courts Building, 350 West Mission Blvd., Pomona, CA**

Amount of unpaid balance and other charges: **$559,883.67**

The purported property address is: **6400 EAST CRESCENT PARK NO. 120, LOS ANGELES, CA 90094**
Legal Description **See Attached Exhibit "A"**
Assessors Parcel No. **4211-025-085**

2250318199

Trustee Sale No. F11-00115 DW
Loan No. 0000189977
Title Order No. 140-1225584-32

The beneficiary under said Deed of Trust heretofore executed and delivered to the undersigned a written Declaration of Default and Demand for Sale, and a written Notice of Default and Election to Sell. The undersigned caused said Notice of Default and Election to Sell to be recorded in the county where the real property is located and more than three months have elapsed since such recordation.

The undersigned Trustee disclaims any liability for any incorrectness of the property address or other common designation, if any, shown herein. If no street address or other common designation is shown, directions to the location of the property may be obtained by sending a written request to the beneficiary within 10 days of the date of first publication of this Notice of Trustee's Sale.

If the Trustee is unable to convey title for any reason, the successful bidder's sole and exclusive remedy shall be the return of monies paid to the Trustee, and the successful bidder shall have no further recourse.

DATE: 5/19/2011

Assured Lender Services, Inc.

Angela Santellan, Foreclosure Assistant
Assured Lender Services, Inc.
2552 Walnut Avenue
Suite 110
Tustin, CA 92780

**Sales Line: (714) 573-1965**
**Sales Website: www.prioritypostlng.com**
Reinstatement Line: (714) 508-7373
To request reinstatement and/or payoff FAX request to: (714) 505-3831

**THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

Trustee Sale No. F11-00115 DW
Loan No. 0000189977
Title Order No. 140-1225584-32

## Exhibit "A"

The land referred to in this guarantee is situated in the State of **California**, County of **Los Angeles** and is described as follows:

A Condominium Composed of:

Parcel 1:

Unit No. 120 as shown in the Phase 1 Condominium Plan, which plan was recorded on September 6, 2005 as Instrument No. 05-2137312, and the First Amendment to the Phase 1 Condominium Plan, which amendment was recorded on November 21, 2005 as Instrument No. 05-2821270, both of Official Records, Constituting portion of combined Lots 18, 19 and 20 of Tract No. 49104-05, in the City of Los Angeles, as per map recorded in Book 1272, Pages 88 to 93 inclusive of Maps, in the Office of the County Recorder of said County.

Excepting therefrom, any and all oil rights, minerals, mineral rights, natural gas rights and other hydrocarbon by whatsoever name known, geothermal steam or other resources, and all products derived from any of the foregoing, that may be within or under the Unit, together with the perpetual rights of drilling, mining or exploring and operating therefore and storing in and removing the same from the unit or any other land, including the right to whipstock or directionally drill and mine from lands other than those conveyed hereby, oil or gas wells, tunnels and shafts into, through or across the subsurface of the land, and to bottom such whipstocked or directionally drilled wells, tunnels and shafts under and beneath or beyond the exterior limits thereof, and to redrill, retunnel, equip, maintain, repair, deepen and operate any such wells or mines; without, whoever, the right to enter upon, drill, mine, store, explore and operate through the surface or the upper five hundred (500) feet of the subsurface of the Unit as reserved by Playa Capital Company, LLC, a Delaware limited liability company ("Playa Capital"), by deed recorded September 2, 2003 as Instrument No. 03-2543669 of Official Records. Further excepting and reserving therefrom, for the benefit of Playa Capital, exclusive Blanker easements ("Telecommunications Easements") over the Unit for access and for purposes of constructing, installing, locating, altering, operating, maintaining, inspecting, upgrading, removing and enhancing Telecommunications facilities (as defined in the Master Declaration) and providing Telecommunication Services (as defined in the Master Declaration). Reserving therefrom, for the benefit of grantor, its successors in interest and others, easements for access, encroachment, support, maintenance, drainage, use, enjoyment, repairs and for other purposes, all as shown in the map and the plan, and as described in the following documents:

A. The Master Declaration of Covenants, Conditions and Restrictions and Reservation of easements for Playa Vista, as amended or restated, which was recorded on February 7, 2000 as Instrument No. 00-187083 and amended by a first amendment thereto recorded on March 26, 2001 as Instrument No. 01-481376, a second amendment thereto recorded on November 26, 2002 as Instrument No. 02- 2875170, and a third amendment thereto recorded November 26, 2002 as Instrument No. 02-2875171, all of Official Records.

B. The superseding supplemental Declaration of Covenants, Conditions and Restrictions and Reservation of easements for Playa Vista (Waterstone), as amended or restated, which was recorded September 6, 2005 as Instrument No. 05-2137311 of Official Records; and

C. The Declaration of Covenants, Conditions and Restrictions and Reservation of easements for Waterstone, as amended or restated, which was recorded on September 6, 2005 as Instrument No. 05-2137313 of Official Records.

Further reserving therefrom, the right to enter the unit to complete and repair any improvements or landscaping located thereon as determined necessary by grantor, in its sole discretion, in order to comply with requirements for the recordation of the map, the grading of said tract and/or as to an undivided compliance with the requirements of applicable governmental agencies, the Condominium Estate (defined below) shall also be subject to a right of entry by the grantor until the expiration of all applicable statutes of limitations for the filing of a complaint or suite or other legal remedies against grantor in any way relating to or arising out of the development, construction, transfer and/or sale of the Condominium Estate by grantor. Said entry by grantor shall be preceded by reasonable notice of grantee before said entry. If this reservation of a right of entry is not complied with by grantee, grantor may enforce this right of entry in a court of law. Grantee shall be responsible for all damages arising out of said breach including Attorney's Fees and Court Costs. This reservation of a right of entry shall automatically expire eleven (11) years from the last close of escrow for a Condominium in the Community (as those terms are defined in the Declaration).

Parcel 2:

Trustee Sale No. F11-00115 DW
Loan No. 0000189977
Title Order No. 140-1225584-32

An undivided 1/64th interest as a tenant-in-common in and to the common area described in the plan which encumber Lots 18, 19 and 20 of said Tract No. 49104-05.
Parcel 3:

Exclusive use area easements for patio purposes as assigned to the unit in the plan, and exclusive use area easements for subterranean parking and storage purposes, if applicable, as assigned to the unit pursuant to descriptions and/or depictions of the Declaration of Covenants, Conditions and Restrictions and Reservation of easements for Waterstone, recorded September 6, 2005 as Instrument No. 05-2137313, official records, and/or plan, and subject to the provisions of said Declaration (including, without limitation, the Reservation of the Declarant's right to relocate an assigned subterranean parking space to another area of the garage).

Keith A. Attlesey, Esq. (SBN: 168470)
Christopher L. Bauer, Esq. (SBN: 255670)
ATTLESEY | STORM, LLP
2552 Walnut Avenue, Suite 100
Tustin, CA 92780
Telephone: 714.508.4949
Facsimile: 714.508.0015

Attorneys for ASSURED LENDER SERVICES, INC.

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

JUL 22 2011

John A. Clarke, Executive Officer/Clerk
By: Jennifer Amezcua, Deputy

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF LOS ANGELES, WEST DISTRICT**

KATHRYN O. SMITH and MICHAEL W. BALL,

Plaintiffs,

vs.

WELLS FARGO BANK, N.A. MATRIX SERVICES; FIDELITY NATIONAL TITLE INS. CO.; ASSURED LENDER SERVICES INC., and DOES 1 through 100, inclusive,

Defendants.

**CASE NO. SC113094**

**DECLARATION OF NONMONETARY STATUS OF DEFENDANT ASSURED LENDER SERVICES, INC. [*CCP § 2924l*] TO COMPLAINT**

Complaint Filed: June 20, 2011
Trial Date: None

**Assigned for all purposes to:**
**the Honorable Allan J. Goodman**
**Dept. P**

**Unlimited Civil**

I, Tina Suihkonen, declare as follows:

1. I am, and since December of 2008 have been, employed as the President of Assured Lender Services, Inc. ("Assured Lender") and am authorized to make this declaration ("Declaration") on its behalf. Each and every statement made herein is based upon my personal knowledge, unless otherwise indicated, and as to such matters I believe them to be true and correct. I am over the age of eighteen and competent to make this declaration.

2. Assured Lender is in the business of processing foreclosure sales and has been

retained by the beneficiary of those certain deeds of trust recorded in the official records of Los Angeles County as Instrument No. 20071597806, to process foreclosures under the power of sale in the Deed of Trust of the real property commonly known as 6400 East Crescent Park, No. 120, Los Angeles, CA, 90094 (referred to hereinafter as the "Subject Property"). In the normal course of the foreclosure process Assured Lender was substituted in as trustee (the "Substitutions of Trustee") under the Deeds of Trust, as provided for in *California Civil Code section 2934(a)*. The Substitution of Trustee for the Deed of Trust was recorded May 20, 2011.

3. As Assured Lender's President, I have access to the foreclosure files maintained by Assured Lender related to the properties that are the subject of this action. In addition, I have reviewed the Complaint (the "Complaint") filed in this action. After reviewing those materials, I maintain a reasonable belief that Assured Lender has been named as a defendant in this proceeding solely in its capacity as the foreclosure trustee under the Deeds of Trust, and not due to any acts or omissions on Assured Lender's part in the performance of its duties as the foreclosure trustee. That belief is based upon, among other factors, the fact that the allegations in the Complaint appear to be related solely to a dispute between the borrowers and lender/broker (plaintiffs and defendants) and that as it applies to Assured Lender, the action seeks only to enjoin the foreclosure sale.

4. Assured Lender therefore agrees to be bound by whatever order or judgment is issued by the court regarding the subject Deeds of Trust without liability for damages, costs or attorneys' fees.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this Declaration was executed on July 20, 2011 at Tustin, California.

Tina Suihkonen

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF ORANGE

I am employed in the County of Orange, State of California. I am over the age of eighteen (18) and not a party to the within action. My business address is 2552 Walnut Avenue, Suite 100, Tustin, CA 92780.

On July 22, 2011, I served the following document(s) described as:

- **DECLARATION OF NONMONETARY STATUS OF DEFENDANT ASSURED LENDER SERVICES, INC. [*CCP § 2924l*] TO COMPLAINT**

on all interested parties in this action by placing a true copy thereof enclosed in sealed envelopes addressed as follows:

**Richard Jacobs**
LAW OFFICES OF GENE W. CHOE, P.C.
3699 Wilshire Blvd., Suite 720
Los Angeles, CA 90010
(Counsel for Plaintiff)

**Moses A. Cohen**
UFAN Legal Group, P.C.
1490 Stone Point Drive, Suite 100
Roseville, CA 95661
(Counsel for Plaintiff)

**Fidelity National Law Group**
915 Wilshire Blvd, Suite 2100
Los Angeles, CA 90017
(Counsel for Defendant)

☒ **By United States mail**: I enclosed the document(s) in a sealed envelope or package addressed to the persons noted above and (specify one):

☐ I deposited such envelope in the United States Mail at Tustin, California, with postage thereon fully prepaid.

☒ I placed the envelope for collection and mailing on the date and at the place shown above following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the

same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

☐ **By overnight delivery.** I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons listed above.  I placed the envelope or    package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

☐ **By fax transmission.**  Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed above.  No error was reported by the fax machine that I used.  A copy of the record of the fax transmission, which I printed out, is attached.

☐ **By e-mail or electronic transmission.**  Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.


I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.


Executed on July 22, 2011, at Tustin, California.



Candice M. Ledford

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| KATHRYN O. SMITH and MICHAEL W. BALL | WELLS FARGO BANK, N.A.; MARIX SERVICES; FIDELITY NATIONAL TITLE INS., CO.; and ASSURED LENDER SERVICES, INC. |
| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br>Moses A. Cohen, Esq., UFAN Legal Group P.C.<br>1490 Stone Point Dr., Suite 100, Roseville, CA 95661<br>Tel: (877) 791-2247 | Attorneys (If Known)<br>Suzanne S. Storm, Esq.<br>ATTLESEY \| STORM, LLP<br>2552 Walnut Avenue, Suite 100, Tustin, CA 92780<br>Tel: (714) 508-4949 |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

- ☐ 1 U.S. Government Plaintiff
- ☑ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☐ 1 Original Proceeding ☑ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify): ☐ 6 Multi-District Litigation ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☑ No **☐ MONEY DEMANDED IN COMPLAINT: $**____________

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Fair Credit Reporting Act, 15 U.S.C. §1681, et seq., Home Ownership and Equity Protection Act, 15 U.S.C. §1639 et seq., Truth In Lending Act, 15 U.S.C. §1601 et seq.

**VII. NATURE OF SUIT (Place an X in one box only.)**

OTHER STATUTES
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☑ 890 Other Statutory Actions
- ☐ 891 Agricultural Act
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Info. Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

TORTS — PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Fed. Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury-Med Malpractice
- ☐ 365 Personal Injury-Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

IMMIGRATION
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus-Alien Detainee
- ☐ 465 Other Immigration Actions

TORTS — PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

CIVIL RIGHTS
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/Accommodations
- ☐ 444 Welfare
- ☐ 445 American with Disabilities - Employment
- ☐ 446 American with Disabilities - Other
- ☐ 440 Other Civil Rights

PRISONER PETITIONS
- ☐ 510 Motions to Vacate Sentence Habeas Corpus
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus/ Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

FORFEITURE / PENALTY
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety /Health
- ☐ 690 Other

LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS-Third Party 26 USC 7609

CV11-6256

**FOR OFFICE USE ONLY:** Case Number: ________________

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): ____________

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No ☐ Yes
If yes, list case number(s): ____________

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply) ☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Kathryn O. Smith - Los Angeles County<br>Michael W. Ball - Los Angeles County | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Assured Lender Services, Inc. - Orange County<br>Fidelity National Title Ins., Co. - Unknown | Marix Servicing, LLC - Florida<br>Wells Fargo Bank, N.A. - South Dakota |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

*** Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): [signature] **Date** July 26, 2011

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Christina A. Snyder and the assigned discovery Magistrate Judge is Margaret A. Nagle.

The case number on all documents filed with the Court should read as follows:

**CV11- 6256 CAS (MANx)**

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

---

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
**312 N. Spring St., Rm. G-8**
**Los Angeles, CA 90012**

[ ] **Southern Division**
**411 West Fourth St., Rm. 1-053**
**Santa Ana, CA 92701-4516**

[ ] **Eastern Division**
**3470 Twelfth St., Rm. 134**
**Riverside, CA 92501**

Failure to file at the proper location will result in your documents being returned to you.